## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **QUINTON BURNS** *et al.*,<br>              **Plaintiff,**<br><br>     **v.**<br><br>**SEAWORLD PARKS &<br>ENTERTAINMENT, INC., SEAWORLD<br>PARKS & ENTERTAINMENT, LLC AND<br>JOHN DOES 1,2,3, AND 4,**<br>              **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  22-2941** |

## OPINION

Plaintiffs allege that they were racially discriminated against at the Sesame Place Philadelphia amusement park ("Sesame Place") operated by Defendants SeaWorld Parks & Entertainment, Inc. and SeaWorld Parks & Entertainment, LLC (collectively, "SeaWorld"). Specifically, Plaintiffs allege that SeaWorld employees performing in costume as various Sesame Street characters repeatedly refused to interact with Black and Hispanic children during parade and "Meet and Greet" events, instead choosing to hug, wave to, and dance with White children.  Plaintiffs filed this putative class action on their own behalf and on behalf of eighty-nine other families who they contend experienced similar treatment.  They bring claims against SeaWorld under 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of contracts, and for negligence.  They seek monetary damages in excess of $50 million; declaratory relief; and injunctive relief requiring, *inter alia*, that SeaWorld implement "rigorous" anti-discrimination training, educational, and screening policies for its employees.

SeaWorld first moves to dismiss both counts for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Second, SeaWorld moves to dismiss Plaintiffs' claims for injunctive relief pursuant to Rule 12(b)(1), arguing that Plaintiffs have failed to adequately

plead standing for injunctive relief.  Separately, SeaWorld moves to dismiss Plaintiffs who purchased season passes to SeaWorld, the Valdez and Willie Plaintiffs, pursuant to a purported class action waiver.  The Court, having heard argument on May 9, 2023, for the reasons that follow, will grant SeaWorld's Motion as to parts of Plaintiffs' negligence claim and denied otherwise.

## I.   FACTUAL ALLEGATIONS

The following facts are drawn from the Amended Complaint and, for the purposes of this Motion to Dismiss, will be taken as true.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  Plaintiffs are Black and Hispanic parents and their children who visited Sesame Place in 2021 and 2022.[1]  Two of the attractions at Sesame Place are parades and "Meet and Greet" events, in which park patrons can interact with costumed performers appearing as various Sesame Street characters.  When Plaintiffs attempted to participate in these events, the costumed performers ignored and refused to interact with their children while "readily engag[ing] with numerous similarly situated white customers and their children[.]"  The Amended Complaint does not name any individual Sesame Place employees involved in the incidents, but does identify the following Sesame Street characters: Elmo, Ernie, Telly Monster, Abby Cadabby, Rosita, Big Bird, Grover, Baby Bear, Zoey, and Cookie Monster.  Plaintiffs recorded portions of these interactions on video and provide links to these videos in the Amended Complaint.

---

[1] Each Plaintiff family alleges they experienced the alleged discrimination on different days.  The Valdez Plaintiffs visited Sesame Place on December 29, 2021; the Burns Plaintiffs on June 18, 2022; the Valette Plaintiffs on June 20, 2022; the Miles Plaintiffs on June 24, 2022; the Romero Plaintiffs on June 25, 2022; the Fleming Plaintiffs on July 4, 2022; the Willie Plaintiffs on July 10, 2022; and the Morales Plaintiffs on July 11, 2022.

## II.   DISCUSSION

### A.  Rule 12(b)(6)

#### i.   *Legal Standard and Documents Considered*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  At this stage, the Court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  Yet, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 663.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  However, a court may also "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Id.*  Here, SeaWorld attached to its Motion copies of the tickets and season passes that Plaintiffs purchased to Sesame Place, and Plaintiffs do not challenge the authenticity of these documents.[2]

---

[2] SeaWorld states that it "has been unable to locate tickets for the Miles or Valette families or for M.L. (child of Katie Valdez) for the dates in the Amended Complaint."  According to SeaWorld, "[t]his could mean that the families did not purchase tickets on those days or that they purchased physical tickets at Sesame Place rather than

Additionally, because the season passes purchased by certain Plaintiffs contain the text "Please refer to EZpay terms and conditions," SeaWorld also attached a copy of the "EZ Pay Terms and Conditions."  As the tickets and season passes form the basis of Plaintiffs' claims, they are incorporated by reference into the Amended Complaint and can be considered by the Court to decide this Motion.  *See id.*  However, the EZ Pay Terms and Conditions will not be.  The copy of the Terms and Conditions attached by SeaWorld provides that "BY ENTERING THIS SITE YOU ACKNOWLEDGE AND AGREE TO THE FOLLOWING TERMS AND CONDITIONS. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT USE THIS SITE," presumably referring to the website identified by URL at the bottom of the document (seaworldentertainment.com).  But the Amended Complaint does not specify whether any Plaintiff purchased tickets online, as opposed to in person.  SeaWorld's inclusion of the Terms and Conditions rests upon an assumption that the Plaintiffs' purchased tickets online—an assertion that is not found in the Complaint.  Accordingly, given the motion-to-dismiss rubric, the Terms and Conditions shall not be considered here.

### ii.   *Section 1981*

Section 1981, passed as part of the Civil Rights Act of 1866, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a). "Make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  Essentially, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial

---

purchasing their tickets online."

discrimination impairs an existing contractual relationship, so long as the plaintiff has or would

have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v.*

*McDonald¸* 546 U.S. 470, 476 (2006).

> To state a claim under Section 1981:
>
> [A] plaintiff "must allege facts in support of the following elements: (1) [that
> plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of
> race by the defendant; and (3) discrimination concerning one or more of the
> activities enumerated in the statute[,] which includes the right to make and enforce
> contracts. . . ."

*Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).  Additionally, "a plaintiff

must initially plead and ultimately prove that, but for race, it would not have suffered the

loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,

140 S. Ct. 1009, 1019 (2020).

> a. Existence of a Contract

SeaWorld first argues that Plaintiffs' Section 1981 claim fails because, by basing their

claims on the purchase of admissions tickets, they have failed to allege the existence of a

contract,[3] in that tickets are not contracts but are instead classified as "revocable licenses."

Therefore, as Section 1981 requires interference with a contractual right, SeaWorld argues that

Plaintiffs have not stated a claim.

This argument is not a basis for dismissal given *Valle v. Stengel*, 176 F.2d 697 (3d Cir.

1949) in which the Third Circuit held that ticket purchases can give rise to a Section 1981 claim.

In *Valle*, the plaintiffs were a group of Black and White individuals who attempted to patronize a

New Jersey amusement park.  176 F.2d at 699.  The park "admitted members of the public upon

---

[3] Although the Amended Complaint does not directly identify Plaintiffs' admission tickets as the contracts
underlying the Section 1981 claim, their counsel clarified during argument that Plaintiffs maintain that the tickets
are the contracts they allege here.

the payment of fees." *Id.* It also "contained a swimming pool and persons who were admitted to the park were admitted to the pool upon the payment of an additional fee." *Id.* Although the plaintiffs had "duly purchased ticket[s]" to the pool, they were denied entry to the pool and ejected from the park "on the ground that the party included Negroes." *Id.* Plaintiffs brought a number of claims, including one under an earlier version of Section 1981 then referred to as "Section 1977,"[4] against the park's corporate proprietor, park managers, and the chief of police who allegedly aided in their ejection. *Id.* Specifically, they alleged that the defendants violated their rights under Section 1977 by refusing "to permit the plaintiffs to make contracts (i.e. to purchase tickets) for the use of the swimming pool" and refusing "to honor contracts (i.e., swimming pool tickets, 'duly purchased')" because of the plaintiffs' race. *Id.* After the district court dismissed the complaint, the Third Circuit reversed and held that plaintiffs stated a claim for violations of their rights under "the Civil Rights Acts," which included Section 1977. *Id.* at 703-04.

Federal courts in other jurisdictions have more recently come to the same conclusion. *See Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir. 1974) (Section 1981 "has been interpreted to require swimming pool owners and operators to sell tickets of admission to blacks." (citing, *inter alia*, *Valle v. Stengel*)); *Scott v. Young*, 421 F.2d 143, 145 (4th Cir. 1970) ("The Timberlake proprietors bestow the right of admission in return for a fee. This is unquestionably a contract. Refusal to extend the same contractual opportunity to blacks is, as the

---

[4] Section 1977, which was codified at 8 U.S.C. § 41 when *Valle* was decided, provided that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* at 700 n.11; 8 U.S.C. § 41 (1946).

District Court decided, a violation of 42 U.S.C. § 1981." (internal citations omitted)); *Anderson v. Tierco Md., Inc.*, 2000 WL 783072, at *1, 3 (D. Md. June 7, 2000) (denying motion to dismiss Section 1981 claims based on plaintiffs' purchase of admission to a Six Flags amusement park); *Williams v. Kansas City*, 104 F. Supp. 848, 859 (W.D. Mo. 1952) (rejecting the argument that plaintiffs could not bring Section 1981 claims based on admissions tickets because "it is rather universally held that a ticket holder to a place of amusement 'may maintain an action for breach of contract' thereon when he is refused admittance after purchase").

Moreover, SeaWorld's reliance on the "revocable license" theory of tickets does not support their argument that ticket purchases cannot give rise to contractual rights. SeaWorld cites *Kennedy Theater Ticket Service v. Ticketron, Inc.*, a case in which the court observed, as part of an analysis of whether the sale of tickets qualifies as a "commodity" under the Robinson-Patman Act, that "[a]dmission tickets have been uniformly defined as revocable licenses." 342 F. Supp. 922, 925-26 (E.D. Pa. 1972). However, as Plaintiffs note, in full context the portion of *Kennedy Theater Ticket Service* that SeaWorld cites undermines its point. Immediately following the statement that tickets are revocable licenses, the court went on to quote an Oregon case that held:

> It is true [a ticket] constitutes a contract between the proprietor and the purchaser of the ticket, and whatever contractual duties grow out of such relation the proprietor is bound to perform or respond in damages for breach of his contract, but he is not liable in an action for trespass or in tort.

*Id.* (quoting *Taylor v. Cohn*, 84 P. 388, 388 (Or. 1906)). SeaWorld argues that this quotation can be disregarded, as Oregon Supreme Court cases are not binding on this Court. However, *Kennedy Theater Ticket Service* also cited a United States Supreme Court case, *Marrone v. Washington Jockey Club of the District of Columbia*, in support of its classification of tickets as revocable licenses. And *Marrone* made the same point that the Oregon case *Taylor* did—

although classifying tickets as licenses renders tort remedies unavailable, a ticket purchase does create a contract:

> ***The fact that the purchase of the ticket made a contract is not enough.***  A contract binds the person of the maker, but does not create an interest in the property that it may concern, unless it also operates as a conveyance.  The ticket was not a conveyance of an interest in the race track, not only because it was not under seal, but because by common understanding it did not purport to have that effect.  There would be obvious inconveniences if it were construed otherwise.  But if it did not create such an interest, that is to say, a right *in rem*, valid against the landowner and third persons, the holder had no right to enforce specific performance by self-help.  ***His only right was to sue upon the contract for the breach.***  It is true that if the contract were incidental to a right of property either in the land or in goods upon the land, there might be an irrevocable right of entry; but when the contract stands by itself, it must be either a conveyance or a license, subject to be revoked.

227 U.S. 633, 636-37 (1913) (emphasis added).  The Pennsylvania Supreme Court has come to the same conclusion:

> When [a proprietor] sells a ticket he creates contractual relations with the holder of it, and whatever duties on his part grow out of these relations he is bound to perform, or respond in damages for the breach of his contract. . . . [A] theater ticket is to be regarded as a mere license, for the revocation of which, before the holder has actually been given his seat and has taken it, the only remedy is in assumpsit for the breach of the contract.

*Horney v. Nixon*, 61 A. 1088, 1089-90 (Pa. 1905).

In other words, the "revocable license theory" concerns the scope of the ticketholder's right to be present on land and, therefore, the question of whether they are entitled to tort remedies if removed from the premises.  It does not establish that tickets cannot create contractual rights.  Plaintiffs' Section 1981 claim will not be dismissed on the grounds that it is based on their ticket purchases.

> b.  Impairment of a Contractual Right

SeaWorld next argues that Plaintiffs fail to state a Section 1981 claim because they were not entitled to interactions with the character performers who allegedly ignored them, and they therefore have not alleged the impairment or denial of a contractual right.  "[I]n order to satisfy

the foundational pleading requirements for a suit under section 1981, a retail customer must allege that he was actually denied the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a race-based animus." *Garrett v. Tandy Corp.*, 295 F.3d 94, 100-01 (1st Cir. 2002) (citing *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10th Cir. 2001); *Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996)).

But the interpretation of the Amended Complaint's allegations offered in SeaWorld's Motion (that it rests on a theory that Plaintiffs were entitled to—but did not get—interactions with the character performers), tells only half the story.  Plaintiffs make two allegations in their Complaint regarding SeaWorld's obligations to provide interactions with character performers.  First, they allege that "SeaWorld's costumer character performers were obligated to not refuse to, *on the basis of race* interact with SeaWorld's customers. . . . "  (emphasis added)  Second, they allege that Plaintiffs "were entitled to SeaWorld's performance of the contract by way of its costume character performers to interact with" their children.  Plaintiffs' counsel clarified at the hearing, however, that despite including the second allegation, Plaintiffs are not alleging that they were contractually guaranteed interactions with the performers.  Instead, the crux of Plaintiffs' contentions, as relevant on a motion to dismiss, is that interactions were refused to minority patrons, but freely given to White patrons.

Primarily in response to this second argument, SeaWorld highlights a disclaimer in the Burns Plaintiffs' tickets that park content is "subject to change without notice" to argue that Plaintiffs were not entitled to participate in any particular park activity.  However, it concedes— correctly—that it could not contract itself out of Section 1981 liability by reserving the right to

change the terms or availability of park content in violation of anti-discrimination laws.[5]  *See Rockwell v. Pa. State Horse Racing Comm'n*, 327 A.2d 211, 212-13 (Pa. Commw. 1974) (The right of private enterprises to refuse service "has been made subject now, of course, to civil rights statutes which prohibit the exclusion of persons from all places of public accommodation when such exclusion is based solely on the race . . . of the persons seeking admission."); *Barfield v. Com. Bank, N.A.*, 484 F.3d 1276, 1280 (10th Cir. 2007) (holding that a Black plaintiff stated a Section 1981 claim where a bank refused his request to make change for a $50 bill, but did make change for White customers); *McCaleb v. Pizza Hut of Am., Inc.*, 28 F. Supp.2d 1043, 1047-48 (N.D. Ill. 1998) (finding that plaintiffs were denied the full enjoyment of their contract even though they were "provided their pizza and permitted to eat it" because defendants "failed to provide them with the proper utensils" and "created a disturbing atmosphere"); *Perry v. Burger King Corp.*, 924 F. Supp. 548, 550-52 (S.D.N.Y. 1996) (denying summary judgment on plaintiff's Section 1981 claim alleging he was denied use of restaurant's bathroom after finishing his meal); *cf. Arguello v. Conoco, Inc.*, 330 F.3d 355, 360-61 (5th Cir. 2003) ("[D]ining at a restaurant generally involves a contractual relationship that continues over the course of the meal and entitles the customer to benefits in addition to the meal purchased.").

Additionally, SeaWorld argued in its Motion that Plaintiffs' allegations were not cognizable under Section 1981 because they appeared to be premised on subjective satisfaction with the park experience.  SeaWorld interpreted Plaintiffs' allegations that they were deprived of the "enjoyment" of park attractions—for example, when Plaintiffs allege they contracted with SeaWorld for "the benefit and privilege of enjoyment of the amusement rides"—to mean Plaintiffs brought this suit to remedy feelings of disappointment.  Plaintiffs' attorney clarified at

---

[5] Moreover, this language only appears on the Burns Plaintiffs' two-day tickets, and not in the tickets or passes purchased by other Plaintiffs.

the hearing that they mean "enjoyment" in a narrower, more objective sense—their right to avail themselves of contractual rights.  SeaWorld agrees that this use of the word comports with the text of Section 1981, which protects the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

However, SeaWorld continues to argue that Plaintiffs' tickets entitled them to nothing more than entrance to the park and access to its attractions, relying on *Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2010).  *Mayer*, a case arising from the NFL "Spygate" scandal, did not involve a Section 1981 claim and is distinguishable.  In *Mayer*, the crux of the plaintiff's claim was that New York Jets ticketholders had contracted for tickets "to observe an honest match played in compliance with all laws, regulations and NFL rules" and were deprived of that interest by the New England Patriots' cheating.  *Id.* at 225.  The Third Circuit disagreed, holding that the plaintiff had contracted to observe specified NFL games, which he did.  *Id.* at 236.  Plaintiffs' claims here are not that they were merely disappointed with the quality of the interactive events, but that Sesame Place provides minority patrons with a markedly different experience than White patrons.  In *Mayer*, which made no allegation of differential or discriminatory treatment, all ticketholders observed the same game.  Here, Plaintiffs allege that White child participants in "Meet and Greets" and parades received interactions with Sesame Street characters, while minority children received the furry cold shoulder.

SeaWorld also argues that Plaintiffs' theory of harm would lead to unbounded liability under Section 1981, analogizing Plaintiffs' claims to a hypothetical situation in which a Black customer "wanted an ice cream cone and stood in line only to find that the vendor just sold the last ice cream cone to a white customer[.]"  The analogy is inapt, as Section 1981's requirement that plaintiffs show intentional racial discrimination would preclude such a claim.  *See, e.g.*,

11

*Lizardo v. Denny's Inc.*, 2000 WL 976808, at *4 (N.D.N.Y. July 13, 2000) (holding that Asian-American plaintiffs who alleged White customers were seated before them did not state a Section 1981 claim because the White customers were a smaller party, and the table would not have accommodated plaintiffs' larger party).  Plaintiffs have alleged more than that (a) they were denied interactions with costumed characters for race-neutral reasons like the one posited in SeaWorld's hypothetical, and (b) they are racial minorities.  Rather, their allegations are that the costumed characters repeatedly ignored minority children while engaging with similarly situated White children—*i.e.*, they were denied a benefit of their contract because of racial discrimination, and SeaWorld performs its contracts with its White and minority patrons on different terms.  *See Hall v. Pa. State Police*, 570 F.2d 86, 92 (3d Cir. 1978) (reversing dismissal of Section 1981 claim premised on defendant bank's policy of taking security photographs of entering Black customers, which constituted "offer[ing] its services under different terms dependent on race"); *Brown*, 250 F.3d at 797 (affirming dismissal of plaintiffs' Section 1981 claim because "[s]ignificantly, Black Smokers do not allege that the mentholated tobacco products sold to African-Americans differ from those sold to whites").  Accordingly, the analogy offered up by SeaWorld as modified for the allegations made here would be that a Black customer wanted an ice cream cone and stood in line only to find upon reaching the front of the line that although there was a freezer full of ice cream still to be sold, the purveyor refused to sell it to him or any other Black person in line—choosing to sell only to the White people in line.  At this stage, Plaintiffs have adequately alleged the impairment of a contractual interest for their Section 1981 claim to proceed.

c. Adequacy of Comparators

In addition to alleging that Plaintiffs were not deprived of a contract interest, SeaWorld argues that Plaintiffs have failed to adequately allege that racial discrimination was the but-for cause of their injuries—*i.e.*, that they were denied interactions with character performers because of their race, as required by Section 1981. *See Comcast Corp.*, 140 S. Ct. at 1018. SeaWorld does not contest that Plaintiffs may show intentional discrimination through "comparator" evidence, meaning favorable treatment of similarly situated White customers. *See Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)) (At the pleading stage, an inference of racial discrimination can "be supported in a number of ways, including, but not limited to, comparator evidence. . . . "). Instead, it provides a strained and overly semantic reading of Plaintiffs' allegations to argue they have not actually alleged that the characters who ignored them interacted instead with White patrons. This reading is not a basis to dismiss Plaintiffs' Section 1981 claim.

Each Plaintiff family's allegations focus on a particular costumed performer's refusal to interact with their children. The Fleming family, for example, alleges that the performer dressed as Telly Monster "intentionally refused to perform SeaWorld's contract with the Flemings and the Class by, *inter alia*, refusing to engage with them." Plaintiffs then allege that, in contrast, Sesame Place's costumed performers collectively "readily engaged with numerous similarly situated white customers and their children" participating in the Meet and Greets and parades. Read together, Plaintiffs are clearly alleging that the particular character that ignored them (*e.g.*, Telly Monster), along with the other performers, readily engaged with White customers. SeaWorld, however, would narrowly parse the allegations to require that Plaintiffs specifically reiterate that Telly Monster, or whichever specific characters each Plaintiff focuses on, interacted

with White children after ignoring the child Plaintiffs.  Otherwise, they contend, Plaintiffs would conflate the actions of separate performers and seek to hold, for example, Telly Monster responsible for Big Bird's actions.  Given that Plaintiffs broader allegation that Sesame Place performers readily engaged with White children—a group that includes the individual performers named as refusing to interact with Plaintiffs—meets their pleading burden, the exercise SeaWorld suggests is unwarranted, at least on a motion-to-dismiss standard. SeaWorld's Motion will be denied as to Plaintiffs' Section 1981 claim.

    *iii.*    **Negligence**

      Plaintiffs' second cause of action alleges that SeaWorld was negligent under five theories: (1) premises liability, by "[f]ailing to provide a reasonably safe premises for all business invitees, including Plaintiffs and Class Members"; (2) negligence *per se*, by "[v]iolating the standards set forth by applicable state, federal, and local regulations and codes against discriminatory conduct, including 42 U.S.C. § 1981, and Pennsylvania Human Relations Act 42 P.S. §§ 953, 954"; (3) negligent hiring by, for example, "[f]ailing to screen and perform background checks [of] potential employees to ensure that no employee has a propensity for racial discrimination"; (4) negligent training by, for example, "[f]ailing to use, require and enforce policies and procedures that ensure the . . . training of employees who do not engage in racial discrimination"; and (5) negligent supervision by, for example, "[f]ailing to monitor its employees."  During the May 9 hearing on this Motion, Plaintiffs withdrew their premises liability theory.

      Under Pennsylvania law, "[t]o establish a cause of action in negligence, the plaintiff must demonstrate that [1] the defendant owed a duty of care to the plaintiff, [2] the defendant breached that duty, [3] the breach resulted in injury to the plaintiff, and [4] the plaintiff suffered

an actual loss or damage." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998).  Plaintiffs premise

their negligence claim on the assertion that SeaWorld "assumed a duty to provide a park

experience that is free of discrimination based upon race or color."  SeaWorld argues that there is

no such duty in negligence recognized under Pennsylvania law and, therefore, the negligence

claim must be dismissed.  *See Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994) ("Any action in

negligence is premised on the existence of a duty owed by one party to another.").  Because

Plaintiffs premise their claim on multiple theories of negligence liability, and Pennsylvania

courts have outlined different frameworks defining the duty owed under each of them, each

theory will be addressed separately below.

a.   Negligence *Per Se*

Plaintiffs allege that SeaWorld is liable for negligence because it violated federal and

state anti-discrimination laws, including Section 1981.  This theory of liability is based on the

doctrine of negligence *per se*, which provides that the violation of "an applicable statute,

ordinance, or regulation designed to prevent a public harm" establishes "the elements of duty and

breach of duty" in a negligence claim.  *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super.

2014) (quoting *Mahan v. Am-Gard, Inc.,* 841 A.2d 1052, 1058-59 (Pa. Super. 2003)).

Negligence *per se* allows the violation of a statute to serve as evidence of a breach of

duty if four requirements are met:

> (1) The purpose of the statute must be, at least in part, to protect the interest of a
> group of individuals, as opposed to the public generally;
> (2) The statute or regulation must clearly apply to the conduct of the defendant;
> (3) The defendant must violate the statute or regulation;
> (4) The violation of the statute or regulation must be the proximate cause of the
> plaintiff's injuries.

*Id.*

An applicable statute, meaning one that can serve as the basis for a negligence *per se*

claim, then, is one that "clearly indicate[s] an intention to protect specific groups from specific types of harm." *Id.* at 1075. Here, Section 1981 is such a statute. *See Hassett v. Dafoe*, 74 A.3d 202, 216 (Pa. Super. 2013) ("A federal regulation may establish the standard of care appropriate to the underlying tort of negligence *per se* under state tort law.").[6] It is "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987), in the making and enforcing of contracts, 42 U.S.C. § 1981(a). And, as discussed above, Plaintiffs have adequately alleged the additional requirements for a negligence *per se* claim—that Section 1981 applied to SeaWorld's conduct, that SeaWorld violated Section 1981, and that the violation caused Plaintiffs' alleged injuries.[7] SeaWorld's Motion will be denied as to Plaintiffs' negligence *per se* theory.

### b.  Negligent Hiring

Plaintiffs next allege that SeaWorld was negligent in its hiring practices because it failed to implement screening and background check procedures to ensure that prospective employees did not have "a propensity for racial discrimination." Under Pennsylvania law an employer is

---

[6] The case SeaWorld relies on in arguing that Plaintiffs cannot use evidence of a Section 1981 violation to establish the duty element of their negligence claim, *Levin v. Dollar Tree Stores, Inc.*, 2006 WL 3538964 (E.D. Pa. Dec. 6, 2006), is inapposite. In *Levin*, the plaintiff alleged he was physically injured by a curb at the defendant's store and sued the defendant for negligence. 2006 WL 3538964, at *1. The *Levin* court held that the plaintiff could not use violations of the Americans with Disabilities Act (the "ADA") as proof of a breach of duty because the ADA makes "no mention of promoting safety or eliminating hazards," and is instead concerned with preventing discrimination. *Id.* at *3. "While evidence that a condition was in violation of a safety statute" would have been relevant to the plaintiff's claim, "[t]he ADA has no bearing on whether there was a dangerous condition on the property of which defendants knew or should have known." *Id.* In other words, the focus of the statute the *Levin* plaintiff attempted to use for his negligence *per se* claim (discrimination) and the duty he invoked (preventing physical injury) did not correspond. Plaintiffs' claim here does not present a similar problem, as the duty they put forth and the focus of the statute they invoke are the same—racial discrimination.

[7] Negligence *per se* allows the violation of a statute to establish the duty and breach elements of a negligence claim. To recover, a plaintiff must further prove "that [the defendant's] negligence was the proximate cause of the injury suffered." *Schemberg*, 85 A.3d at 1074. Plaintiffs here allege that the injury they suffered was "endur[ing] blatant, public and demeaning racial discrimination." SeaWorld only challenges the duty element of Plaintiffs' negligence claim and has presented no argument that Plaintiffs have inadequately pled causation,

liable for negligent hiring if: "[1] he knew or should have known that his employee had a propensity for violence and [2] such employment might create a situation where the violence would harm a third person." *Coath v. Jones*, 419 A.2d 1249, 1250 (Pa. Super. 1980). An employer also "may be negligent for the failure to exercise reasonable care in determining an employee's propensity for violence." *Id.* (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418 (Pa. 1968)).

In *Dempsey*, the Pennsylvania Supreme Court affirmed the dismissal of a negligent hiring claim based on allegations that the plaintiff was assaulted by a fellow employee, who "pulled [plaintiff] out of his chair, bent him over backwards and pinioned him, with his knee in [plaintiff's] back, for several minutes despite his protests," and limited negligent hiring claims to violent or physically dangerous employee conduct. 246 A.2d at 419. The court framed the issue as one of whether the employee's prior conduct indicated that the employer "did not exercise reasonable care in its selection and should not have hired a person inclined to violence." *Id.* In reviewing the history of negligent hiring claims based either on common law or the Restatement (Second) of Torts § 317, the court repeatedly highlighted that negligent hiring claims evaluate an employee's propensity for violence, inflicting injury, or physically dangerous behavior. The court discussed, for example, the statement in *Najera v. Southern Pacific Co.*, 13 Cal. Rptr. 146, 148 (Cal. Dist. Ct. App. 1961), that "the knowing Employment of a dangerous employee who inflicts injury upon a fellow employee constitutes a common law tort on the part of the employer," *id.* at 421; the instruction in *Dincher v. Great Atlantic & Pacific Tea Co.*, 51 A.2d 710, 714 (1947) that liability required that an "employee not only had exhibited a violent temper at times but that it was accompanied by acts of violence on his part and that the employer 'knew, or in the exercise of ordinary care, should have known of such violent and reckless conduct on

17

(the employee's) part,'" *id.*; and the holding in *Fletcher v. Baltimore & Potomac R. Co.*, 168 U.S. 135, 141 (1897) that an employer has a "duty to see that its employees do not act in a manner dangerous to other persons," *id.* at 422.  *See also id.* at 420-21 (summarizing *Frazier v. Pennsylvania Railroad Co.*, 38 Pa. 104 (1858) in which an railroad company was held liable for an accident "because it had, knowingly or negligently, employed a conductor who was careless" and *Rosenstiel v. Pittsburgh Railways Co.*, 79 A. 556 (Pa. 1911), in which a railroad was held liable for an employee's accidental killing caused by an employee who "was incompetent and careless and [whose] incompetency and carelessness was known").  Ultimately, the *Dempsey* court affirmed the trial court's findings that the assaulting employee's conduct had not put the defendant-employer "on notice of any dangerous propensity" on his part.  *Id.* at 423.  Although the employee's conduct constituted "horse-play," it could not support liability because it "did not show a propensity . . . which was vicious or dangerous and which indicated that he intended to inflict injury upon others."  *Id.*

This limitation of negligent hiring claims to violent propensities has been followed for the most part by Pennsylvania's intermediate appellate courts.  *See Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. 2000) (citing *Dempsey*) ("[A]n employer may be held negligent for the failure to exercise reasonable care in determining an employee's propensity for violence in an employment situation where the violence would harm a third person."); *Costa v. Roxborough Mem'l. Hosp.*, 708 A.2d 490, 496-97 (Pa. Super. 1998) (citing *Dempsey*) (analyzing whether an employer "knew or had reason to know of any actions on [its employee's] part which indicated a propensity for violence or physical assault upon others, or that a more extensive hiring procedure would have uncovered such behavior").  In one case, the Pennsylvania Superior Court has appeared to expand the potential scope of negligent hiring claims beyond physical

violence to conduct for which an employee could be found liable more generally.  *See Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 108-09 (Pa. Super. 1998) (analyzing whether an employer was negligent in failing to perform a background check of an employee who later perpetrated an investment scam if the employee's conduct "indicate[d] a propensity for illegal activity").  However, on matters of Pennsylvania law, this Court is "bound by the Pennsylvania Supreme Court's interpretation of current state law."  *Barradas Jacome v. Att'y Gen. U.S.*, 39 F.4th 111, 124 (3d Cir. 2022) (citing *Johnson v. United States*, 559 U.S. 133, 138 (2010)).  Therefore *Dempsey*, which grounds negligent hiring liability in an employee's propensity for *violence*, controls.

Plaintiffs' allegations do not concern any propensity for violence in SeaWorld's employees.  Instead, they concern the employees' "propensity for racial discrimination."  As a result, Plaintiffs' negligence claim will be dismissed with prejudice to the extent it is based on a negligent hiring theory.

### c.   Negligent Training

Plaintiffs' next set of allegations concerns SeaWorld's failure to train its employees to avoid and recognize racial discrimination and implicit bias.  Plaintiffs allege SeaWorld was negligent by failing to train its employees "to avoid racial discrimination in customer interactions," "to recognize incidents of racial discrimination between employees and customers," "to document and report incident[s] of racial discrimination between employees and customers," "to recognize employees who are engaged in racial discrimination of customers," and by failing to "educate employees about racial discrimination and/or implicit bias."  Pennsylvania courts have not outlined a specific framework for analyzing a negligent training claim, separate from the general negligence framework of "duty, breach, causation, damages."

*See Oldham v. Pa. State Univ.*, 2022 WL 1528305, at *24 (M.D. Pa. May 13, 2022).  A negligent

training claim therefore requires a plaintiff to "assert that the defendant employer had a duty to

train its employees on a particular issue." *Bracke v. SiteOne Landscape Supply, LLC*, 2022 WL

1128951, at * 2 (E.D. Pa. Apr. 15, 2022).  Because liability for negligent training "exists only if

all the requirements of an action of tort for negligence exist," *Brezenski*, 755 A.2d at 42 (quoting

Restatement (Second) of Agency § 213 cmt. a (Am. L. Inst. 1958)), the duty to train is limited to

"those issues that could themselves give rise to a cause of action for negligence." *Bracke*, 2022

WL 1128951, at *2.  In *Bracke*, for example, the plaintiffs alleged that the defendant's "failure to

train its employees on proper retail theft procedure" led to the filing of a false police report.  *Id.*

This was an inadequate basis for a negligent training claim as "Pennsylvania law makes clear

that there is no cause of action for the negligent reporting of a crime or the negligent initiation of

criminal proceedings." *Id.*

      SeaWorld argues that no duty to train applies to the alleged failures listed in the

Amended Complaint.  Plaintiffs, for their part, have offered no argument that either a duty to

train employees to avoid or recognize racial discrimination exists under Pennsylvania law, or that

independent negligence liability would exist for the underlying employee conduct of racially

discriminating or failing to recognize racial discrimination against customers.  In total, Plaintiffs

devoted just over one double-spaced page of their Response to their negligence claim, and cited a

single case—a Third Circuit decision reciting the uncontroversial rule that facts alleged in the

complaint are taken as true for the purposes of a motion to dismiss.  *See Malleus v. George*, 641

F.3d 560, 563 (3d Cir. 2011).  They offered no substantive engagement with SeaWorld's

argument that they had not identified a cognizable duty beyond stating that the Amended

Complaint "establishes that Plaintiffs are alleging a duty owed to them by Defendants."  But as

"[t]he existence of a duty is a question of law for the court to decide," *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005), the assertion that a duty exists cannot simply be taken at face value.  When pressed during the May 9 hearing to identify the source of the duty underlying the negligent training claim, Plaintiffs' counsel cited Section 219 of the Restatement (Second) of Agency, which establishes the general principle that "[a] master is subject to liability for the torts of his servants" under certain circumstances.  Restatement (Second) of Agency § 219 (Am. L. Inst. 1958).  The broad statement that employers can be held vicariously liable for some employee actions does not provide an answer to the question raised here—whether Pennsylvania law imposes a duty on employers to train their employees to avoid and recognize racial discrimination against customers.

Arguments "consisting of no more than a conclusory assertion" lacking supporting citations "will be deemed waived."  *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997); *see Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp.2d 506, 511 n.8 (E.D. Pa. 2007) ("Courts in this District have consistently held the failure to cite any applicable law is sufficient to deny a motion as without merit because 'zeal and advocacy is never an appropriate substitute for case law and statutory authority in dealings with the Court.'  These same rationales applicable to briefs in support of motions are equally applicable to opposition briefs." (internal citations omitted)); E.D. Pa. Local Civ. R. 7.1(c) (requiring that "[e]very motion not certified as uncontested . . . shall be accompanied by a brief containing a concise statement of the legal contentions **and authorities relied upon** in support" (emphasis added)).  As Plaintiffs have made no coherent response to SeaWorld's argument that this asserted duty does not exist under Pennsylvania law, Plaintiffs' negligence claim will be dismissed with prejudice to the extent it is based on a negligent training theory.

d.  Negligent Supervision

Finally, Plaintiffs allege SeaWorld negligently supervised its employees by "[f]ailing to monitor its employees," enacting policies that "encouraged and rewarded racial discrimination in customer interactions," and failing to properly discipline employees who engaged in discrimination.[8]  Further, Plaintiffs repeatedly allege in their Complaint that the employee conduct underlying their negligence claim occurred "within the course and scope of [the employees'] employment and/or authority," allegations inconsistent with a negligent supervision claim:

> To recover for negligent supervision under Pennsylvania law, a plaintiff must prove that his loss resulted from (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting ***outside the scope of his employment***, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee.

*Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013) (emphasis added) (citing *Dempsey*, 246 A.2d at 420; *Heller*, 713 A.2d at 107-08).

Given Plaintiffs' allegations that the employees acted within the scope of their employment, a claim for negligent supervision cannot survive and shall be dismissed without prejudice.

**B.  Rule 12(b)(1)**

In addition to arguing that Plaintiffs fail to state a claim under Rule 12(b)(6), SeaWorld argues that Plaintiffs' claims for injunctive relief should be dismissed pursuant to Rule 12(b)(1) because they do not have standing to obtain injunctive relief.

---

[8] Plaintiffs also allege that SeaWorld negligently retained employees by "[f]ailing to fire" or "take any corrective actions against employees that engage in racial discrimination against customers, including Plaintiffs."  The Pennsylvania Supreme Court has indicated that allegations of negligent retention should be analyzed under the negligent supervision framework, as "[t]here may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant."  *Dempsey*, 246 A.2d at 420 (quoting Restatement (Second) of Torts § 317 cmt. c).

### i.    *Legal Standard*

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  A plaintiff "bears the burden of showing that he has standing for each type of relief sought," including injunctive relief.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  "When, as in this case, prospective relief is sought, the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct."  *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *Lyons*, 461 U.S. at 105).

A facial attack to subject matter jurisdiction, which SeaWorld brings here, "relies solely on the pleadings" and is therefore analyzed under "the same standard of review [used] when assessing a motion to dismiss for failure to state a claim."  *Schuchardt v. President of the U.S.*, 839 F.3d 336, 344 (3d Cir. 2016) (quoting *Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir. 2016)).  The court must therefore "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

### ii.    *Adequacy of Plaintiffs' Allegations*

SeaWorld argues Plaintiffs do not have standing to obtain injunctive relief because they have not alleged facts indicating they are likely to experience discriminatory conduct from SeaWorld or its employees in the future.  More specifically, SeaWorld argues Plaintiffs lack standing because they have not alleged any intention to return to Sesame Place.  SeaWorld bases this argument in a rule drawn from consumer deceptive advertising lawsuits setting out that plaintiffs who do not allege an intention to repurchase a service they claim harmed them cannot

23

establish standing to obtain injunctive relief.  *McNair*, 672 F.3d at 224-26.[9]  This is because, by virtue of filing their lawsuit, those plaintiffs have demonstrated that they are now on notice of the harmful elements they allege.  As, "speaking generally, the law accords people the dignity of assuming that they act rationally, in light of the information they possess," courts cannot presume a likelihood of future harm exists without a more definite articulation by the plaintiffs. *Id.* at 225.

Plaintiffs here can establish standing through the Willie family, who entered Sesame Place on a season pass that had not expired when this lawsuit was filed.  *See id.* at 226 ("[S]tanding is determined at the outset of the litigation[.]").  The season pass purchased by the Willies, which allows for "future visits" to Sesame Place prior to its January 2, 2023 expiration date, indicates a non-speculative intent on their part to return to the park.[10]  Somewhat unusually, Plaintiffs themselves did not themselves attach copies of their tickets or passes to the Amended Complaint, or otherwise quote or reference their terms or text.  It was instead SeaWorld that provided a factual basis for Plaintiffs' alleged future injury by attaching copies of the tickets and season passes purchased by the Plaintiffs to its Motion to Dismiss.  However, as discussed *supra*, Plaintiffs' tickets and passes are "documents referenced" in the Amended Complaint, they can properly be considered in resolving a facial challenge to standing brought under Rule 12(b)(1).

---

[9] In consumer deceptive advertising cases alleging "purely economic" injury, which the Third Circuit has termed "stop me before I buy again" claims, injunctive relief is unavailable even if plaintiffs plead an intention to purchase the product or service in the future.  *In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 293 (3d Cir. 2018).  Here, the injury Plaintiffs allege is the dignitary harm of experiencing "blatant, public and demeaning racial discrimination," which is outside the scope of *In re Johnson & Johnson*.

[10] SeaWorld also argues that Plaintiffs' "allegations make it clear that *they will not* [return], given that they now believe that Sesame Place engages in 'demeaning racial discrimination' against children."  That Plaintiffs have alleged demeaning treatment they would presumably avoid experiencing again does not deprive them of standing, as plaintiffs may establish standing through a pleaded intention to return to a defendant's business "but for the discrimination [they] would experience there."  *Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 787 (3d Cir. 2020).

*Const. Party of Pa.*, 757 F.3d at 358.

"As a general rule, in an injunctive case, [a court] need not address the standing of each plaintiff if it concludes that one plaintiff has standing." *Pennsylvania v. DeJoy*, 556 F. Supp.3d 461, 484 n.33 (E.D. Pa. 2021) (citing *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 n.14 (3d Cir. 2016)). The Willies' season passes therefore suffice to overcome SeaWorld's motion to dismiss for lack of standing, which will be denied.

### C. Valdez and Willie Plaintiffs

Finally, SeaWorld moves to dismiss the Valdez and Willie Plaintiffs, who entered Sesame Place on season passes rather than single-day tickets. SeaWorld argues that the terms and conditions of the season passes contain a class action waiver clause which states: "Any and all disputes, claims, and causes of action arising out of or connected with this contract or the use of any park or membership **SHALL BE RESOLVED INDIVIDUALLY, WITHOUT RESORT TO ANY FORM OF CLASS ACTION.**"  Accordingly, it argues that as these plaintiffs cannot serve as class representatives, they must be dismissed.[11]  Again, as discussed above, *supra*, terms and conditions extrinsic to the tickets and passes referenced in the Amended Complaint cannot properly be considered in deciding this Motion. The season passes attached to SeaWorld's Motion do not themselves include the terms and conditions referenced by SeaWorld, but rather contain the single sentence: "Please refer to EZpay terms and conditions." The EZ Pay Terms and Conditions attached by SeaWorld to its Motion state that customers agree to those Terms and Conditions by "entering this site," presumably referring to

---

[11] Plaintiffs note that SeaWorld tries to have it both ways by arguing that the season passes are not contracts for the purposes of dismissing the Plaintiffs' Section 1981 claims, but their terms and conditions are binding for purposes of enforcing the class action waiver against the Valdez and Willie Plaintiffs.  In its Reply SeaWorld maintains, without elaboration or citation, that these positions are consistent.

seaworldentertainment.com.  As Plaintiffs argue, at this stage in the proceedings it is not possible to determine whether either the Valdez or Willie families did in fact agree to these terms when they purchased their season passes—the Amended Complaint alleges they purchased tickets, without specifying whether online or in person or subject to which collateral agreements.  *See Herman v. SeaWorld Parks & Ent., Inc.*, 320 F.R.D. 271, 280 (M.D. Fla. 2017) ("A customer may purchase an EZ Pay pass to one of SeaWorld's parks in one of three ways: 1) through SeaWorld's website for the particular park; 2) over the phone; or 3) at the gate of the SeaWorld park.").  SeaWorld's Motion will be denied as to the Valdez and Willie Plaintiffs on the basis of the purported class action waiver.

## III.    CONCLUSION

For the reasons set forth above, SeaWorld's Motion will be granted in part and denied in part.  The Motion will be denied as to Plaintiffs' Section 1981 claims, their claims for injunctive relief, and as to the Valdez and Willie Plaintiffs on the basis of the purported class action waiver.  The Motion will be granted in part as to Plaintiffs' negligence claim: it will be granted as to their negligent hiring and negligent training theories, which will be dismissed with prejudice; granted as to their negligent supervision theory, which will be dismissed without prejudice; and denied as to their negligence *per se* theory.

An appropriate order follows.

BY THE COURT:


*/s/ Wendy Beetlestone*
_____

**WENDY BEETLESTONE, J.**

26