**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **QUINTON BURNS,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **SEAWORLD PARKS &** | : | **NO. 22-cv-02941** |
| **ENTERTAINMENT, INC.; and** | : | |
| **SEAWORLD PARKS &** | : | |
| **ENTERTAINMENT LLC,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

---

<u>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     FACTS ....................................................................................................................2

        A.      Sesame Place Tickets and Season Passes ................................................. 2

        B.      Sesame Place Parades and Meet and Greets ............................................. 3

        C.      The Viral Rosita Video .............................................................................. 4

III.    PROCEDURAL HISTORY....................................................................................5

        A.      Plaintiffs' Complaint................................................................................. 5

        B.      Motion to Dismiss...................................................................................... 5

        C.      Discovery ................................................................................................... 6

        D.      Plaintiffs' Motion for Class Certification ................................................ 6

IV.     LEGAL STANDARD.............................................................................................7

V.      DEFENDANTS SHOULD BE GRANTED JUDGMENT ON PLAINTIFFS'
        § 1981 CLAIM.......................................................................................................8

        A.      Summary Judgment Standard for § 1981 Claims ..................................... 8

        B.      Plaintiffs Cannot Make a *Prima Facie* Case For Some Claims............................ 10

        C.      Plaintiffs Cannot Demonstrate an Intent to Discriminate ...................... 14

        D.      Plaintiffs Cannot Demonstrate Discrimination in Contracting............................ 20

VI.     DEFENDANTS SHOULD BE GRANTED JUDGMENT ON PLAINTIFFS'
        NEGLIGENCE CLAIM ......................................................................................22

VII.    DEFENDANTS SHOULD BE GRANTED JUDGMENT ON THE VALDEZ
        CLAIMS BECAUSE MS. VALDEZ SIGNED A CLASS ACTION WAIVER .............24

VIII.   DEFENDANTS SHOULD BE GRANTED JUDGMENT ON THE
        INJUNCTIVE RELIEF CLAIMS BECAUSE PLAINTIFFS LACK ARTICLE III
        STANDING ..........................................................................................................24

IX.     CONCLUSION......................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................7

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3d Cir. 2010) ................................8

*Avington v. Andales Rest. Corp.*, 2011 WL 256879 (N.D. Okla. Jan. 25, 2011).........................21

*Blackshire v. Cnty. of Yuba*, 648 F. Supp. 3d 1221 (E.D. Cal. 2023)..............................8

*Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d Cir. 2001) .........................................9, 15

*Calhoun v. TJM Trevose, LLC*, 2023 WL 5208853 (E.D. Pa. Aug. 14, 2023)..................... 1, 8-9

*Carroll v. Tompkins Rubber Co.*, 1993 WL 195472 (E.D. Pa. June 8, 1993) .........................8, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................7

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...........................................24

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 409 (2013) ......................................26

*Clark v. Safeway, Inc.*, 478 F. Supp. 3d 1080 (D. Or. 2020) .........................................8

*Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media*, 140 S. Ct. 1009 (2020)........................9

*Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205 (10th Cir. 2022) ......................................8

*Doe v. Abington Friends Sch.*, 480 F.3d 252 (3d Cir. 2007) .....................................7-8

*Doe v. Brown Univ.*, 43 F.4th 195 (1st Cir. 2022)...........................................8

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) .......................................21-22

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000)....................................14

*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999) .........................................15

*Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965 (3d Cir. 1981).........................................7

*Fox v. Vitamin Cottage Natural Grocers*, 2006 WL 2308492 (D. Colo. Aug. 9, 2006) ......................21

*General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982) ...........................15

*Green v. Dillard's, Inc.*, 483 F.3d 533 (8th Cir. 2007)......................................9

*Gregory v. Dillard's, Inc.*, 565 F.3d 464 (8th Cir. 2009) .........................................21

*Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001).......................................21

*Hurst v. PNC Bank*, 2004 WL 999759 (E.D. Pa. May 5, 2004) ......................................................23

*Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103 (3d Cir. 1985)...............................8

*Kubischta v. Schlumberger Tech Corp.*, 2016 WL 4752917 (W.D. Pa. July 14, 2016) ..................................................................................................................................................24

*Lewis v. J.C. Penney Co.*, 948 F. Supp. 367 (D. Del. 1996).........................................................21

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...........................................................................26

*McCaleb v. Pizza Hut of Am., Inc.*, 28 F. Supp. 2d 1043 (N.D. Ill. 1998) ...................................22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983) ........................................................8-9

*McNair v. Synapse Grp., Inc.*, 672 F.3d 213 (3d Cir. 2012)...............................................24, 26

*Murray v. Com. Union Ins. Co. (Com.)*, 782 F.2d 432 (3d Cir. 1986) ........................................23

*Perry v. Burger King Corp.*, 924 F. Supp. 548 (S.N.D.Y. 1996) ................................................22

*Randler v. Kountry Kraft Kitchens*, 2012 WL 6561510 (M.D. Pa. Dec. 17, 2012).....................23

*Roadman v. Select Specialty Hosp.*, 2020 WL 571058 (W.D. Pa. Feb. 5, 2020) .........................23

*Schaller v. U.S. Soc. Sec. Admin.*, 844 F. App'x 566 (3d Cir. 2021)...........................................25

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 407 (1993) .....................................................................9

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ....................................................................24

*Tannous v. Cabrini Univ.*, 2023 WL 6465842 (E.D. Pa. Oct. 4, 2023).........................................9

*Tashman v. Advance Auto Parts, Inc.*, 63 F.4th 1147 (8th Cir. 2023)...........................................9

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................................................25

*Watkins v. BLM Cos., LLC*, 644 F. Supp. 3d 439 (S.D. Ohio 2022) ............................................21

*West v. Honewell Int'l Inc.*, 558 F. Supp. 3d 369 (S.D. Tex. Aug. 31, 2021) ................................9

*Williams v. Richland Cnty. Children Servs.*, 489 F. App'x 848 (6th Cir. 2012) .........................20

**State Cases**

*Candelaria v. Hospital of Univ. of Pennsylvania*, 285 A.3d 935 (Pa. Super. Ct. Sept. 16, 2022) .............................................................................................................................23

*Clay v. Advanced Comput. Applications, Inc.*, 559 A.2d 917 (Pa. 1989) .......................................23

*Schemberg v. Smicherko*, 85 A.3d 1071 (Pa. Super. 2014) ............................................................22

*Weaver v. Harpster*, 975 A.2d 555 (Pa. 2009) .............................................................................22

**Federal Statutes**

42 U.S.C. § 1981 .................................................................................................................*Passim*

42 U.S.C. § 2000a ..........................................................................................................................21

**State Statutes**

Pa. Stat. § 955(h)(11)(i)(1) .............................................................................................................23

Pa. Stat. § 962(b) ...........................................................................................................................22

I.    **INTRODUCTION**

Plaintiffs were not satisfied with their Sesame Place experiences.  They filed a federal court class action alleging race discrimination in violation of 42 U.S.C. § 1981 and negligence based on their experiences.  After more than a year of discovery, including the production of thousands of pages of documents and fifty depositions, Plaintiffs do not have evidence establishing the essential elements of their claims, and summary judgment should be granted to Defendants.

As to their § 1981 claim, after the Court's motion to dismiss ruling, Plaintiffs must show that a costumed character <u>refused</u> to interact with them.  Many of the named Plaintiffs cannot do so.  Their own videos show, and they admitted in their depositions, that the costumed characters at issue <u>did</u> interact with their children, just not in the way they thought their children wanted to be interacted with.  That theory did not survive the motion to dismiss hearing when Plaintiffs' counsel admitted that Plaintiffs are not arguing that guests are entitled to the personalized interactions they desire.  As to the other Named Plaintiffs whose scenarios include a costumed character's alleged refusal to interact, the factual evidence shows that there were legitimate non-discriminatory reasons why.  It was not because of the race of the child, but because the costumed character performer could not see the child due to the positioning of the costume's field of vision, because they did not have time to provide an individual interaction because they had to move to their next mark along the parade route, or because of the positioning of the children along the parade route.  Plaintiffs therefore cannot show the necessary discriminatory intent.  They also cannot show the violation of any contractual right.  While it is certainly the case that there is a right not to be discriminated against at a theme park like Sesame Place, that right is provided by federal and state law, not by the only alleged contracts at issue here—Plaintiffs' tickets/season passes.  "[N]ot every negative interaction is a product of discrimination." *Calhoun v. TJM Trevose, LLC*, 2023 WL 5208853, at *1 (E.D. Pa. Aug. 14, 2023).  Here, Plaintiffs may have had what they

consider to be negative interactions, but they cannot show that those interactions were the product of intentional race discrimination or that they resulted in the impairment of a contractual right, and thus have failed to establish the essential elements of their § 1981 claim.

Because Plaintiffs cannot establish their § 1981 claim, their negligence *per se* claim based on it fails.  The negligence *per se* claim also fails for the additional reason that it is preempted by the Pennsylvania Human Relations Act ("PHRA").  Any claim for race discrimination at a place of public accommodation (like a theme park) in Pennsylvania must be brought as a PHRA claim with the Pennsylvania Human Relations Commission rather than as a common law claim in court. None of the Named Plaintiffs filed a PHRA claim with the Commission, and they cannot subvert the PHRA's statutory framework by pursuing a negligence claim in this court instead.

Defendants also should be granted summary judgment as to Plaintiffs' injunctive relief claims because discovery has confirmed that none of them has injunctive relief standing.  None faces a real and immediate threat of being wronged again in a similar way because none has any concrete plans to return to Sesame Place.  Without at the very least returning to the park, it is impossible that they would be injured again.

Judgement should therefore be entered for Defendants and Plaintiffs' Amended Class Action Complaint dismissed with prejudice.

## II.    FACTS

### A.    Sesame Place Tickets and Season Passes

Sesame Place is a theme park located in Langhorne, Pennsylvania.  Statement of Undisputed Material Facts, filed concurrently herewith, ("SUMF") 1.  There are multiple ways to gain admission to the park, including single day tickets, multiple day tickets, and season passes. SUMF 2.  If a person purchases a season pass, they have the option to pay the entire cost of the season pass on the day of purchase, or they can opt for the "EZPay" payment method that allows

the purchaser to break the full payment amount into monthly installments.  SUMF 3.  If a person decides to pay for a season pass via the EZPay method, they are required to agree to SeaWorld's EZPay terms and conditions.  SUMF 4.  Sesame Place tickets and season passes allow the holder admission to the park provided there are not weather or capacity constraints and that the guests obey all park rules and regulations.  SUMF 5.  Tickets and season passes do not guarantee that a customer will get an interaction with a costumed character during a parade or meet and greet. SUMF 6.

### B.      Sesame Place Parades and Meet and Greets

Sesame Place has employees who work in multiple different departments responsible for various park functions.  As relevant to Plaintiffs' complaint, costumed character performers are members of the Entertainment Department.  SUMF 7.  During the class period, costumed character performers participated in various activities, including full (also known as regular) parades, mini parades, and meet and greets (also known as character walks).  SUMF 8.

Both the full and mini parades included costumed characters, dancers, and floats that proceeded along the parade route while park guests gathered along both sides of the parade route. SUMF 9.  During both full parades and mini parades, performers needed to be sure to stay in front of parade floats for safety because the line of sight of parade float drivers is limited; if a performer does not stay in front of the float, it is possible they could not be seen by the float driver and be hit by the float.  SUMF 10.

Full parades lasted approximately 25 minutes and included three "show stops," which were scripted performances along the parade route with choreography.  SUMF 11.  Those show stops provided some opportunities for costumed character performers to provide "extra interactions" with some park guests along the parade route.  SUMF 12.

During 2022, when Sesame Place had lower staffing, they began doing mini parades. SUMF 13.  Mini parades, which were approximately 10 minutes shorter than full parades, included constant movement of costumed characters, dancers, and floats with no show stops.  SUMF 14. There were fewer opportunities for costumed character performers to interact with park guests during mini parades than during full parades because there were no show stops in mini parades. SUMF 15.

Meet and greets, also known as character walks, involve a costumed character performer going to a designated location in the Sesame Place park to take photographs and/or videos with guests.  SUMF 16.   During these events, costumed character performers are accompanied by a non-costumed Entertainment Department employee, called a walk host, who escorts the costumed character to the designated location and forms a line of guests waiting to meet with the costumed character.  SUMF 17.  Walk hosts are also responsible for "cutting" the line of guests waiting to take a picture with the costumed character within the designated time limit.  SUMF 18.  Meet and greets have a 30-minute time limit or, if the "real feel" temperature is 100 degrees Fahrenheit or higher, a 20-minute time limit.   SUMF 19.   These time limits are for the safety of costumed character performers and are intended to prevent them from overheating.  SUMF 20.  Meet and greets often are scheduled to end an hour before a scheduled parade because the costumed character performer participating in a meet and greet would also likely participate in the parade. SUMF 21.

C.   **The Viral Rosita Video**

In July of 2022, a video filmed during a mini parade at Sesame Place involving the costumed character Rosita went viral on the Internet.  SUMF 22.  The "viral" Rosita video did not involve any of the Named Plaintiffs.  SUMF 23.  In response to the "viral" Rosita video, Sesame

Place made a number of changes, including that costumed characters no longer provide personal extra interactions with any guests during the parades.  SUMF 24.

### III.    PROCEDURAL HISTORY

#### A.    Plaintiffs' Complaint

Shortly after the Rosita video went viral in July of 2022, Plaintiffs filed their original complaint in this case as a putative class action.  ECF 1.  They voluntarily amended it two months later and included seven (7) additional putative class representative parents and children.  ECF 25 ("FAC").  There are now eight (8) putative class representative adults and eight (8) putative class representative children (the "Named Plaintiffs").  They allege that, while visiting Sesame Place, all class members were the victims of "intentional race discrimination" because their minority children were ignored, while "similarly situated white children" were "openly interacted with" during parades and meet and greets.  FAC ¶¶ 43, 52, 61, 70, 79, 88, 97, 106, 109(e).  Plaintiffs pled two counts: (1) violation of 42 U.S.C. § 1981; and (2) negligence.  *Id.* ¶¶ 115-128.  They seek, *inter alia*, monetary damages, declaratory relief, and multiple forms of injunctive relief.  *Id.* ¶ 130.

#### B.    Motion to Dismiss

Defendants moved to dismiss both counts for failure to state a claim and to dismiss the injunctive claims for relief for lack of standing.  ECF 29.  The Court granted in part and denied in part Defendants' motion.  ECF 48, 49.

As to § 1981, the Court found that Plaintiffs' admission tickets are the contracts underlying their claims.  ECF 48 at 5 n.3.  The Court further found that Plaintiffs had abandoned the theory alleged in the complaint that Plaintiffs were contractually guaranteed interactions with character performers.  *Id.* at 9.  However, Plaintiffs' § 1981 claim based on the theory that the costumed character performers were contractually obligated to not <u>refuse to interact</u> with customers on the basis of race survived dismissal.  *Id.* at 9, 12.

As to negligence, the Court granted the motion to dismiss as to four of Plaintiffs' five pleaded theories.  *Id.* at 14-22.  The Court dismissed with prejudice Plaintiffs' claim premised on alleged negligent hiring and negligent training (*id.* at 16-21); dismissed without prejudice Plaintiffs' claim premised on alleged negligent supervision (*id.* at 22); and found that Plaintiffs abandoned their premises liability theory.  *Id.* at 14.  The Court declined to dismiss Plaintiffs' negligence *per se* claim, finding that it was adequately pleaded based on Plaintiffs' § 1981 claim. *Id.* at 15-16.

The Court denied the motion to dismiss the injunctive relief claims, finding that because the Willie family had a non-expired season pass at the time the complaint was filed, they had a non-speculative intent to return to Sesame Place.  *Id.* at 24.

Therefore, what remains after the Court's ruling is (1) a § 1981 claim based on the theory that Plaintiffs' Sesame Place tickets/season passes provided them a right not be refused interactions with costumed characters on the basis of race; and (2) a negligence *per se* claim based on alleged violations of § 1981.

### C.  Discovery

The parties exchanged written discovery, produced documents, and conducted depositions. As relevant here, Defendants deposed all adult Named Plaintiffs.  Plaintiffs deposed twenty-seven fact witnesses, including seven current and former employees involved in the at-issue videos linked in the FAC.  Plaintiffs also conducted multiple 30(b)(6) depositions of the Defendants.

### D.  Plaintiffs' Motion for Class Certification

On November 27, 2023, Plaintiffs filed their motion for class certification.  ECF 97.  In that motion, Plaintiffs presented a different class definition, a different theory of the case, and a different theory for certification than what they pled in the FAC.  Because Plaintiffs have not filed

a motion for nor been granted leave to amend, for purposes of this summary judgment motion,

Defendants will address Plaintiffs' claims as alleged in the operative pleading, the FAC.

## IV.   **LEGAL STANDARD**

A motion for summary judgment should be granted when "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Rule 56 "mandates the entry of summary judgment" where the non-moving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

"By its very terms, [the summary judgment] standard provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is "material" if it "might

affect the outcome" of the case, and a dispute is "genuine" only if there is sufficient evidence "that

a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

The moving party bears the initial burden of showing that there is no genuine issue of

material fact.  *Celotex*, 477 U.S. at 323.  Then, the non-moving party "must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  The non-moving party

must show more than the "mere existence of a scintilla of evidence in support of [its] position."

*Id.* at 252.  It "may not merely deny the allegations in the moving party's pleadings," *Doe v.*

*Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted), or "rely merely upon

bare assertions, conclusory allegations or suspicions."  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d

965, 969 (3d Cir. 1981) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1971)).  Further,

arguments made in briefs "are not evidence and cannot by themselves create a factual dispute

sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).  Instead, the mon-moving party "must show where in the record there exists a genuine dispute over a material fact."  *Doe*, 480 F.3d at 256.

## V.   DEFENDANTS SHOULD BE GRANTED JUDGMENT ON PLAINTIFFS' § 1981 CLAIM

### A.   Summary Judgment Standard for § 1981 Claims

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981.  To prove a § 1981 claim, "a plaintiff must prove intentional discrimination, which can come with direct or indirect evidence."  *Calhoun*, 2023 WL 5208853, at *3.  Where, as here, Plaintiffs have no direct evidence of discrimination[1], courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983), including in the non-employment context.  *Calhoun*, 2023 WL 5208853, at *3 (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010)).[2]

Under that three-part framework, ***first*** the Plaintiffs must establish a *prima facie* case of discrimination.  *Calhoun*, 2023 WL 5208853, at *3; *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case of discrimination for § 1981, Plaintiffs must show: (1) that they belong to a racial minority;[3] (2) Defendants' intent to discriminate on the basis of race; and (3) discrimination concerning activities enumerated in § 1981, including the right to make and

---

[1] Direct evidence, if believed, proves the existence of discriminatory intent "without the need for inference or presumption," for example, racially derogatory statements.  *Carroll v. Tompkins Rubber Co.*, 1993 WL 195472, at *5 (E.D. Pa. June 8, 1993), *aff'd*, 16 F.3d 402 (3d Cir. 1993).

[2] *See also Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1210 (10th Cir. 2022); *Doe v. Brown Univ.*, 43 F.4th 195, 208 n.9 (1st Cir. 2022); *Blackshire v. Cnty. of Yuba*, 648 F. Supp. 3d 1221, 1233 (E.D. Cal. 2023); *Clark v. Safeway, Inc.*, 478 F. Supp. 3d 1080, 1087 (D. Or. 2020).

[3] Defendants do not challenge this element of Plaintiffs' claim.

enforce contracts.  *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001); *Calhoun*, 2023 WL 5208853 at *3.[4]

 **Second**, if Plaintiffs establish a *prima facie case*, the burden shifts to Defendants to offer a "legitimate, nondiscriminatory reason" for their conduct.  *Calhoun*, 2023 WL 5208853, at *3; *McDonnell Douglas*, 411 U.S. at 802.

 **Third**, if Defendants do so, then Plaintiffs must offer evidence that Defendants' evidence is pretextual.  *Calhoun*, 2023 WL 5208853, at *3; *McDonnell Douglas*, 411 U.S. at 804-05.  At this third stage in the burden-shifting framework, Plaintiffs must show "both that the [non-discriminatory] reason was false, *and* that discrimination was the real reason" for the defendant's conduct.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 407, 515 (1993).

 Unlike in Title VII cases, in which a plaintiff can demonstrate pretext by showing that discrimination was a ***motivating*** factor for Defendants' conduct, "[s]ection 1981 claimants must prove discrimination was [a] ***but-for cause***" of the conduct.  *West v. Honewell Int'l Inc.*, 558 F. Supp. 3d 369, 379 (S.D. Tex. Aug. 31, 2021) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media*, 140 S. Ct. 1009, 1014-15 (2020)) (emphasis added); *Tannous v. Cabrini Univ.*, 2023 WL 6465842, at *6 (E.D. Pa. Oct. 4, 2023) (a plaintiff "must prove that *but for his race*, he would not have been discriminated against in the making or enforcing of contracts," not that "race was a 'motivating factor' in the loss of a legally protected right.") (original emphasis).

---

[4] *See also Tashman v. Advance Auto Parts, Inc.*, 63 F.4th 1147, 1151 (8th Cir. 2023) ("To establish a prima facie case of discrimination in the retail context, a § 1981 plaintiff must show (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, and (3) interference by the defendant with an activity protected under the statute." (quoting *Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007)).

### B.     <u>Plaintiffs Cannot Make a *Prima Facie* Case For Some Claims</u>

Some of the Named Plaintiffs' claims cannot get past the first step in the *McDonnell Douglas* framework because they fail to establish a *prima facie* case of race discrimination.

**Burns.**  The Burns family alleges that during their June 18, 2022 Sesame Place visit, the employees performing as <u>Elmo</u>, <u>Ernie</u>, <u>Telly Monster</u>, and <u>Abby Cadabby</u> committed intentional race discrimination by "refusing to engage with them and ignoring them" while readily engaging "with numerous similarly situated white customers and their children."  FAC ¶¶ 36, 40, 41, 43. Plaintiffs cannot make a *prima facie* case of discrimination as to the characters <u>Elmo</u> and <u>Abby Cadabby</u>, because Mr. Burns admitted in his deposition that they did not engage in discriminatory conduct.

As to <u>Elmo</u>, Mr. Burns admitted that he had confused the characters, and that Elmo actually was <u>not</u> one of the characters that allegedly discriminated against K.B.  SUMF 25.  He testified, "Elmo is not the one that didn't engage with [K.B.], it was Ernie and the monster," and that he could not recall anything that Elmo did that was discriminatory to his family.  JA 109-112. Because the Burns Plaintiffs no longer claim that the employee dressed as Elmo discriminated again them, Defendants should be granted judgment as to that portion of their claim.

As to <u>Abby Cadabby</u>, Mr. Burns clarified during his deposition that he is not claiming that Abby Cadabby ignored K.B. during the parade.  SUMF 26.  The Burns family's claim related to Abby Cadabby is about a meet and greet, not a parade.  SUMF 27.  However, the employee dressed as Abby Cadabby was not even a part of the meet and greet interaction about which the Burns family complains.  JA 97-100 (testifying that the escort for the character, not the character, told him that the line was closed).[5]  Because Plaintiffs have no claim that the employee dressed as

---

[5] Even as to the unidentified escort, this person did not say anything racist to the Burn Plaintiffs. *See* JA 101 (the only thing the employee said was that the line was closed, and then the Burns

Abby Cadabby discriminated against the Burns Plaintiffs, Defendants should be granted judgment as to that portion of their claim.

The **Fleming**, **Miles**, and **Romero** Plaintiffs cannot establish a *prima facie* case of race discrimination following the Court's motion to dismiss ruling.  As acknowledged therein, Plaintiffs have abandoned their theory that they were contractually guaranteed personally curated interactions with characters.  ECF 48 at 9.  The only theory that remains is that Sesame Place employees could not "refuse to engage" with customers on the basis of race.  *Id.*  It is undisputed that the at-issue costumed characters <u>did interact</u> (did not "refuse to engage") with the Fleming, Miles, and Romero children.  The parents admitted that in their depositions.  JA 174-179, 196-197 (Fleming); JA 244-248, 262 (Miles); JA 374, 381-382, 384, 397 (Romero).  The children just did not receive the <u>specific type</u> of interaction they apparently desired.  Because the characters did not "refuse to engage" with the Fleming, Miles, and Romero Plaintiffs, those families do not have viable § 1981 claims.

**Fleming.**  The Fleming family alleges that the employee performing as Telly Monster in the parade during their July 4, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the videos in footnotes 3 and 4 of the FAC.  FAC ¶¶ 45, 49, 50, 51, 52.  However, Mr. Fleming admitted that the video in footnote 4 does not show

---

walked away).  Mr. Burns claims that he believes he was told that the line was closed because of race discrimination, but his only basis for this conclusion is that as he walked away, he looked back and saw another family that he assumed was white, but admits could have been Hispanic, getting in line.  JA 87, 97, 101-103, 132.  He was walking away from the location at that point, and did not know whether the escort said anything to that family, e.g., similarly told that other family that the line was closed.  JA 101, 133.  The Burns have not alleged race discrimination by this unidentified escort, but have not established a *prima facie* case of race discrimination against them in any event.

an act of discrimination; it was included merely because it purports to show O.F.'s reaction to the incident captured in the video in footnote 3.  SUMF 28.  As to the video in footnote 3, it shows the employee dressed as Telly Monster specifically engaging with O.F. and touching her hand.  FAC p. 9 n.3.  Mr. Fleming admitted in his deposition that O.F. <u>did</u> get an interaction with Telly Monster, just an interaction he found insufficient.  JA 174-179, 189-190, 196-197.  Mr. Fleming also testified that he believes the child next to O.F. that received a high five from Telly Monster was Asian.  JA 174-177.  So it is not the case that Telly Monster "refused to engage with" O.F., or that he was "engaging with numerous similarly situated white customers," as alleged, and Defendants are entitled to judgment on the Fleming family's § 1981 claim.

*Miles*.  The Miles family alleges that the employee performing as Rosita in the parade during their June 24, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them and ignoring them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the video in footnote 5 of the FAC.  FAC ¶¶ 54, 58, 59, 60, 61.  Ms. Miles confirmed in her deposition that the video linked in footnote 5 captures the only alleged incident of discrimination underlying her claim.  SUMF 29. Ms. Miles admitted that the Rosita character did not say anything derogatory or anything about race to M.C.  SUMF 30.  Her sole basis for alleging that the interaction was discriminatory is that the Rosita character hugged one little girl (that Ms. Miles believes to be white because of her skin color and hair texture) and looked at M.C.'s sister and walked away.  JA 20-22, 239-242.

In the at-issue video, M.C. was wearing a black shirt and swimming trunks, and his sister, L.C.[6], was between M.C. and the camera.  SUMF 31.  M.C. and L.C. both identify as Black.

---

[6] Herein, Defendants use initials for the names of minors, but this child is referred to in Ms. Miles's deposition transcript by her name.  JA 213.

SUMF 32.  Ms. Miles identified and circled L.C.'s hand as the hand on or near Rosita's hand in a still shot of the video in footnote 5.  JA 244-246, 262.  The employee performing as Rosita during this event testified that he waved to the little girl with her hand stretched out [L.C.].  SUMF 33, 34.  Ms. Miles further admitted in her deposition that a wave counts as an interaction.  SUMF 35.  Therefore, the allegation that Rosita "refused to interact" or "ignored" the Miles family is false.  At the very least, L.C. received a wave, and Ms. Miles testified that a wave counts as an interaction.

Further, even if the Miles Plaintiffs had established a *prima facie* case, summary judgment should still be granted because the employee involved also testified that the reason why he gave the first girl in the video a hug and the second girl [L.C.] a wave, was not because of the second girl [L.C.]'s race, skin color, or because of how she looked.  Rather, he hugged the girl he came upon first and then was concerned about keeping the mini parade moving, so waved to other guests after that point.  SUMF 36.  Thus, that employee had a legitimate, non-discriminatory reason for the interaction complained of and captured in the video in footnote 5.

***Romero.***  The Romero family alleges that the employees performing as Cookie Monster and Zoe in the parade during their June 25, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the videos in footnotes 8 and 9 of the FAC.  FAC ¶¶ 72, 76, 77, 78, 79.  Ms. Romero confirmed in her deposition that the videos in footnotes 8 and 9 capture all of the alleged incidents of discrimination underlying her claim.  SUMF 37.

As to the video in footnote 8 involving Cookie Monster, Ms. Romero admitted in her deposition that E.C. did get an interaction with Cookie Monster (a "hand tap"), just an interaction she found insufficient.  JA 351, 374-376, 396, 397.  And even though Ms. Romero complains that

13

Cookie Monster went on to "hug" a child that she assumes is white based on skin color (JA 37-39, 377-379, 398), that interaction was for the safety of the child, who had crossed the yellow safety line and was in the parade route.  The yellow line at the parade is there for guests' safety and prevents them from getting too close to the parade floats and performers.  SUMF 38.  The costumed characters are trained that in instances when a child crosses the yellow safety line into the parade route, to gently guide the child back behind the yellow line to safety.  JA 1031, ¶ 9.  There is thus a legitimate, non-discriminatory reason for that interaction.

Similarly as to the video in footnote 9 involving Zoe, Ms. Romero admitted that Zoe did interact with E.C. by giving her a "thumbs up," but that she thinks Zoe should have done more  JA 381-382, 384-385.

Because neither Cookie Monster nor Zoe "refused to engage" with E.C., Plaintiffs have failed to make a *prima facie* case of race discrimination and judgment should be granted for Defendants.[7]

### C.    Plaintiffs Cannot Demonstrate an Intent to Discriminate

Assuming for the sake of efficiency, without conceding, that Plaintiffs have established a *prima facie* case as to the other interactions alleged in the FAC not addressed in the above section, Plaintiffs' § 1981 claim would still fail.[8]

---

[7] Ms. Romero also admitted that neither Cookie Monster nor Zoe said anything derogatory or anything about race to E.C.  SUMF 39, 40.

[8] When a defendant offers a legitimate, non-discriminatory reason for the at-issue conduct, courts may start with step two of the *McDonnel Douglas* framework and assume for purposes of analysis that a plaintiff has made out a *prima facie* case.  *See Caroll*, 1993 WL 195472, at *5; *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.").

The second element of a § 1981 claim is intent to discriminate on the basis of race.  *Brown*, 250 F.3d at 797.  Section 1981 can only be violated by purposeful discrimination.  *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) ("Section 1981 liability must be founded on purposeful discrimination.").  None of the at-issue costumed characters is alleged to have said anything racially offensive or to have made any offensive gestures.  Plaintiffs' claims are based solely on an alleged lack of personal interactions.  Here, there is a legitimate, non-discriminatory reason for each action complained of by Plaintiffs.  In other words, there was no purposeful discrimination.

**Burns.**  The Burns family alleges that the employees performing <u>Telly Monster</u> and <u>Ernie</u> committed intentional race discrimination as documented in the videos in footnotes 1 and 2 of the FAC.  FAC ¶¶ 40, 41, 42, 43.

As to <u>Telly Monster</u>, the employee performing as Telly Monster during the event in the video in footnote 1 testified that the reason he did not interact with the little girl with the pigtails [K.B.] was because she was not in his vision from within the costume and he could not see her, not because of her race, skin color, or the way she looked.  SUMF 41, 42.  Thus, that employee had a legitimate, non-discriminatory reason for the interaction complained of and captured in the video in footnote 1.

As to <u>Ernie</u>, Sesame Place's Events and Production Manager, who has extensive experience performing in the Ernie costume and who reviewed the video in footnote 2 of the FAC, declared that because the part of the costume that the performer sees out of is pointing away from the little girl with the pigtails wearing the white shirt in the video [K.B.], the performer in the Ernie costume could not have seen the little girl with the pigtails and the white shirt [K.B.].  SUMF 43, 44, 45.  He further declared that twelve seconds in to the video, Ernie begins to cross the street

with the choreography mapped to that point in the parade, and at that point, the performer was required to cross the street to the other side of the parade route and could not perform any more interactions with guests on the side of the parade route where they were located at the beginning of the video.  SUMF 46.  Thus, that employee had a legitimate, non-discriminatory reason for the interaction complained of and captured in the video in footnote 2.

*Morales.*  The Morales family alleges that the employees performing as <u>Big Bird</u>, <u>Grover</u>, and <u>Baby Bear</u> in the parade during their July 11, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them and ignoring them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the videos in footnotes 6 and 7 of the FAC.  FAC ¶¶ 63, 67, 68, 69, 70.  Ms. Morales confirmed in her deposition that the videos linked in footnotes 6 and 7 of the FAC capture all of the alleged incidents of discrimination underlying her claim.  SUMF 47.  In those videos, Plaintiff N.M. is the girl with braids holding the Abby Cadabby doll.  SUMF 48.  What Ms. Morales claims is discriminatory is that (1) Big Bird interacted in some way with someone to the left of N.M. and high-fived the child in the stroller to the right of N.M. in the video in footnote 6 (JA 285-286, 293-296); (2) Grover high-fived the child in the stroller to the right of N.M. in the video in footnote 7 (JA 297, 300-304); and (3) Baby Bear high-fived the woman to the left of N.M. in the video in footnote 7.  JA 297, 304-307.  Plaintiffs' claims must fail because Ms. Morales has admitted that she does not know whether the family to the left or the child in the stroller to the right were actually Hispanic as opposed to Caucasian.  JA 287-288, 291-292, 294, 300-301, 305.  Plaintiffs thus have not established that they were ignored while "similarly situated white customers and their children" were interacted with.

Even if the Morales Plaintiffs had established a *prima facie* case, however, their claim would still fail.  As to the interaction with <u>Big Bird</u>, the employee performing that character testified that the allegation that he did not interact with the little girl with the braids [N.M.] because of her race is false, and that his actions in the video were not in any way motivated by her race, by her skin color, or by how she looked.  SUMF 49, 50.  Rather, he did not see her as he walked past.  SUMF 50.  That is because the field of vision in the costume is very small, with no peripheral vision, and when the part of the costume that the performer sees out of is facing forward (as was the case in the video in footnote 6), the employee in the costume is "fully blind" to the guests on the sides, JA 820-821, and N.M. was to the character's side.  FAC at ¶ 11, n.6; SUMF 51, 52.  Accordingly, to the extent it is even factually true that he interacted with white customers (as opposed to Hispanic ones) and not N.M., there is a legitimate, non-discriminatory reason for his actions.

As to the interaction with <u>Grover</u>, the employee performing as Grover during the event in the video in footnote 7, who is Black, declared that by the time the little girl with the braids and black hooded sweatshirt [N.M.] waved at Grover, the part of the Grover costume that the performer sees out of was completely turned away from her, so he did not see her express her desire for an interaction.  SUMF 53, 54, 55.  He further declared that he did not avoid interacting with the little girl because of her race, and to him, her skin color appeared to be the same as or similar to that of the child in the stroller to whom he gave a high five.  SUMF 56.  Thus, to the extent he interacted with white customers (as opposed to a Hispanic one) and not N.M., that employee had a legitimate, non-discriminatory reason for his actions.

As to the interaction with <u>Baby Bear</u>, the employee performing that character testified that he did not decline to interact with N.M. because of her race or because of how she looked in any

way.  SUMF 57, 58.  Race did not play a role in his deciding to interact with anyone on the parade route at any time.  SUMF 58.  Rather, he explained that: (1) it is not possible to have personal interactions with every child on the parade route; (2) he did not interact with N.M. because he had to keep the parade moving and had to cross to the other side of the street when Telly Monster came to his side; and (3) N.M. was behind (rather than right up on) the yellow line, making it more difficult to see her given the limited vision in the costume as well as potentially indicating a reluctance or less of a desire for an interaction.  JA 867-875, 877-880.  Accordingly, to the extent he interacted with a white child (as opposed to a Hispanic one) and not N.M., there is a legitimate, non-discriminatory reason for his actions.

*Valdez.*  The Valdez family alleges that the employee dressed as Abby Cadabby in the parade during their December 29, 2021 Sesame Place visit committed intentional race discrimination by "refusing to engage with them and ignoring them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the video in footnote 10 of the FAC.  FAC ¶¶ 81, 85, 86, 87, 88.  In that video, M.L. is the boy in the cap with the olive fur jacket.  SUMF 59.

The employee performing as Abby Cadabby in the video in footnote 10 testified that she did not refuse to interact with M.L. because of his race, but rather because he was behind the children she was interacting with, and he did not approach the line of children until after she had passed that spot when she was turning and walking to her next mark in the parade.  SUMF 60, 61.  Given the limited field of vision in the Abby Cadabby costume, she testified that she believes that she did not even see M.L. given the timing of his approach.  SUMF 62. She further testified that she never chooses which children to interact with on the parade route based on race.  SUMF 63.  Accordingly, there is a legitimate, non-discriminatory reason for her actions.

*Valette.*  The Valette family alleges that the employee dressed as Grover in the parade during their June 20, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them and ignoring them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the video in footnote 11 of the FAC.  FAC ¶¶ 90, 94, 95, 96, 97.  Ms. Valette confirmed in her deposition that the lack of interaction with Grover is the only alleged incident of discrimination underlying her claim.  SUMF 64.

The employee performing as Grover in the video in footnote 11 testified that she did not refuse to interact with D.V. because of her race, nor did she choose to interact with the other two children in the video because of their race (which appears to be Caucasian), but rather for safety. She first interacted with the other two children because they stepped out into the street, and she hugged them to gently push them back for their safety, and then she did not interact with D.V. because she had to keep moving to follow the safety rule that characters must stay in front of the approaching float.  SUMF 65, 66.  Accordingly, there is a legitimate, non-discriminatory reason for her actions.

*Willie.*  The Willie family alleges that the employee dressed as Rosita during their July 10, 2022 Sesame Place visit committed intentional race discrimination by "refusing to engage with them" while readily engaging "with numerous similarly situated white customers and their children," as documented in the video in footnote 12 of the FAC.  FAC ¶¶ 99, 103, 104, 105, 106.[9]

---

[9] Ms. Willie also complains about an incident (about which she has no video or photographic evidence) in which her family allegedly attempted to get in line for a meet and greet with Rosita. But that incident consisted of an employee (other than the person in the Rosita costume) telling the family that the line was closed because Rosita needed to get ready for the parade, and Ms. Willie did not claim that her family was treated differently than any other family (e.g. did not testify that a white family was allowed to enter the line while her family was denied).  JA 62-63, 576-578.  Further, walk hosts cut the lines at meet and greets to abide by the time limit the

The employee performing as Rosita in the video in footnote 12 testified that she did not refuse to interact with L.W. because of her race or skin color, but rather because she did not see L.W. because the employee was looking upwards, and in the Rosita costume, the employee cannot see anything below their eyeline.  SUMF 67, 68.  She further testified that Sesame Place has cute photo ops around the park, including the one seen in the video in footnote 12 that features a painting of Abby Cadabby's wings that people can stand in front of and take pictures.  SUMF 69. She testified that she would frequently join guests in their photo ops at murals like that, and her decision to run over for a photo op with the child at the mural wall was not motivated by the race of the people standing by the mural wall.  SUMF 69.  Accordingly, there is a legitimate, non-discriminatory reason for her actions.

To the extent that Plaintiffs will argue in their opposition that any of the Sesame Place employee's explanations of their intent or circumstances in the videos is pretextual, Defendants will respond to any such arguments in their reply brief.

### D.    Plaintiffs Cannot Demonstrate Discrimination in Contracting

Plaintiffs' § 1981 claim also fails because they cannot establish the third element of the claim—a violation of their right to make or enforce a contract.  A § 1981 claim requires that Plaintiffs "possess[] some contractual right that the defendant blocked or impaired."  *Williams v. Richland Cnty. Children Servs.*, 489 F. App'x 848, 851 (6th Cir. 2012).  Here, the only "contracts" are Plaintiffs' Sesame Place tickets/season passes.  ECF 48 at 5 n.3.  Those tickets/passes entitled the holder to admission to the park (provided there were not weather or capacity constraints and

---

performers can be in the costumes for their safety, and meet and greets are often scheduled to end an hour before a parade because the costumed character performer participating in a meet and greet would also likely participate in a parade.  SUMF 18, 19, 20, 21.  Thus to the extent Plaintiffs intend to pursue a claim based on this claimed incident, they have not established a *prima facie* case.

that the guests obeyed all park rules and regulations).  SUMF 5.  They did not guarantee that a customer would get an interaction with a costumed character.  SUMF 6.

To be sure, Plaintiffs have a right not to be discriminated against on the basis of race at Sesame Place.  But that is not a right provided by the purported <u>contract</u>—the ticket/season pass. Federally, that right is provided by Title II of the Civil Right Act, which prohibits race discrimination in places of public accommodation.  42 U.S.C. § 2000a ("All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation … without discrimination on the ground of race[.]").

But Plaintiffs did not bring a Title II case.  They chose to bring a § 1981 case, which prohibits only race discrimination in <u>contracting</u>.  42 U.S.C. § 1981.  "[U]nder § 1981, it is not enough to show purposeful discrimination, a plaintiff must show such purposeful discrimination interfered with contractual rights."  *Watkins v. BLM Cos., LLC*, 644 F. Supp. 3d 439, 451-52 (S.D. Ohio 2022) (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006)).  For a § 1981 claim, there "must have been interference with the contract beyond the mere expectation of being treated without discrimination[.]"  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10th Cir. 2001); *see also Fox v. Vitamin Cottage Natural Grocers*, 2006 WL 2308492, at *5 (D. Colo. Aug. 9, 2006) (disparate treatment by store employees not actionable under § 1981); *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471 (8th Cir. 2009) (discriminatory surveillance in store not actionable under § 1981; *Avington v. Andales Rest. Corp.*, 2011 WL 256879, at *3 (N.D. Okla. Jan. 25, 2011) (that black restaurant patrons had to wait longer than white restaurant patrons, "even if based on racial animus, does not constitute an interference with the contractual relationship under § 1981."); *Lewis v. J.C. Penney Co.*, 948 F. Supp. 367, 371 (D. Del. 1996) (granting

summary judgment to defendants and rejecting theory that an unwritten contract between commercial establishments and the public guarantees that whenever a member of the public enters the premises they "will be treated equally regardless of race.").[10]  The Supreme Court has stated clearly that § 1981 does not "provide an omnibus remedy for *all* racial injustice."  *Domino's*, 546 U.S. at 479.  And it does not provide a remedy for what Plaintiffs complain of here.

## VI.   DEFENDANTS SHOULD BE GRANTED JUDGMENT ON PLAINTIFFS' NEGLIGENCE CLAIM

The only part of Plaintiffs' negligence claim that remains is negligence *per se* based on an alleged § 1981 violation.  Because, as shown above, Plaintiffs cannot establish a § 1981 violation, judgment should also be granted to Defendants on Plaintiffs' negligence claim.  *See Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. 2014) (negligence *per se* requires violation of applicable statute).

However, even if Plaintiffs could show a § 1981 violation, Defendants should still be granted judgment on the negligence claim because it is preempted by the Pennsylvania Human Relations Act ("PHRA").   The PHRA is "the exclusive state law remedy for unlawful discrimination, preempting the advancement of common law claims … based on claims of discrimination."  *Weaver v. Harpster*, 975 A.2d 555, 567 n.10 (Pa. 2009); 43 Pa. Stat. § 962(b) (PHRA excludes any action that could have been brought pursuant to the PHRA).

---

[10] While some district court cases have determined in the restaurant context that denying black guests "the accoutrements that are ordinarily provided with a restaurant meal," such as silverware, plates, and use of restaurant bathrooms can state a § 1981 claim (*McCaleb v. Pizza Hut of Am., Inc.*, 28 F. Supp. 2d 1043, 1048 (N.D. Ill. 1998); *Perry v. Burger King Corp.*, 924 F. Supp. 548, 552 (S.N.D.Y. 1996)), here, individual interactions with costumed characters are not "accoutrements ordinarily provided" with Sesame Place tickets.  SUMF 6; *see also* ECF 48 at 9 (during the motion to dismiss hearing, "Plaintiffs' counsel clarified" that "Plaintiffs are not alleging that they were contractually guaranteed interactions with the performers.").

Plaintiffs' common law negligence claim is based on alleged race discrimination that could have been brought pursuant to the PHRA.  43 Pa. Stat. § 955(h)(11)(i)(1) (prohibiting race discrimination in places of "public accommodation, resort or amusement").  No putative class representative filed a PHRA claim with the Pennsylvania Human Relations Commission regarding the incidents underlying this lawsuit.  SUMF 70.  Accordingly, Defendants should be granted judgment on Plaintiffs' negligence claim.  *Clay v. Advanced Comput. Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989) (plaintiffs who fail to seek redress for their grievances through the Pennsylvania Human Rights Commission are barred from judicial recourse); *Murray v. Com. Union Ins. Co. (Com.)*, 782 F.2d 432, 436-37 (3d Cir. 1986) (Pennsylvania courts will not recognize common law action for claims that are cognizable under the PHRA); *Candelaria v. Hospital of Univ. of Pennsylvania*, 285 A.3d 935 (Table), 2022 WL 4282830, at *3 (Pa. Super. Ct. 2022) (holding that summary judgment should have been granted to defendant on negligence claim because "there is no question that where an action falls within its scope, the PHRA preempts a common law tort claim"); *Roadman v. Select Specialty Hosp.*, 2020 WL 571058, at *6 (W.D. Pa. Feb. 5, 2020) (granting summary judgment to defendant on negligence claim as preempted by PHRA); *Hurst v. PNC Bank*, 2004 WL 999759, at *6 (E.D. Pa. May 5, 2004) (same).  Plaintiffs' "failure to invoke [their] rights under the PHRA does not allow [them] to circumvent its statutory framework and … bring a common law tort cause of action."  *Randler v. Kountry Kraft Kitchens*, 2012 WL 6561510, at *14 (M.D. Pa. Dec. 17, 2012) (granting summary judgment on negligent supervision claim as excluded by PHRA).

## VII.   DEFENDANTS SHOULD BE GRANTED JUDGMENT ON THE VALDEZ CLAIMS BECAUSE MS. VALDEZ SIGNED A CLASS ACTION WAIVER

Plaintiff Valdez used a season pass for her family's at-issue visit to Sesame Place.  SUMF

71; ECF 29-3 at p.18 (Valdez 2021 Platinum Season Pass – Ezpay)[11].  She purchased that season

pass online at the Sesame Place website.  SUMF 72.  As a condition of that season pass purchase,

Ms. Valdez agreed to SeaWorld's EZPay terms and conditions, which include a class action

waiver.  SUMF 74, 75.  That waiver states:

> Any and all disputes, claims, and causes of action arising out of or connected with this contract or the use of any park or membership **SHALL BE RESOLVED INDIVIDUALLY, WITHOUT RESORT TO ANY FORM OF CLASS ACTION**.

SUMF 75.  Because the Valdez Plaintiffs' claims "arise out of" "the use of" the Sesame Place park

and their membership, they have waived their right to participate in this class action and must

resolve any such claims individually.  Defendants therefore should be granted judgment as to all

of their claims.  *See, e.g.*, *Kubischta v. Schlumberger Tech Corp.*, 2016 WL 4752917, at *1, *6-8

(W.D. Pa. July 14, 2016) (granting summary judgment to defendant on claims of putative class

representative because he signed a class action waiver).

## VIII.   DEFENDANTS SHOULD BE GRANTED JUDGMENT ON THE INJUNCTIVE RELIEF CLAIMS BECAUSE PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs "bear[] the burden of showing that [they] ha[ve] standing for each type of relief

sought," including injunctive relief.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)

(citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  Because Plaintiffs seek prospective

injunctive relief, they "must show that [they are] 'likely to suffer ***future injury***' from the

defendant's conduct."  *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (emphasis

---

[11] The Valdez season pass in ECF 29-3 is a copy of Ms. Valdez's season pass.  SUMF 73.

added) (quoting *Lyons*, 461 U.S. at 105).  Those claiming a "risk of future harm" may seek "forward-looking, injunctive relief to prevent the harm from occurring," but only if "the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).

Accordingly, to have standing, Plaintiffs must show that they are likely to imminently suffer future race discrimination by Sesame Place employees.  Defendants argued in their motion to dismiss that none of the Plaintiffs could make that showing because Plaintiffs are not likely to return to Sesame Place.  ECF 29-1 at 22.  If they do not at the very least go back to Sesame Place, then they cannot "again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

At the motion to dismiss stage, the Court found that the fact that the Willie family had season passes that had not expired at the time the lawsuit was filed indicated a sufficient enough "intent on their part to return to the park" to survive a motion to dismiss.  ECF 48 at 24.  Discovery has confirmed that none of the Plaintiffs has returned to Sesame Place since the date they sued Defendants.  SUMF 76, 78, 80, 82, 84, 86, 89, 92.  The Willie family did not use their season passes to return to Sesame Place after their at-issue visit on July 10, 2022, SUMF 91, 92, despite the fact that those passes did not expire until January 2023.  Those passes have now expired and were not renewed.  SUMF 91, 92, 93.  Ms. Valdez also terminated the season pass she used for the at-issue Sesame Place visit.  SUMF 87.  Further, none of the Plaintiffs has current plans to return to Sesame Place, SUMF 77, 79, 81, 83, 85, 88, 90, 94.  They therefore do not have an "imminent" risk of being harmed again, and thus lack standing for injunctive relief.

Even if a Named Plaintiff would hypothetically be willing to return to Sesame Place "if things were different," that would not establish standing.  "Mere 'allegations of possible future injury are not sufficient.'" *Schaller v. U.S. Soc. Sec. Admin.*, 844 F. App'x 566, 571 (3d Cir. 2021)

(not precedential) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  "[A]n injury in fact requires an intent that is concrete rather than only 'some day' intentions[,] because some day intentions do not support a finding of the actual or imminent injury required to establish standing." *Id.* (cleaned up, quotations omitted).  Especially where "an injury rests on a claimed desire to travel somewhere, providing specific dates is crucial, as imminency would be 'stretched beyond the breaking point when … a plaintiff alleges only an injury at some indefinite future time.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992)).  Plaintiffs cannot establish standing "without description of concrete plans, or indeed even any specification of *when* the some day will be."  *Lujan*, 504 U.S. at 564.  None of the Named Plaintiffs has such concrete plans, and thus none can seek injunctive relief.

When no Named Plaintiffs have standing for injunctive relief, they cannot pursue injunctive relief on behalf of a class.  *McNair*, 673 F.3d at 223-27.  Defendants therefore should be granted judgment on Plaintiffs' injunctive relief claims.

## IX.    <u>CONCLUSION</u>

For the foregoing reasons, judgment should be granted to Defendants on all counts, and the Amended Class Action Complaint dismissed with prejudice.

Dated: December 18, 2023                    Respectfully submitted,

                                            **DUANE MORRIS LLP**

                                            */s/ Leigh M. Skipper*
                                            Leigh M. Skipper (PA #49239)
                                            Aleksander W. Smolij (PA #329521)
                                            30 South 17th Street
                                            Philadelphia, PA 19103
                                            Tel.: (215) 979-1157
                                            Fax: (215) 689-4939
                                            lmskipper@duanemorris.com
                                            awsmolij@duanemorris.com

                                            Michelle C. Pardo (*admitted pro hac vice*)
                                            John M. Simpson (*admitted pro hac vice*)
                                            Rebecca E. Bazan (*admitted pro hac vice*)
                                            901 New York Avenue NW, Suite 700 East
                                            Washington, DC 20001
                                            Tel.: (202) 776-7844
                                            Fax: (202) 478-2563
                                            mcpardo@duanemorris.com
                                            jmsimpson@duanemorris.com
                                            rebazan@duanemorris.com

                                            *Attorneys for SeaWorld Parks & Entertainment, Inc.
                                            and SeaWorld Parks & Entertainment LLC*