IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| QUINTON BURNS *et al.*,<br>    Plaintiffs,<br><br>       v.<br><br>SEAWORLD PARKS &<br>ENTERTAINMENT, INC., SEAWORLD<br>PARKS & ENTERTAINMENT, LLC.<br>AND JOHN DOES 1,2,3 AND 4,<br>    Defendants. | CIVIL ACTION<br><br><br><br><br>NO.  22-2941 |

## MEMORANDUM OPINION

Defendants SeaWorld Parks & Entertainment, Inc. and SeaWorld Parks & Entertainment, LLC (collectively, "SeaWorld") move to strike the report and testimony of Plaintiffs' expert, Dr. Michael L. Lindsey, who interviewed the named plaintiffs in this case (the "Plaintiff Parents"), many of their children (the "Plaintiff Children"), and other family members to assess the extent to which they suffered trauma from the alleged racial discrimination that they suffered at Defendants' property, Sesame Place Philadelphia ("Sesame Place"), pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 759 (1993).  For the reasons that follow, that motion will be granted in part and denied in part.

**I.       BACKGROUND**

This case arises out of Plaintiffs' visits to Sesame Place, a SeaWorld property, and the alleged racial discrimination that they suffered there.  Plaintiffs—Black and Hispanic parents and their children—allege that, when they visited the park, costumed character performers refused to interact with them in favor of similarly situated white children.  According to Plaintiffs' disclosures, Fed. R. Civ. P. 26(a)(2), Dr. Lindsey was retained to opine on "the extent to which racial discrimination, experienced by Plaintiffs, psychologically and traumatically impacted"

them and "the therapeutic needs Plaintiffs will have over the course of their respective lifetimes." Dr. Lindsey is a lecturer in the Psychology Department at Southern Methodist University in Dallas, Texas and the President of Nestor Consultants, Inc., which offers multiple services, including psychological evaluations and diversity trainings. He received a juris doctor from Villanova Law School and a PhD in Clinical Psychology from Hahnemann University. He has taught classes on, among other topics, developmental psychology, child psychology, research methods, and the role of ethics and diversity in psychology. He is a member of the American Psychological Association's ("APA") Law and Society Division and is a member of the planning committee for the International Academy of Law and Mental Health.

To help form his opinions, Dr. Lindsey interviewed the named Plaintiffs and some of their family members and compiled reports of his observations. (Not every child who visited Sesame Place, however, was interviewed.) He conducted "each" of these interviews "exactly" according to an interview protocol that asked questions of both the children and parents in the room. That extensive script included questions directed at the children who were allegedly discriminated against and their parents. The questions for those children included:

> 23. Do you know why we are here today?
> 24. Did you know about Sesame Place before you all went for a visit?
> 25. What did you know about it?
> 26. Did you know any of the Sesame Place characters before you went to visit?
>
> . . .
>
> 36. Can you tell me what was fun about the visit?
> 37. Did anything happen while you were there that you didn't like?
> 38. Can you tell me more about it?
> 39. What happened next?
> 40. Did the Sesame Street character do anything that made you feel they did not want to play with you?
> 41. Did anyone say anything to the Sesame Place character?
> 42. Did you say anything?
> 43. Did your mom say anything?

> 44. How did it make you feel?
> 45. Do you still feel like that makes a person feel bad?
> 46. What do you think the Sesame Street character should have done?
> 47. Why?
> 48. How do you feel about the Sesame Place character(s)?
> 49. Do you still feel that way today?
>
> . . .
>
> 53. Did you cry?
> 54. Were you sad?
> 55. Did you tell anyone about this when you went home?
> 56. Who did you tell?
>
> . . .
>
> 69. How has this experience changed how you might want to play with mascots at amusement parks?

Dr. Lindsey included additional questions to ask the Plaintiff Parents, both before and after interviewing their children, including:

> 15. [Interviewee:] please tell me what you saw that day?
> 16. How did it make you feel?
> 17. What did you observe in your child?
> 18. What were your thoughts then?
> 19. What were your feelings then?
> 20. What were your concerns for your child?
> 21. What were your fears (if any) for your child?
>
> . . .
>
> 25. Have you needed emotional support?
> 26. Did you receive therapy?
> 27. Do you think therapy for you would have been helpful?
> 28. Do you think therapy for your child would/was helpful?
> 29. What is your greatest concern for your child since the Sesame Place incident?
> 30. What is the greatest impact you have noticed on your child since the incident?

Dr. Lindsey testified in his deposition that this script was informed by the criteria in the Diagnostic and Statistics Manual – 5 ("DSM-5"), the widely used taxonomy of mental health disorders. The DSM-5 contains diagnostic criteria for post-traumatic stress disorder ("PTSD"),

3

which include the presence of certain "intrusion symptoms," such as recurrent "distressing memories" or "[d]issociative reactions (e.g., flashbacks), and "persistent avoidance of stimuli associated with the traumatic event(s)," which can manifest as "efforts to avoid activities, places, or physical reminders" of the event, "[m]arkedly diminished interest or participation in significant activities," or "[s]ocially withdrawn behavior."

Having conducted nine interviews of up to two hours, Dr. Lindsey prepared reports about each family.  The reports summarize his interviews and review relevant scientific literature on different forms of racism, their potentially traumatic consequences for both children and parents, and how cognitive behavioral therapy can address those consequences.  According to Dr. Lindsey, that research shows that "[r]acism should be conceptualized as a toxic stressor" that is "associated with internalizing and externalizing behaviors, anger, conduct problems, and delinquent behaviors in adolescents and preadolescents" or even "should be considered . . . a form of violence."  Dr. Lindsey also discusses institutional racism and concludes that "SeaWorld's costumed characters, by their behaviors of shunning and ignoring children of color, are representative examples of" widely accepted definitions of that term.  Most reports note that children in general have lived through a series of adverse childhood experiences ("ACEs") in recent years, including the COVID-19 pandemic, school shootings, hate crimes, and political polarization.

In each report, Dr. Lindsey notes that ACEs "may cause trauma," and "when an ACE occurs that does result in trauma," experts "without exception" recommend trauma-informed care.  Dr. Lindsey concludes that, in his "professional opinion . . . SeaWorld has created traumatic experiences for" the families involved.  He recommended therapy to the Plaintiff Parents "to assist them with an appreciation of the" ACEs to which their children were subjected

and to some of the children themselves. Moreover, he opined "SeaWorld must pay them for their immediate harm, allocate funds for the collateral mental and physical consequences of these experiences, and pay punitive damages to substantially and significantly discourage other similarly situated institutions from perpetuating such experiences."

## II. LEGAL STANDARD

Defendants' Motion is governed by *Daubert* and Federal Rule of Evidence 702. That rule provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus "impose[s] a 'trilogy of restrictions on expert testimony: qualification, reliability and fit.'" *Langbord v. U.S. Dep't of Treas.*, 832 F.3d 170, 194 (3d Cir. 2016) (quoting *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). The party proffering the expert must demonstrate compliance with Rule 702 by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

## III. DISCUSSION

SeaWorld challenges Dr. Lindsey's reports' compliance with all three *Daubert* requirements. For the reasons stated below, the company's motion will be granted in part.

### A. Qualification

SeaWorld first argues that, because he is not a licensed psychologist and does not maintain a clinical practice, Dr. Lindsey is not qualified to deliver his opinions as a matter of

law.  That is not the case because Rule 702's plain text does not tie the qualification requirement to licensing.  It merely requires that the expert have "scientific, technical, or other specialized knowledge . . . ."  Fed. R. Evid. 702(a).  These are "disjunctive" pathways to satisfying the qualification requirement.  *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998), *superseded by statute on other grounds as stated in Collins v. Prudential Inv. and Ret. Servs.*, 119 F. App'x 371, 379-80 (3d Cir. 2005) (not precedential).  The Third Circuit has "interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts."  *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal quotation marks and citation omitted).  Consistent with Rule 702's text, courts repeatedly have advised that lack of a degree or license affects the weight of an expert's testimony as determined by the jury, not his or her qualification.  *Calvetti v. Antcliff*, 346 F. Supp.2d 92, 112 (D.D.C. 2004) (collecting cases); *United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir. 1981) (per curiam).  Dr. Lindsey's lack of a professional license is not dispositive.  And while Dr. Lindsey does not have a clinical practice, he has extensive experience both lecturing on and researching issues related to developmental psychology and consulting on the precise type of psychological issues relevant to his reports.  That is sufficient to give him "skill or knowledge greater than the average layman" as necessary to qualify him as an expert per Rule 702.  *Waldorf*, 142 F.3d at 625 (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).

### B.  Reliability

Reliability, on the other hand, poses greater challenges to Dr. Lindsey's reports.  SeaWorld maintains that they are not based on "*any* methodology . . . let alone a methodology" that satisfies *Daubert* and its progeny.  And, further that they do not reliably show—indeed, they do not show at all—a causal relationship between the alleged racial discrimination Plaintiffs

suffered at Sesame Place and the trauma he says they have suffered.  Next, SeaWorld argues that Dr. Lindsey's decision to interview the plaintiff families in a group, without ever speaking with the children alone, renders his reports inadmissible.  Finally, SeaWorld takes issue with Dr. Lindsey's nearly identical recommendations that the Plaintiff Parents receive therapy.

*Daubert* requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) ("*Paoli II*") (quoting *Daubert*, 509 U.S. at 590).  That means that both the expert's methodology and his or her application of that methodology must pass legal muster. *Id.* at 745; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  That said, "the test of reliability is 'flexible,'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quotation omitted), and "[w]here scientific factors have little bearing to the nature of the expert testimony, a district court may base its decision on a proffered expert's technical or other specialized knowledge," *Walker v. United States*, 2006 WL 8458685, at *6 (E.D. Pa. Apr. 17, 2006) (citation omitted).  Moreover, reliability "must not be used as a tool by which the court excludes all questionably reliable evidence." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990) ("*Paoli I*").  "*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology.  Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).  The "ultimate touchstone" is simply "whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results." *Paoli II*, 35 F.3d at 744 (internal quotation marks and citation omitted).

The Third Circuit has identified several non-exclusive factors to aid that determination, including "whether a method consists of a testable hypothesis"; "whether the method has been subject to peer review"; "the known or potential rate of error"; "the existence and maintenance of standards controlling the technique's operation"; and "the relationship of the technique to methods which have been established to be reliable." *Id.* at 742 n.8; *see also United States v. Downing*, 753 F.2d 1224, 1238-39 (3d Cir. 1985). The party proffering an expert must "make more than a prima facie showing that his expert's methodology is reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247 (3d Cir. 2008).

### *i. Dr. Lindsey's Reasoning*

"[T]he requirement of reliability . . . extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Paoli II*, 35 F.3d at 743. Dr. Lindsey's reports contain three separate findings, the last of which drives his recommendations that the Plaintiffs receive therapy and, especially, punitive damages:

1. His professional experience and the scientific literature show that, in general, ACEs "may cause trauma."
2. According to that literature, when ACEs in general "do[] result in trauma," they should be treated with trauma-informed care.
3. Based on Dr. Lindsey's "professional opinion . . . SeaWorld has created traumatic experiences for these identified family members."

Implicit in his final finding is: (1) that what allegedly happened to the Plaintiff Children at Sesame Place constituted ACEs; (2) that those ACEs are the sort, in general, that cause trauma; and, (3) that those individual ACEs in fact caused trauma for the Plaintiff Children. The question is whether these conclusions are "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation,'" *id.* at 742 (quoting *Daubert*, 509 U.S. at 590).

Not every step in Dr. Lindsey's analysis passes muster. His conclusions at the first step

8

in this chain are plainly based on a reliable methodology.[1]  As Plaintiffs point out, the APA has made clear that Dr. Lindsey's chosen method of assessment, a clinical interview, is a widely accepted tool for that purpose.  Even if, as SeaWorld argues, his script might not have constituted a "structured diagnostic interview" per the APA's handbook, this technique, although subjective, can still be sufficiently scientifically grounded to be reliable.  *Walker*, 2006 WL 8458685, at *6; *see also Blanchard v. Eli Lilly & Co.*, 207 F. Supp.2d 308, 316-17 (D. Vt. 2002) (citations omitted) (collecting sources noting that "[t]he reliability of expert opinion testimony based on psychiatric or psychological observation and analysis does not readily lend itself to evaluation using the specific *Daubert* factors").  Here, the interview protocol included several questions to both sets of interviewees aimed at understanding what happened to the Plaintiff Children at Sesame Place, how it made them feel at the time, and how they have processed the events since, all of which would help him, based on his decades of professional experience and interaction with the relevant scientific literature, evaluate whether they constituted ACEs.  Dr. Lindsey's conclusion that the events at Sesame Place constituted ACEs thus is "based on the methods and procedures of science," not just "subjective belief."  *Paoli II*, 34 F.3d at 742.

Next, SeaWorld's argues that Dr. Lindsey "neither provided nor followed any identifiable framework to assess which adverse experiences result in 'trauma.'"  Indeed, by Dr. Lindsey's

---

[1] SeaWorld also takes issue with a background premise that Dr. Lindsey included in his reports that it argues must be stricken.  In each of his reports, Dr. Lindsey says that the Plaintiff Parents "selected SeaWorld as a place of relief from pervasive community negativity."  When in his deposition asked whether any of the parents actually told him that they faced such "negativity," however, Dr. Lindsey admitted that this statement is based not on his interviews, but his background experience alone.  Indeed, an expert's "training and years of experience," standing alone, might not always be enough to make his or her opinions the product of a scientifically valid and properly applied methodology.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000).  But here, Dr. Lindsey based his premise on his knowledge of scientific research showing that, in his words, "racism is a pervasive issue in America."  His statement that the Plaintiff Parents wanted to use a trip to Sesame Place as "relief from pervasive community negativity thus is based on more than just his personal experience.  *Id.*; *see also United States v. Davis*, 397 F.3d 173, 178-79 (3d Cir. 2005).

own estimation, not all ACEs cause trauma, and the ACEs that do not cause trauma do not necessarily require trauma-informed care. Without a reliable method for determining whether the ACEs that Dr. Lindsey identified caused trauma in the specific instances he was tasked with examining, then, his conclusion that "SeaWorld created traumatic experiences for" Plaintiffs would not rest on a reliable basis. *See Joiner*, 522 U.S. at 146 (citation omitted) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). While in his deposition, Dr. Lindsey admitted that he did not go through any sort of scoring to determine whether the ACEs he identified through his interviews in fact were the kinds that cause trauma, he only declined to do so because, in his view, "the instruments that exist are not that rigorous, particularly for children." Clinical interviews like the ones Dr. Lindsey conducted remained, in his view, the primary basis for determining whether an ACE had caused trauma, even though SeaWorld identified multiple peer-reviewed tests that can be used to measure trauma in both adults and children.

This sort of dispute between the parties about the efficacy of a particular assessment method involves the weight, rather than admissibility, of an expert's testimony and thus is not grounds to strike it at this stage. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (explaining that the Federal Rules of Evidence "place[ ] the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination"); *Kannankeril*, 128 F.3d at 806. An expert's methodology "does not have to obtain general acceptance or be subject to peer review to be admitted under Rule 702." *Schneider*, 320 F.3d at 406. Here, Dr. Lindsey's interview protocol, albeit nonstandard, contained questions that plainly track the diagnostic criteria for PTSD contained in the DSM-5, which SeaWorld concedes is "the authoritative work on mental disorders," *United States v. Reed*,

796 F. App'x 119, 121 (3d Cir. 2019) (not precedential). It thus constituted a scientifically grounded means by which he could assess, in combination with his experience and review of the relevant scientific literature, whether the ACEs that the Plaintiff Children experienced are the type that would cause trauma.

Dr. Lindsey's methodology falters, however, at the final step in this logical chain. Here, his reports' findings shift in scope from the general to the individual, concluding that "SeaWorld has created traumatic experiences for these identified family members." Because his interview protocol contains no mechanism for assessing the causal link underlying this conclusion, Dr. Lindsey's reports were not based in the scientific method in this respect. *Paoli II*, 35 F.3d at 742. This conclusion "is connected to existing data only by [his] *ipse dixit*" statement. *Joiner*, 522 U.S. at 146. "[T]here is simply too great an analytical gap" between the data Dr. Lindsey collected and the opinion he is submitting. *Id.* (citation omitted).

Although Dr. Lindsey's interview protocol does contain plenty of questions that would allow him to elicit the Plaintiff Children's emotions and how they now relate to amusement parks, it does not contain any mechanism for isolating the causes of those sentiments. Dr. Lindsey's failure to ask the Plaintiff Parents about their children's psychosocial history is especially telling in this respect, given that he admitted in his deposition that "a clinician" would "want to get some sense of history and what [symptoms] may be predispositional." Here, he conceded, "[t]hose didn't exist." On top of that, he admitted in his deposition that he did not review Plaintiffs' videos of some of the interactions between the children and the costumed characters, which could have helped him better understand the severity of the ACEs being described. Nor can the scientific literature he cited bridge the gap at this step because these studies discuss the potentially traumatic impact of ACEs that involve racism, not the actual

11

traumatic nature of the ACEs that Dr. Lindsey identified. Accordingly, Dr. Lindsey's will not be permitted to testify on whether the ACEs he identified caused the symptoms of trauma that he observed.

He may, however, testify that, based on his scientifically based interview protocol, his review of relevant scientific literature, and his years of professional experience, the alleged discriminatory events at Sesame Place were ACEs of the sort that tend to cause trauma. He also is free to testify that, based on this information, the Plaintiff Children's symptoms are consistent with trauma. Finally, he can be questioned about his opinion that many of the interviewees and their family members would benefit from therapy. He cannot, however, attribute the symptoms he observed to the alleged discrimination that took place at Sesame Place alone.

### ii. Dr. Lindsey's Techniques

SeaWorld raises the concern that, by interviewing the parent and child plaintiffs together, Dr. Lindsey failed to "control for 'suggestibility'—a cognitive bias concept in which a child's response's may be influenced or contaminated by what parents or older siblings said about the events in issue or their feelings about said events"—and malingering—an interviewee's "incentive to exaggerate or confabulate symptoms or to distort the impact of actual symptoms." That may be, but this concern implicates Dr. Lindsey's credibility and is the province of the jury, beyond the scope of the *Daubert* inquiry. *Stecyk*, 295 F.3d at 414 ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination.").

Second, the phrasing and scope of Dr. Lindsey's recommendations do not render his reports inadmissible either. It does not follow from the fact that, as SeaWorld correctly points out, Dr. Lindsey made essentially the same recommendation for every Plaintiff Parent, whether interviewed or not, that he failed to engage in *any* "differentiation or . . . individualized

12

analysis." Indeed, in addition to these concededly materially identical recommendations, Dr. Lindsey's reports contain unique narratives of the interviews he conducted, including the responses from both the child and parent interviewees that inform his conclusions that what happened to Plaintiffs at Sesame Place constituted an ACE. As with the suggestibility and malingering concerns, the jury is free to draw conclusions from the significant overlap between Dr. Lindsey's reports, but this does not implicate the reliability analysis.[2]  *Id.*

### C. Fit

SeaWorld also argues that there is a "fit" problem in Dr. Lindsey's reports because his decision to "kick[] the can down the road by making a 'referral' to another mental health practitioner to determine . . . whether Plaintiffs have suffered emotional harm or racial trauma" renders them irrelevant. But this fact does not render them totally useless to the jury, so Dr. Lindsey's reports satisfy *Daubert* in this respect.

*Daubert* requires that an expert's testimony be "'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert*, 509 U.S. at 591); *see also United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010). An expert opinion's "scientific validity for one purpose" will not guarantee its "scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. In multiple instances, the Third Circuit has held that where an expert's testimony is purely speculative, it "offer[]s 'the beginning of a discussion and not the end,'" and the "fit" requirement is not satisfied. *UGI Sunbury*, 949 F.3d at 836 (quoting *In re TMI*, 193 F.3d at 670).

---

[2] The same is true of Dr. Lindsey's conclusion that some children who were not interviewed nonetheless would benefit from therapy, as his interview of their parents and review of the literature still could have given him a sufficient basis for offering that recommendation.

SeaWorld argues that the necessary fit is missing here because Dr. Lindsey stopped short of diagnosing any Plaintiff with a condition listed in the DSM-5. But the question of whether therapy (with or without a DSM-5 diagnosis) would be beneficial is relevant to questions that the jury will have to evaluate at trial. Given the "liberal" nature of the "fit" inquiry, *Schiff*, 602 F.3d at 173 (quotation omitted), Dr. Lindsey's reports will not be excluded on this ground.

### D. Legal Conclusions

SeaWorld also identifies multiple statements in Dr. Lindsey's reports that it argues are otherwise inadmissible as a matter of law. Dr. Lindsey's discussion of institutional racism includes a legal conclusion that SeaWorld argues must be stricken: "SeaWorld, by their behaviors of shunning and ignoring children of color, are representative examples of" individual or institutional racism. SeaWorld argues that the same must happen to Dr. Lindsey's discussion of damages, where he concluded that "SeaWorld must pay [Plaintiffs] for their immediate harm, allocate funds for the collateral mental and physical consequences of these experiences, and pay punitive damages to substantially and significantly discourage other similarly situated institutions from perpetuating such experiences."

Although "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), it is well established that "an expert witness is prohibited from rendering a legal opinion . . . because it would usurp the District Court's pivotal role in explaining the law to the jury," *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citations omitted). In general, concluding that a party is responsible for "institutional racism" would not in itself reach an ultimate issue in a case like this one because a Section 1981 plaintiff must prove that the defendant engaged in intentional discrimination, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982), a distinct concept from institutional or structural racism, *see generally Bronze Shields, Inc. v. N.J. Dep't of Civ. Serv.*, 667 F.2d 1074, 1094-95,

14

1097 (3d Cir. 1981) (Higginbotham, J., dissenting and concurring). But the definition of "institutional racism" that Dr. Lindsey tagged SeaWorld with here—including a description of "[i]nstitutional discrimination" as something that "*targets* specific, easily stereotyped, generalizable attributes of individuals" (emphasis added)—implies that the company acted with a degree volition that steers his conclusion too close to an ultimate issue in this case. This statement therefore must be stricken.

Similarly, where, as here, the availability of punitive damages tracks the scope of federal rights, *see Sec. and Data Techs., Inc. v. Sch. Dist. of Phila.*, 145 F. Supp.3d 454, 469 (E.D. Pa. 2015) ("Under Section[] 1981 . . . punitive damages are recoverable where the 'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))), opining on their appropriateness is a job for the fact finder, not an expert witness, *Berckeley*, 455 F.3d at 217. Thus, he may not opine on these issues at trial.

## IV. CONCLUSION

For the foregoing reasons, SeaWorld's Motion to Strike will be granted in part and denied in part.

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____
**WENDY BEETLESTONE, J.**