## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **QUINTON BURNS** *et al.*,<br>              **Plaintiffs,** | **CIVIL ACTION** |
| **v.** | |
| **SEAWORLD PARKS &<br>ENTERTAINMENT, INC., SEAWORLD<br>PARKS & ENTERTAINMENT, LLC AND<br>JOHN DOES 1, 2, 3 AND 4,**<br>              **Defendants.** | **NO.  22-2941** |

### OPINION

      Plaintiffs, a group of Black and Hispanic families who allege that they suffered racial

discrimination when they visited Defendants SeaWorld Parks & Entertainment, Inc.'s and

SeaWorld Parks & Entertainment LLC's (collectively, "SeaWorld") Sesame Place Philadelphia

("Sesame Place") theme park in Langhorne, Pennsylvania, move to certify a class seeking

declaratory and  injunctive relief aimed at protecting them and other similarly situated guests

from facing such discrimination.  Fed. R. Civ. P. 23(b)(2), 23(c)(4).[1]  For multiple reasons,

certifying a class action is not appropriate here, and Plaintiffs' motion will be denied.

### I.       BACKGROUND

      Sesame Place offers a number of attractions to visitors, among them amusement park

rides, pools, restaurants, parades, and meet-and-greets.  The latter two attractions allow visitors

opportunities to interact with costumed performers portraying characters from the Sesame Street

---

[1] Despite requesting in their Complaint "compensatory, actual, punitive, and statutory damages, including interest, in excess of $50,000,000[]", Plaintiffs' class certification motion proceeds under Federal Rule of Civil Procedure 23(b)(2) which entitles them only to damages that are "incidental to the injunctive or declaratory relief."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986).

television program such as Elmo, Big Bird, Grover, Telly Monster, Abby Cadabby, and Rosita.

Plaintiffs allege that the Sesame Place employees portraying these characters declined to interact

with their children and instead interacted with similarly situated White children.  Some of these

incidents were recorded and received significant public attention.  The interactions with these

costumed characters, however, were not the only instances of alleged racial discrimination.  For

example, one class member's child allegedly was not allowed to use a ride alone despite meeting

its height requirements, while White children who did not meet the height requirements were

allowed to.  Another family alleges that they had to wait to receive their food at a park restaurant

for much longer than White families did.

These allegations of racial discrimination implicate multiple departments at Sesame

Place: for example, the Operations Department runs the park's rides; the Culinary Department

manages the food and beverage options.  Most of Plaintiffs' allegations, however, focus on

employees of the Entertainment Department, which runs the parades and meet-and-greets.  The

record indicates that the department's employees were vested with a significant amount of

discretion in how they carried out their duties in the parades.  As an Entertainment Department

manager put it, costumed character employees were "instructed . . . to spread as much love as

possible" and "try to touch as many people as [they] can."  That said, he agreed that these

performers had "wide discretion" in how they went about that.  SeaWorld company policy

prohibits discrimination on the basis of race, and the leader of entertainment operations at

Sesame Place testified that their human resources orientation instructed that the policy applied to

"[a]nyone you come into contact with."  That training included some discussion of

discrimination and harassment.

At the outset, Plaintiffs' lawsuit alleged violations of 42 U.S.C § 1981 and several forms

of negligence under Pennsylvania law.  Following SeaWorld's motion to dismiss, only the Section 1981 claim and Plaintiffs' claim for negligence *per se* remained.  *Burns v. SeaWorld Parks & Ent., Inc.*, 675 F. Supp.3d 532, 551 (E.D. Pa. 2023).  Following briefing on this Motion for Class Certification, however, Plaintiffs moved for leave to amend to resurrect their claim for negligent supervision, the motion for which the Court granted.  *Burns v. SeaWorld Parks & Ent., Inc.*, 2024 WL 1016363, at *8 (E.D. Pa. Mar. 8, 2024).

Plaintiffs' theory of liability is based in large part on how Sesame Place is staffed:  Many of the Entertainment Department's employees are students at high schools in Bucks County, Pennsylvania, where the park is located.[2]  Those high schools, Plaintiffs submit, suffer from an endemic culture of racism.  Plaintiffs maintain that, owing to Sesame Place's close working relationship with these schools and the surrounding area, it either knew or should have known about the extent of racism in this community.  Indeed, SeaWorld received complaints about racial discrimination at Sesame Place.  Nevertheless, say Plaintiffs, the park continued to hire from these schools and failed to implement any training on racism, implicit bias, or other similar concepts that could have alleviated the risk that their employees would discriminate against Black and Hispanic guests.  Plaintiffs contend that, having not received any training to address the biases that these employees had brought to work with them, they intentionally discriminated against those guests: When working as costumed characters, for example, they exercised their discretion in a racist manner.  Thus, according to Plaintiffs, SeaWorld was deliberately

---

[2] The record before the Court is rather thin when it comes to SeaWorld's hiring practices.  The Vice President of Human Relations at Sesame Place Philadelphia, who was involved in recruiting, used local high schools and colleges as a "starting point" for outreach, and also advertised for positions via social media.  She agreed with statements from other witnesses that employees of the Entertainment Department in particular were recruited from local high schools, but she did not testify with any specificity about recruiting practices in other departments such as Operations or Guest Relations.  Outreach to high schools would take place via either in-person recruiting sessions or by distributing flyers for the schools to put up themselves.

indifferent to and is liable for racial discrimination at Sesame Place under state and federal law.

The proposed class is represented by several families who allegedly faced racial

discrimination when they visited Sesame Place (together, the "Named Plaintiffs").  They are:

1. Quinton Burns and K.B.: Burns and his daughter visited Sesame Place from
   Baltimore, Maryland with two-day tickets in June 2022.  Burns testified that,
   during a parade, Sesame Place employees dressed in costume ignored his
   daughter, who is Black, but interacted with similarly situated White children.
   Moreover, at a meet-and-greet, Burns was told that the line to interact with a
   costumed character was closed, but, as he departed the line, he observed another
   White family still in line for the event.

2. Nathan Fleming and O.F.: Fleming and his family, including his daughter, visited
   Sesame Place from York, Pennsylvania with single-day tickets in July 2022.  He
   testified that, during a parade, a Sesame Place employee dressed as the character
   Telly Monster ignored his daughter, who is Black, but interacted with a similarly
   situated Asian child.  Other parade performers did not interact with O.F. either.

3. Lashonda Miles and M.C.: Miles, who is from Philadelphia, Pennsylvania,
   received tickets to Sesame Place from her cousin, who worked for SeaWorld at
   the time.  She and her family visited the park in June 2022.  She testified that,
   during a parade, a Sesame Place employee dressed as the character Rosita shooed
   away her son, who is Black, and hugged a nearby White girl.

4. Ingrid Morales and N.M.: The Morales family purchased single-day tickets to
   Sesame Place and visited the park from Philadelphia in July 2022.  Ingrid Morales
   testified that she and her daughter, who identify as Afro-Latina, attended a parade,
   where park employees dressed as the characters Big Bird, Grover, and Baby Bear
   ignored them while high-fiving other nearby White children.

5. Yoselis Romero and E.C.: The Romero family purchased single-day tickets to
   visit Sesame Place in June 2022.  Yoselis Romero testified that, during a parade,
   park employees yelled at her child for being past the point where audience
   members were allowed to stand.  On top of that, she testified that her daughter did
   not receive the same interactions from park employees dressed as the characters
   Zoe and Cookie Monster that nearby White children did.

6. Katie Valdez and M.L.: Valdez visited Sesame Place on a season pass in
   December 2021.  She testified that, during a parade, her son, who is Hispanic, was
   ignored by a Sesame Place character dressed as Abby Cadabby, who nonetheless
   interacted with similarly situated White children, including a boy right next to
   them.

7. <u>Ashley Valette and D.V.</u>: Valette and her family visited Sesame Place from West Hampton, New York in June 2022 using "Sunny Day" tickets, which the park gives out to visitors who purchased tickets for days with inclement weather.  They attended a parade, where she testified that a Sesame Place employee dressed as the character Grover initially moved towards her daughter, who is Black, but ultimately ignored her and interacted with White children next to them instead.

8. <u>Lauren Willie and L.W.</u>: The Willie family visited Sesame Place from Brooklyn, New York in July 2022 using season passes that they had purchased the previous month.  Willie testified that her daughter, who is Black, was ignored by a Sesame Place employee dressed as the character Rosita and another park employee, who instead took a picture with a White child.  Undeterred, Willie took her daughter to get a picture taken with Rosita at a subsequent meet-and-greet.  The same park employee who had been escorting Rosita earlier ended the meet-and-greet when the Willie family had gotten to the front of the line, allowing the White family in front of them to take a picture, but not them.  On top of that, Willie alleges that, when her family went to get food, her order took significantly longer to arrive than White families' did.

The contours of the class at issue have changed in important respects over the course of this litigation.  In their original complaint, Plaintiffs alleged that they represented a class of:

> All minority persons who since July 27, 2018 entered [into] contracts with SeaWorld for admission into Sesame Place who suffered disparate treatment from SeaWorld and/or its agents and/or employees by ignoring minority children while openly interacting with similarly situated white children.

The class that they now claim to represent, as slightly amended in their reply brief, is both narrower in some respects—in that certain racial minorities no longer are included—and far broader in others—in that it is no longer defined with reference to racial discrimination:

> All African-American or Hispanic persons who, since July 27, 2018, either directly or as third-party beneficiaries, entered into contracts with SeaWorld by purchasing admission tickets into Sesame Place Philadelphia.

Pursuant to Federal Rule of Civil Procedure 23(c)(4), Plaintiffs seek certification of this class to resolve "[w]hether SeaWorld intentionally refused to identify and address overt and/or implicit biases in its park employees, between 2018 and 2022, to ensure said biases would not be acted out upon the minority guests of the amusement park."  Fed. R. Civ. P. 23(c)(4).  And as remedies

for the discrimination that they allege, Plaintiffs request a court order that SeaWorld:

1. Employ an Injunctive Relief Manager who will review, revise, and post antidiscrimination policies on bulletin boards throughout the workspaces of Sea World's employees.

2. Maintain a confidential, toll-free employee hotline number for reporting concerns about racial discrimination, harassment, or retaliation that occurs at Sesame Place Philadelphia.

3. Require Sea World to provide continuing mandatory anti-discrimination and race equity training for all employees, which is to be monitored by the Injunctive Relief Manager or third-party entity experienced in conducting such trainings such as Race Forward and/or The National Conference for Community and Justice.  This course of training must be strategically customized to provide instruction on the history of race discrimination, the effect of systems of oppression and privilege in the United States, racial justice values, tools for combating structural racism in the workplace, and recognition of racial biases and racial equity. This course of training must also include practical application and concrete action items for Sea World employees to practice applying the race equity and non-discrimination concepts to their work duties.

4. Require the Injunctive Relief Manager to submit quarterly reports for a period of five years to the Court relating to Sea World's compliance with the Court's Judgment for Injunctive Relief.

## II.   LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)) ("*In re Hydrogen Peroxide*").  For a class to be certified, the Court must be "'satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met.'"  *Id.* at 309 (quoting *Falcon*, 457 U.S. at 161).  Here, Plaintiffs seek to certify an issue class action, whereby class-wide litigation is "maintained . . . with respect to particular issues."  Fed R. Civ. P. 23(c)(4).  In the context of a such an action, the Court thus must answer three questions: "First, does the proposed issue class satisfy Rule 23(a)'s requirements?  Second, does the proposed issue class fit within one of Rule 23(b)'s categories?  Third, if the proposed issue class

does both those things, is it 'appropriate' to certify these issues as a class?"  *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 2706 (2022) (citing Fed. R. Civ. P. 23(c)(4)).  Rule 23(a) has four prerequisites: (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) the named plaintiffs' claims and defenses must be "typical of the claims or defenses of the class" (typicality); and, (4) "the representative parties [must] fairly and adequately protect the interests of the class" (adequacy).  Fed. R. Civ. P. 23(a).  And, here, the class can be certified only if SeaWorld "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Id.* 23(b)(2). Therefore, the class must be sufficiently cohesive, and certification is improper where "adjudication of the case will . . . devolve into consideration of myriad individual issues."  2 Newberg and Rubenstein on Class Actions § 4.34; *see Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The moving party must "'prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," and "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 351).  And, it must do so by a preponderance of the evidence. *Russell*, 15 F.4th at 265 (citations omitted).  Analyzing a motion for class certification thus "calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met."  *In re Hydrogen Peroxide*, 552 F.3d at 307.  "[T]he district court must make

whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties . . . even if they overlap with the merits . . . ." *Id.* (citations omitted).

## III.   DISCUSSION

Plaintiffs have not carried their burden of proving numerosity under Rule 23(a)(2), cohesiveness under Rule 23(b)(2), or that their proposed issue is appropriate for certification under Rule 23(c)(4), so their motion will be denied.

### A.  Certification Under Rule 23(a)

#### i.      *Numerosity*

To be certified, a class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A putative class that has more than forty members generally clears this bar.  *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (citation omitted).  Like the rest of the requirements in Rule 23(a), "a court must be presented with *evidence* that would enable the court to" determine that it is more likely than not that the class is large enough.  *Id.* at 484 (emphasis added).  "Mere speculation as to the number of class members—even if such speculation is 'a bet worth making'—cannot support a finding of numerosity."  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 357 (3d Cir. 2013) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012)).  Put "more generally, where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone."  *Id.* at 358.

Thus, parties cannot satisfy numerosity by their say-so alone.  In one case in this district, the plaintiffs sought to certify a class consisting of all Black people who, within the limitations period, had "been terminated or . . . been denied employment . . . as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA as a result of a past

felony or misdemeanor conviction." *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 184 (E.D. Pa. 2009). As a matter of simple probabilities, no doubt more than forty people fit the bill. But, "[d]espite the existence of SEPTA's on-line application system, and despite the fact that Plaintiff has had ample opportunity to conduct class discovery" the court had not received "any informed estimate of how many people applied for or were terminated from bus or paratransit operators during the relevant time period." *Id.* at 187.

A similar proof problem is found here. To support numerosity in this case, Plaintiffs submit in their certification briefing that "there are currently approximately 100 class member families involving over 130 children," but they do not cite record evidence to support that assertion. Instead, they rely on an allegation from their operative Complaint and testimony that does not sufficiently support that statement. This mere "representation," as Plaintiffs describe it in their reply brief, does not in itself carry any evidentiary weight. *See Mielo*, 897 F.3d at 484; *United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970) ("We have repeatedly held that statements by counsel in briefs or in court are not evidence."). Plaintiffs' allegation in their operative Complaint that, "[w]ith over 1 million guests visiting Sesame Place Philadelphia each year," there are sure to be enough class members to satisfy Rule 23(a)(1) is exactly the sort of speculation that does not "support a finding of numerosity." *Hayes*, 725 F.3d at 357 (quotation omitted). The Third Circuit rejected a similar statistical argument in *Mielo*: it did not follow from the fact that there are between 14.9 million and 20.9 million people with disabilities in the United States "that at least 40 of those individuals would have experienced access violations at one of the Steak 'n Shake locations at issue" there. 897 F.3d at 486. Finally, because the proposed class is no longer defined with reference to instances of racial discrimination, Plaintiffs' citations to testimony about complaints of such discrimination that

Sesame Place received do not assist the numerosity inquiry.  Thus, Plaintiffs have not carried their burden of showing that the putative class is so numerous that joinder would be impractical.

"Were this the only defect in Plaintiff[s'] Motion for Class Certification, the Court would be likely to deny it without prejudice to allow Plaintiff[s] to provide some sort of estimate or viable claim of numerosity."  *Jackson*, 260 F.R.D. at 188 (citing *Bennett v. Corr. Med. Servs.*, 2008 WL 2064202, at *12 n.16 (D.N.J. May 14, 2008)).  Because Plaintiffs' Motion falls short in additional respects, however, the Court declines to do so.  *See id.*

### ii. Commonality

For any class to be certified, there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This means that the party seeking certification must show "that the class members have suffered the same injury . . . not . . . merely that they have all suffered a violation of the same provision of law."  *Dukes*, 564 U.S. at 349-50 (internal quotation marks and citation omitted).  Class members' "claims must depend upon a common contention . . . that . . . is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  Thus, what matters for this commonality inquiry is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (quotation omitted).  The inquiry focuses on the defendant's conduct, not that of the individual putative class members.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) ("*In re Warfarin*").  The commonality requirement "is easy enough" to satisfy, and it can be met even when some class members have not been injured, have somewhat different claims, or have "claims [that] were arguably not even viable"  *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 427 (3d Cir. 2016) ("*In re NFL*") (quoting *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) ("*In re Cmty. Bank*")).

Plaintiffs have identified a plethora of putative common questions of law or fact, including "whether Defendants knew of the systemic racism that exists in Bucks County, Pennsylvania, particularly in its high schools where many of their park employees were enrolled," and "whether, despite this knowledge, Defendants hired teenagers from this racist culture and gave them wide discretion on how to interact with guests of Defendants' Sesame Place Philadelphia theme park," both of which are embodied in their proposed issue. In response, SeaWorld argues that these questions do not fit the bill because Plaintiffs' allegations bear a striking resemblance to those deemed insufficient in *Dukes*, the Supreme Court's seminal exposition of the commonality requirement. In that SeaWorld relies heavily on *Dukes*, it bears reviewing in some depth.

In *Dukes*, a putative nationwide class of current and former Wal-Mart employees alleged that the company had discriminated against them in pay and promotion decisions based on their gender in violation of Title VII of the Civil Rights Act of 1964. 564 U.S. at 342. At Wal-Mart, these decisions were "generally committed to local managers' broad discretion, which is exercised in a largely subjective manner." *Id.* at 343 (internal quotation marks and citation omitted). The plaintiffs argued that, because the company was aware "that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees," its "refusal to cabin its managers' authority amounts to disparate treatment" in violation of the law. *Id.* at 344-45.

The Supreme Court held that this class could not satisfy the commonality requirement. The plaintiffs had to deliver "[s]ignificant proof that Wal-Mart operated under a general policy of discrimination." *Id.* at 353 (quotation omitted). That proof was lacking in part because a "'policy' of *allowing discretion* by local supervisors over employment matters . . . is just the

opposite of a uniform employment practice that would provide the commonality needed for a

class action; it is a policy *against having* uniform employment practices." *Id.* at 355.  And

because the plaintiffs "ha[d] not identified a common mode of exercising discretion that

pervades the entire company," Rule 23(a)(2) had not been satisfied.  *Id.* at 356.  "Other than the

bare existence of delegated discretion, [the plaintiffs had] identified no 'specific employment

practice'—much less one that ties all their 1.5 million claims together.  Merely showing that

Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice."

*Id.* at 357.  To satisfy the commonality requirement, the discretion exercised must have acted

upon the class in a common manner.  *See, e.g.*, *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105,

113 (4th Cir. 2013).

       *Dukes* therefore would foreclose certification of a class in this case pressing violations of

Section 1981 alone.  The statute "offers relief . . . when racial discrimination impairs an existing

contractual relationship, so long as the plaintiff has or would have rights under the existing or

proposed contractual relationship."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476

(2006).  Plaintiffs' theory of liability under Section 1981 is, in essence, that their contractual

rights were "impair[ed]," *id.*, via the myriad unique ways in which costumed characters

exercised their "wide discretion when interacting with minorities."  Because here, as in *Dukes*,

SeaWorld has a policy against racial discrimination, which the record indicates applies both to

employees' interactions with one another and with park guests, there is no "glue holding the

alleged *reasons* for all those decisions" by Sesame Place employees "together."  *Dukes*, 564 U.S.

at 352.  Because *Dukes* requires there be a common question the "truth or falsity" of which "will

resolve an issue that is central to the validity of each one of the claims in one stroke," *id.* at 350,

certifying a class to address SeaWorld's potential violation of 42 U.S.C. § 1981 would be

inconsistent with Rule 23(a)(2).

But Plaintiffs press a negligent supervision claim as well, and they seek to certify their class to resolve a narrow issue that relates to that claim. Fed. R. Civ. P. 23(c)(4). Unlike their Section 1981 claim, Plaintiffs' negligent supervision claim does not depend solely on the ways in which Sesame Place employees exercised their discretion in interacting with Plaintiffs. Instead, it is predicated on systemic failures by Sesame Place's management in hiring, monitoring, and training, and *Dukes* therefore is inapposite. To prevail on a negligent supervision claim, Plaintiffs must show that, *inter alia*, SeaWorld "kn[ew] or ha[d] reason to know of the necessity and ability to control [its] employee[s]." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013) (citations omitted). Whether Plaintiffs can make that showing depends on multiple questions of fact common to the class, such as: (1) the extent to which SeaWorld was aware of alleged pervasive racial discrimination in Bucks County, Pennsylvania, high schools given its close relationship with those schools; and, (2) what—if any—standard pre-hiring investigation into the park's new hires took place, especially whether they had been involved in any incidents involving racial bias. To be sure, the alleged incidents of racial discrimination that led to this lawsuit are a product of how Sesame Place employees exercised delegated discretion, and how those employees did so would not be "capable of classwide resolution." *Dukes*, 564 U.S. at 350. But Plaintiffs' proposed issue class action aims far higher up the corporate ladder, accusing SeaWorld of being, at best, willfully blind to the environment from which the park's junior employees were being hired. The truth or falsity of Plaintiffs' allegations on this score is the same for every member of the putative issue class.

Although Plaintiffs' Section 1981 claim no doubt implicates the Supreme Court's concerns in *Dukes* regarding the certification of a class whose members were discriminated

against in infinitely unique ways, "[f]or purposes of Rule 23(a)(2), even a single common question will do." *Marcus*, 687 F.3d at 597 (quoting *Dukes*, 564 U.S. at 359). Unlike their statutory claim, Plaintiffs' negligent supervision claim avoids the commonality pitfalls that many classes run into when they allege discrimination by lower-level employees exercising delegated discretion by focusing instead on what Sesame Place's leaders knew about those employees. Therefore, with respect to their negligent supervision claim only, Plaintiffs' proposed class satisfies the commonality requirement.

### iii. Typicality

Plaintiffs have satisfied the requirement that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

The typicality inquiry ensures that "the incentives of the plaintiffs are aligned with those of the class." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Thus, a court must "consider the attributes of the plaintiff[s], the class as a whole and the similarity between the plaintiff[s] and the class." *Marcus*, 687 F.3d at 598 (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009)). "This investigation properly focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp.*, 598 F.3d at 597-98. When a party seeks to certify a class only to resolve certain issues, as Plaintiffs do here, Fed. R. Civ. P. 23(c)(4), the comparison must be conducted "as to the issue proposed for aggregate litigation," not the entire class action. 2 Newberg and Rubenstein on Class Actions § 4:92; *see Russell*, 15 F.4th at 270. Typicality is assessed "in common-sense terms," *In re Schering Plough Corp.*, 598 F.3d at 598 (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006), and "even relatively pronounced factual differences will generally not

preclude a finding of typicality where there is a strong similarity of legal theories," *Baby Neal*, 43 F.3d at 58 (citation omitted), or "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001) (citations omitted).

SeaWorld attacks the Named Plaintiffs' compliance with Rule 23(a)(3) by pointing out that some of them might not have formed a contract with Sesame Place, in which case they would not be class members, rendering them atypical. *See Hayes*, 725 F.3d at 360 (citing *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962)) ("It is axiomatic that the lead plaintiff must fit the class definition."). First, the Valdez family entered Sesame Place via season passes (as opposed to single- or multi-day tickets) that, SeaWorld argues, included class action waivers that bar their participation in this suit. The company brought this issue up at the motion to dismiss stage, and while it was premature at that point to dismiss them from the case on this ground, *Burns*, 675 F. Supp.3d at 550-51, at the class certification stage, the waiver poses a typicality problem in that it is a defense to the family's membership in the proposed class. Second, Lashonda Miles poses a separate contract-based typicality and adequacy issue, as SeaWorld argues her receipt of her tickets as a gift from a Sesame Place employee means she never, in the proposed class definition's parlance, "entered into [a] contract[] with SeaWorld by purchasing" a ticket to the park. Thus, Miles, too, might not be a class member. At the very least, whether, as Plaintiffs argue, Miles was a third-party beneficiary of the contract and thus herself is a class member presents a separate defense from much of the proposed class that makes her, like Valdez, atypical. *In re Schering Plough Corp.*, 589 F.3d at 598.

But this does not defeat compliance with Rule 23(a)(3) where, as here, "the remaining named plaintiffs have adequately shown typicality." *In re Bank of Am. Home Affordable*

*Modification Program (HAMP) Contract Litig.*, 2013 WL 4759649, at *8 (D. Mass. Sept. 4, 2013); *see also Houser v. Pritzker*, 28 F. Supp.3d 222, 245-47 (S.D.N.Y. 2014) (concluding that, while the portion of a class action alleging racial discrimination against Latinos could not satisfy typicality because no Latino class representative had standing, the African-American class representatives were typical of the group they purported to represent); *Valenzuela v. Ducey*, 329 F. Supp.3d 982, 990 n.1 (D. Ariz. 2018). That is the case because the rest of the Named Plaintiffs present no contract-based defenses to class membership,[3] and the issue class action that they press is: (1) predicated on nearly identical legal theories, *Baby Neal*, 43 F.3d at 58; and, (2) focused on SeaWorld's conduct alone, *Newton*, 259 F.3d at 183-84. Although Plaintiffs purport to represent a class including many individuals who never entered Sesame Place, let alone were discriminated against there, that poses no bar to certification where, as here, the typicality analysis is conduct with reference to Plaintiffs' proposed issue, *Russell*, 15 F.4th at 270, and that issue only seeks to determine what SeaWorld as an institution did (and did not do) in response to those alleged incidents. Thus, with respect to their proposed issue class action, Plaintiffs are typical of the class they wish to represent.

### *iv. Adequacy*

To grant a class certification motion, the class's representatives must be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Like typicality, the "primary purpose" of the adequacy inquiry "is 'to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class.'" *Duncan v. Governor of V.I.*, 48 F.4th 195, 209 (3d Cir. 2022) (quoting *In re Cmty. Bank*, 795 F.3d at 393).

---

[3] SeaWorld also cites testimony from Nathan Fleming that he "can't speak for all minorities" and could only represent Hispanic class members to the extent that they also identified as Black to suggest that he is atypical, too. Assuming *arguendo* that Fleming's statements pose a typicality problem, it is extinguished by the presence of other African-American and Latino class representatives. *Cf. Houser*, 28 F. Supp.3d at 245-47.

It thus "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), ensuring "the alignment of interests and incentives between the representative plaintiffs and the rest of the class," *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) (citations omitted).

On top of this requirement, "the adequacy inquiry tests the qualifications of the counsel to represent the class."  *In re Warfarin*, 391 F.3d at 532.  "Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)."  *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010).  That rule instructs that a court "must consider:"

> (i)   the work counsel has done in identifying or investigating potential claims in the action;
> (ii)  counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv)  the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  A court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  *Id.* 23(g)(1)(B).

For essentially the same reasons as discussed above, those Named Plaintiffs who are not subject to defenses to their class membership and who are typical of the class they purport, can adequately represent the class with respect to the narrow issue that they seek to resolve on a class-wide basis.  *See In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 198 (E.D. Pa. 2017) (citing *Amchem*, 529 U.S. at 625-26 & n.20) ("Typicality and adequacy, though separate requirements, are closely related and are often analyzed together.").[4]

---

[4] Because this is an issue class action, Plaintiffs need only satisfy Rule 23(a)(4) with respect to their proposed issue. *Russell*, 15 F.4th at 270; 2 Newberg and Rubenstein on Class Actions § 4:92.  It therefore is of no moment that, as SeaWorld points out, Plaintiffs' newer, broader class definition "includes people who purchased a ticket but never

As to the questions of whether class counsel are "'qualified, experienced and generally able to conduct the litigation,'" *Ninivaggi v. Univ. of Del.*, 2023 WL 2734343, at *6 (D. Del. Mar. 31, 2023) (quoting 1 Newberg and Rubenstein on Class Actions § 3:72); *see In re NFL*, 821 F.3d at 428, Plaintiffs have submitted as attachments to their reply brief the biographies of class counsel, which include experience in civil rights cases and complex litigation, including at least one class action. On top of that, counsel "have developed the claims at issue in this action and engaged in extensive discovery" and merits briefing over the course of almost two years. *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 346 (D.N.J. 2019). Through that process, they have demonstrated knowledge of the applicable law. *See id.* Therefore, the Court finds that they adequately represent the interests of the class under Rule 23(a)(4).

In sum, Plaintiffs' proposed issue class complies with the commonality, typicality, and adequacy requirements embodied in Rule 23(a), but they have failed to carry their burden with respect to the rule's numerosity requirement.

### B.  Compliance with Rule 23(b)(2)

Although, for the reasons discussed above, Plaintiffs' proposed class does not satisfy Rule 23(a), for purposes of completeness the Court analyzes the class's compliance with Rule 23(b)(2) as well. The rule provides that certification is proper only where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Third Circuit has long held that this means that "the class claims must be cohesive." *Barnes*, 161 F.3d at 143. In that Plaintiffs have not carried their

---

visited the park at all" and "those who purchased tickets, visited the park, and have no complaints of race discrimination," while every Named Plaintiff alleges such mistreatment. The proposed issue here focuses on SeaWorld's conduct and therefore does not implicate the conflicts that it argues preclude a finding of adequacy.

burden on this requirement, this is another reason why their Motion will be denied.[5]

The cohesiveness requirement "is well established." *Id.* "[S]ignificant individual issues"
cannot "pervade the entire action" for two reasons. *Id.* (citation omitted). First, "it would be
unjust to bind absent class members to a negative decision where the class representatives'[]
claims present different individual issues than the claims of the absent members present." *Id.*
(citation omitted); *accord Dukes*, 564 U.S. at 360 (observing that "[t]he key to the (b)(2) class is
the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the
conduct is such that it can be enjoined or declared unlawful only as to all of the class members or
as to none of them"). Second, without a cohesive class, "the suit could become unmanageable
and little value would be gained in proceeding as a class action . . . ." *Barnes*, 161 F.3d at 143
(citation omitted); *cf. Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015). Thus, where there
are "'disparate factual circumstances [among] class members,'" the class "may be unable to be

---

[5] SeaWorld also argues that the Named Plaintiffs do not have standing to seek injunctive relief because none of them
plans to return to the park. To seek injunctive relief, at least one named plaintiff must have standing to sue under
Article III of the United States Constitution. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)
(citations omitted); *accord Warth v. Seldin*, 422 U.S. 490, 502 (1975). Thus, Plaintiffs must establish, *inter alia*,
injury in fact, *i.e.*, that they are "likely to suffer future injury from defendant's threatened illegal conduct." *Roe v.
Operation Rescue*, 919 F.2d 857, 864 (3d Cir. 1990) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).
Standing is "determined at the outset of the litigation," *McNair*, 672 F.3d at 226; *accord Newman-Green, Inc. v.
Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as
they exist when the complaint is filed."). Although satisfied at the motion-to-dismiss stage, *Burns*, 675 F. Supp.3d
at 550-51, standing "represents a jurisdictional requirement which remains open to review at all stages of the
litigation," *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994).

Here, as was the case at the motion to dismiss stage, the Willie family has standing to sue. *Burns*, 675 F. Supp.3d at
550. Unlike some of their compatriots, the Willies purchased a season pass to Sesame Place allowing them to return
to the park prior to its expiration on January 2, 2023 (months prior to the Court's denial of SeaWorld's motion to
dismiss). That purchase "indicate[d] a non-speculative intent on their part to return to the park." *Id.* Moreover,
consistent with that allegation, Lauren Willie since has testified that, if SeaWorld were to let her know what sort of
new trainings had been implemented and invited her to observe how things had changed at Sesame Place, she would
be willing to return to the park. Although SeaWorld argues that the Willie family no longer has standing because
their season passes expired and were not renewed, the Court has held that a party "may establish standing through a
pleaded intention to return to a defendant's business 'but for the discrimination [they] would experience there.'" *Id.*
at 550 n.10 (quoting *Yucis v. Sears Outlet Stores*, LLC, 813 F. App'x 780, 787 (3d Cir. 2020) (not precedential)).
Lauren Willie's testimony establishes the necessary intent to return to Sesame Place. Thus, Plaintiffs have standing
to seek injunctive relief.

certified under Rule 23(b)(2)."  *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011)

(quoting *Carter v. Butz*, 479 F.2d 1084, 1089 (3d Cir. 1973)).

 As discussed above, Plaintiffs bear the burden of showing that certification would be

consistent with Rule 23.  *Russell*, 15 F.4th at 265; *accord Reyes v. Netdeposit, LLC*, 802 F.3d

469, 485 (3d Cir. 2015).  That extends to compliance with Rule 23(b) as well.  *Comcast*, 569

U.S. at 33.  Despite their unambiguous burden, Plaintiffs' briefing does not include much of any

argumentation in favor of cohesiveness.  Instead, their opening brief relies on Rule 23(b)(2)'s

plain language without reference to the cohesiveness requirement.  And in their reply brief, they

hang their collective hat on their commonality argument without explaining why their arguments

in favor of commonality map onto the separate cohesiveness requirement.  Their entire argument

in favor of cohesiveness in that brief is copied below:

> Defendants make two arguments supporting their contention that Plaintiffs'
> claims are not cohesive.  First, they argue each Plaintiff must prove the intentional
> racism was the but-for cause of their contractual injury.  Second, Defendants
> argue Plaintiffs cannot establish a "strong commonality of interests" required for
> a finding of cohesiveness because Plaintiffs claim individual monetary damages.
> These arguments fail for all the reasons set forth, *supra*, in Plaintiffs' reply to
> Defendants' failure of commonality arguments.

To be sure, "[t]he cohesion requirement is not wholly separate from the previous inquiry" under

Rule 23(a), including commonality.  *S.R. ex rel. Rosenbauer v. Pa. Dep't of Hum. Servs.*, 325

F.R.D. 103, 111 (M.D. Pa. 2018).  But they remain separate requirements for class certification.

The Supreme Court has fashioned clear instructions for Plaintiffs: they must carry their burden

with respect to both components of Rule 23.  *Comcast*, 569 U.S. at 33.  In that Plaintiffs have

cited no legal authority to support the proposition that their proposed class is cohesive, they have

waived any argument in favor of their compliance with this requirement.  *See Burns*, 675 F.

Supp.3d at 548 (citing *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997)); E.D. Pa. Local

Civ. R. 7.1(c); *cf. Gates*, 655 F.3d at 271 (affirming denial of class certification where "[t]he trial court properly considered and rejected the arguments plaintiffs *did make*" (emphasis added)). Again, as with Plaintiffs' failings on numerosity, if there were no other defects in Motion, perhaps a denial without prejudice could be warranted. But, as will be explained below, the issue that Plaintiffs seek to resolve on a class-wide basis is not appropriate for such adjudication, so denial without prejudice is not merited.

### C.  Appropriateness of Certifying an Issue Class Under Rule 23(c)(4)

Plaintiffs seek to certify a class only to resolve one issue: "Whether SeaWorld intentionally refused to identify and address overt and/or implicit biases in its park employees, between 2018 and 2022, to ensure said biases would not be acted out upon the minority guests of the amusement park." That issue is not appropriate for certification, so Plaintiffs' Motion will be denied.

The Federal Rules of Civil Procedure vest district courts with discretion to certify a class "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "Selectively used, this provision may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." Manual for Complex Litigation (Fourth) § 21.24 (May 2023 Update). Thus, "Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to 'treat common things in common and to distinguish the distinguishable.'" *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004), *abrogated on other grounds as stated in In re Hydrogen Peroxide*, 552 F.3d at 318 n.18 (quoting *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)). Conversely, "[c]ertification is not appropriate if" it "would not make the case more manageable or serve the varied interests Rule 23 seeks to advance." *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1332 (E.D.N.Y. 1996)

(Weinstein, J.).  A court should exercise its discretion under Rule 23(c)(4) after conducting the

same "rigorous analysis" required for "any other certification determination under Rule 23."

*Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 201 (3d Cir. 2009).

      In *Gates*, the Third Circuit identified nine "non-exclusive" factors to guide courts in

deciding whether to certify such a class, derived from the American Law Institute's Principles of

the Law of Aggregate Litigation:

1. the type of claim(s) and issue(s) in question;
2. the overall complexity of the case;
3. the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;
4. the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;
5. the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);
6. the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;
7. the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;
8. the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and
9. the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Russell*, 15 F.4th at 268 (quoting *Gates*, 655 F.3d at 273).

      On top of these factors, in *Russell*, the Third Circuit appears to have added a threshold

inquiry.  There, the court noted that:

> *Gates* did not define which "issues" would be appropriate for class treatment or, more importantly, which would not.  Specifically, *Gates* did not answer whether the term "particular issues" in Rule 23(c)(4) could encompass claim elements (like duty or breach, or causation or reliance) and defenses (like consent or intervening cause), or if the "particular issues" that the district court could certify "when appropriate" must be limited to questions that would resolve a defendant's liability.

*Id.* at 268-29.  While *Gates* "[a]t several points . . . appears to suggest that the certified 'issues' should (perhaps except in exceptional circumstances) be able to resolve a defendant's liability," at other points, the opinion "suggests that claim elements *may* be appropriate for issue-class treatment in certain circumstances."  *Id.* at 269.  The Third Circuit thus held that in the latter set of cases—where the "issue[], once resolved, do[es] not resolve a defendant's liability"—certification is proper "provided that" doing so: (1) "substantially facilitates the resolution of the civil dispute;" (2) "preserves the parties' procedural and substantive rights and responsibilities;" and, (3) "respects the constitutional and statutory rights of all class member and defendants."  *Id.* at 270.  The implication from this rule is that, when presented with motions to certify classes to answer questions that do not wholly resolve liability, if these three preconditions are not satisfied, a district court need not apply the *Gates* factors because certification would not be appropriate under Rule 23(c)(4).[6]

Plaintiffs' proposed issue plainly implicates *Russell*'s threshold test.  The proposed issue would not address any component of SeaWorld's potential liability under Section 1981.  To prevail in such an action, the plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  Because the statute forbids intentional discrimination only, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982), SeaWorld's failure to "identify and address overt and/or implicit biases in its park employees" is not dispositive as to its liability on that claim.  Nor would the issue fully resolve

---

[6] Another way to conceptualize *Russell*'s holding is as identifying three "kinds of classes that may be certified" consistent with Rule 23(c)(4): "issues related to overall liability, particular elements of a claim, or issues that would substantially advance litigation."  *C.P. v. N.J. Dep't of Educ.*, 2022 WL 3572815, at *10 (D.N.J. Aug. 19, 2022) (citing *Russell*, 15 F.4th at 270).  The result is the same here under either approach, as Plaintiffs' proposed issue only implicates the final category and falls short of doing so.

SeaWorld's liability for negligent supervision, which requires proof that: (1) the defendant "fail[ed] to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment;" (2) the harm took place on the employer's premises; and, (3) the employer "knows or has reason to know of the necessity and ability to control the employee." *Belmont*, 708 F.3d at 487-88 (citations omitted).  Plaintiffs' proposed issue would address portions of the first and third elements of their claim but would fully resolve neither.[7]  For example, assuming *arguendo* that such "overt and/or implicit biases" existed, whether any Sesame Place employees *in fact* acted upon those biases against class members falls outside the proposed issue but is critical to SeaWorld's liability on the first element.  Without proof of "an intentional harm by an employee acting outside the scope of his employment," a negligent supervision claim fails.  *Id.* at 487.  Thus, Plaintiffs' proposed issue class implicates *Russell*'s three-part test.[8]

Applying that test, certification of an issue class action would not substantially facilitate the resolution of this case.  *Russell*, 15 F.4th at 270.  As was the case in *Gates* itself, the proposed issue implicates questions that "are not divisible from the individual issues."  655 F.3d at 273 (citation omitted).  There, the plaintiffs moved to certify an issue class regarding a company's liability to landowners whose properties it was accused of damaging.  *Id.* at 258, 272.  The company allegedly had "dumped wastewater containing vinylidene chloride into a nearby

---

[7] Neither party disputes that alleged discrimination took place on SeaWorld property.

[8] Plaintiffs argue that *Gates* and *Russell* are inapposite because their proposed issue class is focused on resolving their entire negligent supervision claim, as opposed to a specific issue within that claim.  This is unpersuasive for two reasons.  First, Plaintiffs rely only on district court caselaw to support that proposition.  *See Walney v. SWEPI LP*, 2015 WL 5333541, at *31 (W.D. Pa. Sept. 14, 2015), *class decertified*, 2019 WL 1436938, at *14 (W.D. Pa. Mar. 31, 2019).  Second, even if the Court were to adopt this interpretation of *Gates*, Plaintiffs' proposed issue would not fit within their own rule because it would not resolve key elements of their negligent supervision claim, such as whether class members suffered intentional racial discrimination.  *Belmont*, 708 F.3d at 487.

lagoon that seeped into an underground aquifer where it degraded into vinyl chloride, a carcinogen." *Id.* at 258.  From there, it "evaporated into the air . . . and was swept by the wind over" plaintiffs' properties.  *Id.*  The Third Circuit affirmed the district court's conclusion that certification was improper because determining whether the defendant dumped the carcinogen that seeped into the plaintiffs' aquifer would not resolve whether that was the cause of any diminution in their properties' values or the extent of that damage, both of which were individualized inquiries.  *Id.* at 272-73.

Plaintiffs' proposed issue presents analogous problems because the extent of SeaWorld's class-wide action (or inaction) "to address overt and/or implicit biases" leaves unresolved the individualized questions of: (1) with whom each Plaintiff interacted at the park; and, (2) when the company knew that it had a duty to take action with respect to the employee in question.  The answers to both questions are essential to SeaWorld's liability for negligent supervision.  *Russell*, 15 F.4th at 270.  First, for each class member, Plaintiffs will need to show that a specific employee committed an act of intentional racial discrimination.  *Belmont*, 708 F.3d at 488.  But the proposed issue focuses on SeaWorld's knowledge and conduct only, not its employees'.  Second, critical to every negligent supervision claim is when the employer was on notice to its employee's illicit tendencies.  *See Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 422 (Pa. 1968) ("[W]hat was [the employee's] conduct prior to [the date of the incident] and was it of such nature as to indicate a propensity for violence?"); *Nelson v. Loftus*, 2019 WL 175127, at *5 (E.D. Pa. Jan. 11, 2019).  But the proposed issue does not touch this set of inquiries, which would have to be conducted on an individualized basis.  Mere "refus[al] to identify and address," in Plaintiffs' terms, is not enough to implicate SeaWorld's duty of care—the employer must have "specific knowledge of" a specific employee-perpetrator's prior behavior.  *Hutchison ex rel.*

*Hutchison v. Luddy*, 742 A.2d 1052, 1062 (Pa. 1999); *accord Dempsey*, 246 A.2d at 422. Finally, how SeaWorld reacted (or failed to react) to their discovery of an employee's propensity to engage in racial discrimination might vary from employee to employee. All these individualized inquiries, and perhaps more, are inherent in Plaintiff's proposed issue class and make it unsuitable for certification. *See Gonzalez v. Corning*, 885 F.3d 186, 202-03 (3d Cir. 2018).

In this respect, this case in stark contrast to cases where the issue to be certified would advance resolution of the case. For example, in a complex antitrust case, it was proper to certify a class action where the proposed issues—for example, whether the defendant "engaged in anticompetitive and deceptive conduct" or "had a specific intent to monopolize"—all related to "the issue of anticompetitive conduct," which "is wholly severable from the issues of antitrust impact and damages." *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, 421 F. Supp.3d 12, 71, 77 (E.D. Pa. 2019). Resolving these issues would "require copious amounts of witness testimony, documents, and expert analysis, *all of which will be common to each individual class member*." *Id.* at 77 (emphasis added). That is not the case here because, as discussed above, the nature and extent of SeaWorld's "intentional[] refus[al] to identify and address . . . biases in its park employees" will vary depending on the employee with whom each class member interacted.

Issue class actions should "either obviate the need for further individual trials or . . . fairly and efficiently advance those individual trials by resolving multiple questions common to the class." *Id.* at 77-78; *accord Russell*, 15 F.4th at 270. Because this proposed issue class does neither, certification under Rule 23(c)(4) is improper.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification will be denied.  An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.