# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **QUINTON BURNS** *et al.*,<br>                    **Plaintiffs,**<br><br>           v.<br><br>**SEAWORLD PARKS &<br>ENTERTAINMENT, INC., SEAWORLD<br>PARKS & ENTERTAINMENT, LLC AND<br>JOHN DOES 1, 2, 3 AND 4,**<br>                    **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  22-2941** |

## <u>MEMORANDUM OPINION</u>

Defendants SeaWorld Parks & Entertainment, Inc. and SeaWorld Parks & Entertainment

LLC (collectively, "SeaWorld") move for summary judgment on Plaintiffs' racial discrimination

claims for negligence *per se*, as premised on a violation of 42 U.S.C. § 1981, and negligent

supervision arising out of events at Sesame Place Philadelphia ("Sesame Place"), a theme park

that the entities operate in Langhorne, Pennsylvania.  Fed. R. Civ. P. 56(a).  For the reasons laid

out below, SeaWorld's Motion will be granted in part and denied in part.

## I.      BACKGROUND

Except where noted below, the following facts are not in genuine dispute.[1]

---

[1] Two preliminary issues merit addressing.  The first is how to characterize some of Plaintiffs' responses to
SeaWorld's factual statements.  To call into question parts of SeaWorld's Statement of Undisputed Material Facts
(ECF No. 108-2), Plaintiffs say that, "while [they] do not dispute the testimony referenced [therein] is as stated,
[they] do dispute the veracity of those material fact statements."  These responses, Plaintiffs contend, "thereby
plac[e] them in dispute."  Not so.  When opposing summary judgment, "[t]he non-moving party may not merely
deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a
genuine dispute over a material fact."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)).  Plaintiffs' omnibus response does not cite any portion of
the record that places Defendants' statements into genuine dispute, so these statements are deemed undisputed.  *See
Araoye v. Vilsack*, 2024 WL 422076, at *1 (E.D. Pa. Feb. 5, 2024); *accord* Fed. R. Civ. P. 56(c), (e).

The second is the status of SeaWorld's Supplemental Statement of Undisputed Material Facts (ECF No. 131-1),
submitted in support of its Supplemental Motion for Summary Judgment (ECF No. 131), to which Plaintiffs did not
respond.  The Court's Policies and Procedures, referenced as part of the Scheduling Order in this case (ECF No. 36),
require the party opposing summary judgment to file a statement of disputed material facts and, where a fact is
purported to be in dispute, provide a citation to the record to support that view.  Where, as here, that party has failed
to do so, the movant's offered facts are deemed undisputed.  *See, e.g.*, *Lance v. Se. Pa. Transp. Auth.*, 2023 WL

### A.  Sesame Place

SeaWorld operates the Sesame Place theme park in Langhorne, Pennsylvania.  The park contains several attractions, including rides and opportunities to interact with employees dressed as characters from the Sesame Street television program ("costumed characters").  In particular, Sesame Place operates parades and "meet-and-greets" whereby visitors can interact with these costumed characters.  In meet-and-greets, a costumed character, accompanied by another Sesame Place employee who is not in costume (a "walk host"), will go to a specific location within the park so that guests can take pictures or videos with the character.  Guests form a line, which the walk host is responsible for cutting off after a certain amount of time has passed.  In general, meet-and-greets run for thirty minutes, but if the "real feel" temperature is at least 100 degrees Fahrenheit, they will run for only twenty minutes.  Many meet-and-greets are scheduled to end an hour before a parade so that the employee performing as a Sesame Street character can attend both events.  A parade is a twenty-five-minute, choreographed event involving costumed characters, floats, and dancers.  Costumed characters march along the route and are instructed to remain in front of the floats.  A parade includes three "show stops"—scripted performances by costumed characters along the route.  At these stops, costumed characters can interact with park guests who line up along the parade route, waving to, high-fiving, and hugging them.  (In 2022, because of low staffing, Sesame Place also ran "mini-parades," which ran for fifteen minutes instead of twenty-five and were not supposed to include any stops.)

Meet-and-greets and parades are run by employees of Sesame Place's Entertainment Department.  One former employee testified that the Entertainment Department maintains

---

5916464, at *2 n.3 (E.D. Pa. Sept. 11, 2023); *Farhangui v. Grossinger*, 2021 WL 37711, at *2 (E.D. Pa. Jan. 4, 2021).

seniority levels within it.  The most junior employees are generally responsible for meet-and-greets but not parades.  More senior members of the Entertainment Department would perform in the parades.  One such employee testified that he was given a few specific instructions on how to go about that performance.  For one, it was "a strict rule" that guests could not pass the yellow safety line that runs along the edge of the parade route to interact with the costumed characters, and vice versa.  If guests crossed the yellow line, employees were instructed to guide them back to a safe place to stand.  On top of that, the employees performing as costumed characters were supposed to spread out.  Two such characters tended to march together on opposite sides of the street; if one crossed the street, the other one had to as well so that they did not end up on the same side.  Because, as one costumed character performer testified, "the floats are continuously moving, it is impossible to [interact with] every single kid on both sides of the street at any given moment."

The Events and Production Manager at Sesame Place, Peter Schweizer, agreed that costumed characters are given wide discretion in with whom they interact at parades.  Consistent with that testimony, Sesame Place's President said that costumed characters were trained more generally in how to "embody[] who the character was" and "how to engage with . . . guests."  Beyond the choreography and safety protocols discussed above, however, the parties do not identify a specific park policy governing how Entertainment Department employees should go about those interactions.

### B.  The Park's Employees and the Surrounding Community

Sesame Place is located in Bucks County, Pennsylvania, which has a population of over 600,000.  The park recruited employees from the surrounding community, including local high schools.  The screening process for these hires varied depending on their age.  Those who were at least eighteen years old had to pass a background check before starting work.  Minors,

however, did not have to pass a background check until they turned eighteen.  At least with respect to minor employees who were students at Bucks County high schools, their schools were not permitted to disclose disciplinary information to Sesame Place.

Throughout this litigation, Plaintiffs have alleged that a significant portion of Sesame Place employees are from nearby towns, and that this region and its high schools suffer from endemic racism.  Nevertheless, Plaintiffs maintain that Sesame Place disregarded the racist environment in which their employees were steeped and placed them in positions where they could inflict their prejudices on racial minorities who visited the park.

A significant portion of Plaintiffs' theory rests on the testimony of Barbara Simmons.[2] Simmons is the former Executive Director of The Peace Center, an organization located in Langhorne, Pennsylvania that focuses on addressing racism and violence in Bucks County schools.  Starting in 2016, she kept a spreadsheet that compiled incidents of racism or other forms of discrimination that she heard about via emails or phone calls from community members.  Through May 2020, she documented and investigated 142 incidents of discrimination—including racism, ableism, and antisemitism—that were included in the spreadsheet from elementary schools, middle schools, high schools, and other locations in the area.  Thus, the spreadsheet includes incidents that did not involve local high schools, and some of the ones that did take place in Bucks County high schools did not involve student perpetrators. Although it is not clear from the record exactly what Simmons did to investigate each incident in the spreadsheet, in the aftermath of at least one event, she spoke with the victim's family and the

---

[2] SeaWorld argues that parts of Simmons's testimony is not proper from a lay witness under Federal Rule of Evidence 701 and that her spreadsheet is inadmissible double hearsay under Federal Rules of Evidence 802 and 805. The Court need not decide this issue because, as will be explained below, even if true and fully admissible, her testimony and spreadsheet do not offer a basis for denying summary judgment on Plaintiffs' negligent supervision claims.

school's principal and offered her support.

Based on her work, Simmons concluded that there is a "culture of racism"—in her words, one where incidents of discrimination are met with indifference by leaders such that "kids that are different don't feel safe"—in Bucks County. That said, she was unable to pinpoint whether there was a culture of racism at specific Bucks County high schools. Moreover, to Simmons's knowledge, the spreadsheet does not contain any incidents of racism that took place at Sesame Place or that involved a student from Bucks County who worked at Sesame Place, including those who are alleged to have discriminated against Plaintiffs. No supervisor at Sesame Place who was asked as part of this case had ever heard that Bucks County high schools had a reputation for being racist environments.

Whatever the cause, the record does show that there were complaints of racial discrimination by visitors to Sesame Place, although not necessarily involving costumed character performers prior to July 16, 2022. On that day, a video capturing an incident from a mini-parade involving a Sesame Place employee portraying the character Rosita went viral. In the video, Rosita can be seen walking along the parade route near the yellow safety line. Two Black girls approach Rosita, who had high-fived two people who appear to be White seconds before. Rosita then wags her finger at a person off-screen and at the two Black girls before passing them out of frame. This incident received significant nationwide news coverage.

### C. Plaintiffs' Visits to Sesame Place

Although the family whom Rosita turned away from is not a party to this case, Plaintiffs, a group of Black and Hispanic parents and their children who visited Sesame Place in 2021 and 2022, allege that they were treated similarly when they visited the park. Many of these interactions were recorded, and witnesses' discussions of these videos form an important part of the evidence here.

### *i. The Burns Family*

Plaintiff Quinton Burns and his daughter, K.B., visited Sesame Place in June 2022. While at the park, the Burns family attended a meet-and-greet to take a picture with the costumed character Abby Cadabby. When the family reached the front of the line, the walk host escorting Abby Cadabby told them that the line was now closed because the character had to get ready for an upcoming parade. Despite having been turned away from the meet-and-greet, Burns saw a White family get in line after it was supposed to be closed as he left to attend a parade. Later, at that parade, K.B. tried to interact with costumed character employees performing as Telly Monster and Ernie. K.B. reached out to touch Ernie, who high-fived many nearby White guests, but not K.B. Similarly, as Telly Monster bounded over to where K.B. was standing, the character reached out to a White guest right next to her. The Sesame Place employee performing as Telly Monster testified that he did not see K.B. as he was crossing the street. The Burns family has not returned to Sesame Place since this visit and does not have plans to do so.

### *ii. The Fleming Family*

Plaintiff Nathan Fleming and his family, including his daughter, O.F., visited Sesame Place on July 4, 2022. During a parade, a Sesame Place employee dressed as Telly Monster allegedly ignored his daughter, who is Black, but high-fived a nearby Asian boy. This came after a fifteen-minute period during the parade where Fleming "felt like [O.F.] was being overlooked . . . as far as like basic waves, gestures, high-fives." As Fleming saw it, the costumed character playing Telly Monster "was walking towards her in her line of sight with his hand out and then he . . . gave the high-five to the Asian kid." Instead of high-fiving O.F., however, Telly Monster "brushed" her hand, "but it wasn't like a high-five. It wasn't a pat or a respectful acknowledgement. It looked more like just a downward motion." From there, Telly Monster "just kept walking, doing his routine." Fleming saw "hundreds of kids" in the crowd at the

parade, and "most of them don't look like [O.F.], and there's a lot of acknowledgement . . . whether it had been touch or waves, that O.F. didn't get."  He conceded, however, that he had no way of knowing what the Sesame Place employee wearing the Telly Monster costume could see in the crowd.  The Fleming family has not returned to Sesame Place since this visit and does not have plans to do so.

### iii. The Miles Family

Plaintiff Lashonda Miles and her family visited Sesame Place in June 2022.  Miles testified that, at a mini-parade, a Sesame Place employee performing as the Sesame Street character Rosita "gave a little white girl . . . a hug, and basically walked past [her son] M.C.," who had his arms outstretched to embrace the character.  Miles believed that, along the parade route, costumed characters "have to show some type of recognition"—"[e]ither . . . a high five, a hug, or a wave"—to guests.  The Sesame Place employee performing as Rosita testified that he hugged the first girl in his path whom he came upon and then decided to wave to subsequent guests in order to keep the mini-parade moving.  He also testified that he in fact waved to M.C.'s sister, who had her hand outstretched to interact with Rosita.  The Miles family has not returned to Sesame Place since this visit and does not have plans to do so.

### iv. The Morales Family

Plaintiff Ingrid Morales and her daughter, N.M., both of whom identify as Afro-Latina, visited Sesame Place in July 2022.  She testified that, at a parade, costumed character employees performing as the Sesame Street characters Big Bird, Grover, and Baby Bear refused to interact with N.M. while engaging with nearby White children and their families.  While standing behind the yellow safety line along the parade route, N.M. put her hand up to high-five Big Bird, who did not reciprocate when walking by.  Big Bird did, however, interact with an apparently White child in a stroller nearby.  The employee performing as Grover behaved similarly with other

nearby guests whom Morales identified as White.

The employees who were performing as Big Bird and Grover testified that they did not see N.M. because the costumes that they were wearing substantially limit their peripheral vision (performers in these costumes see out of Big Bird's tie and Grover's mouth respectively). The employee who was performing as Baby Bear testified that he did not interact with N.M. because his colleague, performing as Telly Monster, had crossed the street to his side of the route, and at that point, his instructions were to cross to the other side. The Morales family has not returned to Sesame Place since this visit and does not have plans to do so.

### v. The Romero Family

The Romero family visited Sesame Place in June 2022. Plaintiff Yoselis Romero testified that, during a parade, park employees yelled at her child for being past the point where audience members were allowed to stand. On top of that, she testified that characters Zoe and Cookie Monster did not interact with her daughter, E.C., as fulsomely as they did with nearby White children. Specifically, while at the parade, while the Sesame Place employee performing as Cookie Monster gave other children "a full . . . blown hug," E.C. received only [a] quick tap in the air." Similarly, the employee performing as Zoe gave a "thumbs up" gesture towards E.C. while approaching or touching other children. The Romero family has not returned to Sesame Place since this visit and does not have plans to do so.

### vi. The Valdez Family

Plaintiff Katie Valdez visited Sesame Place on a season pass in December 2021. She testified that, at a parade, a Sesame Place employee performing as the character Abby Cadabby ignored her Hispanic son, M.L., while interacting with similarly situated White children, including a boy in a stroller next to them. Valdez noted that Abby Cadabby's failure to see M.L. is suspicious given that he is taller than the boy in the stroller with whom the character did

interact.  The employee who was performing as Abby Cadabby testified that, when M.L. approached her, he was outside of her limited field of vision—she sees out of the costume's mouth, which she testified was not pointed towards M.L. at any point—and before that, he was behind the group of children with whom she was interacting.

At the time of her visit to Sesame Place, Valdez had a season pass to the park, but it since has expired.  In her response to SeaWorld's interrogatories, Katie Valdez said that she last visited Sesame Place in August 2022.  In her deposition, Valdez conceded that she had no current plans to return to the park.  Months after that deposition was taken, however, Plaintiffs filed an affidavit from Valdez saying that she and her family visited Sesame Place in June, August, and December 2023, having received guest passes from a cousin who had a season pass to the park.  Valdez also wrote that the family had plans to visit Sesame Place for the 2024 Easter holiday.  The inconsistencies between these statements will be addressed below.

### vii. The Valette Family

Plaintiff Ashley Valette and her family, including her daughter, D.V., visited Sesame Place in June 2022.  The family attended a mini-parade, where she testified that a Sesame Place employee dressed as the character Grover initially moved towards her daughter, who is Black, but ultimately ignored her and hugged two White children next to them instead.  No other costumed characters interacted with Valette's children, but only the incident involving Grover forms the "basis" for Valette's suit.

The Sesame Place employee who was performing as Grover testified that she only chose to hug the White children in the video of this incident because they had stepped into the street beyond the yellow safety line.  A hug allowed her to usher the children to a safe position.  Once she had done so, she did not have time to interact with any other guests because, in a mini-parade, the costumed characters "have to keep moving."  Moreover, a float was approaching, and

Sesame Place rules mandated that she stay in front of the float.  The Valette family has not returned to Sesame Place since this visit and does not have plans to do so.

### viii.  *The Willie Family*

Plaintiff Lauren Willie and her family visited Sesame Place in July 2022 using season passes.  Willie testified that, while walking through the park, her daughter, L.W., who is Black, was ignored by a Sesame Place employee dressed as the character Rosita and her walk host, who instead took a picture with a White child.  Although L.W. ran towards Rosita, the character "skipped off to a place . . . 20, 30 feet away where a White child was standing and taking pictures with her parents and jumped in the picture" with them.  The Willie family later came across Rosita again at a meet-and-greet, and they took their place at the end of the line to see her. The same person who had been escorting Rosita previously cut the line off right before they would have been able to meet her and said that Rosita would not be seeing anyone else that day. No family was behind them at that point.  On top of that, Willie testified that, when her family purchased food at the park, it took much longer for their food to arrive than it did for other guests whom she believed to be White.  The employee performing as Rosita testified that she did not see L.W. running towards her, in large part because she was too short to be in her costume's field of vision.  The season passes that the Willie family used to enter Sesame Place that day have expired, and Lauren Willie testified that the family does not have plans to return to the park.

### D.  Procedural Background

Plaintiffs filed this lawsuit in July 2022, alleging that Sesame Place had violated the Civil Rights Act of 1866, 42 U.S.C. § 1981, and had committed several forms of negligence under Pennsylvania law.  They seek $50 million in damages and significant equitable relief, requesting that the Court order SeaWorld implement: (1) "rigorous mandatory cultural sensitivity training for its agents and/or employees;" (2) "mandatory educational courses for its agents and/or

employees on the history of discrimination against minority people in America provided by a mutually agreed upon nationally acclaimed expert in the field of African and minority History and Culture;" and, (3) "psychological screening methods for vetting their potential agents and/or employees to avoid hiring racially bigoted employees and agents, and to evaluate by appropriate psychological testing and behavioral history whether its existing agents and/or employees are racially bigoted who therefore should not be retained."

The Court dismissed most of Plaintiffs' state law claims, allowing their Section 1981 (and, thus, negligence *per se*) claims to proceed.  *Burns v. SeaWorld Parks & Ent., Inc.*, 675 F. Supp.3d 532, 551 (E.D. Pa. 2023).  The Court concluded that Plaintiffs allegation "that the costumed characters repeatedly ignored minority children while engaging with similarly situated White children . . . adequately alleged the impairment of a contractual interest for their Section 1981 claim to proceed."  *Id.* at 543.  Those claims and a claim for negligent supervision are before the Court on SeaWorld's Motion for Summary Judgment.[3]

## II.   LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

---

[3] Plaintiffs filed this case as a class action.  The Court denied their motion for class certification prior to addressing SeaWorld's Motion for Summary Judgment.  *Burns*, 2024 WL 1621337, at *14.  After Plaintiffs filed their motion for class certification, they moved for leave to amend to reincorporate their claim for negligent supervision, which the Court granted.  *Burns v. SeaWorld Parks & Ent., Inc.*, 2024 WL 1016363, at *8 (E.D. Pa. Mar. 8, 2024).

When the Court granted Plaintiff's motion for leave to amend, the Court rejected SeaWorld's argument, reprised here, that the Pennsylvania Human Relations Act preempts Plaintiffs' negligent supervision claims.  *Id.* at *3-5.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Material facts are those that could affect the outcome of the proceeding." *Roth v. Norfalco LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks and citation omitted).  Unless those facts are derived from evidence that would be admissible at trial, they cannot defeat a motion for summary judgment. *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 252 n.11 (3d Cir. 1999); *accord* Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

"Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning that "courts are required to view the facts and draw *reasonable* inferences" in favor of the nonmoving party (emphasis added)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

III.     DISCUSSION

   A.   Plaintiffs' Standing to Seek Injunctive Relief

As it has at other points in this litigation, SeaWorld argues that Plaintiffs do not have standing to seek injunctive relief.  Plaintiffs must establish that they have standing consistent with Article III of the United States Constitution for "each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)) (noting that "a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief").  In cases like this one with multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *accord Children's Health Def., Inc. v. Rutgers, State Univ. of N.J.*, 93 F.4th 66, 75 (3d Cir. 2024) (citation omitted).

Standing is "determined at the outset of the litigation," *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 226 (3d Cir. 2012), and was established for purposes of injunctive relief at the motion-to-dismiss stage, *Burns*, 675 F. Supp.3d at 550-51, as well as the class certification stage, *Burns v. SeaWorld*, 2024 WL 1621337, at *10 n.5 (E.D. Pa. Apr. 15, 2024), but it "represents a jurisdictional requirement which remains open to review at all stages of the litigation," *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994).  "At summary judgment, a plaintiff 'can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' establishing standing."  *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023), *petition for cert. filed*, No. 23-833 (U.S. Feb. 2, 2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)).

"To establish standing, a plaintiff must show an injury in fact fairly traceable to the challenged action that a favorable ruling may redress."  *Id.* (citation omitted).  The injury-in-fact

must be "actual or imminent, not conjectural or hypothetical." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The actuality or imminence requirement takes on outsize importance when, as here, plaintiffs seek injunctive relief." *Richard Roe W.M. v. Devereux Found.*, 650 F. Supp.3d 319, 327 (E.D. Pa. 2023). That is because, "[e]ven if the plaintiff has suffered a previous injury due to the defendant's conduct, . . . an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]'" *ZF Meritor*, 696 F.3d at 301 (quoting *Lyons*, 461 U.S. at 111). Thus, when suing to enjoin unlawful conduct, a plaintiff can meet his or her burden by, for example, proving the defendant's "intent to engage in the challenged conduct again," *Falcone v. Dickstein*, 92 F.4th 193, 204 (3d Cir. 2024), or their own "intention to return to a defendant's business 'but for the discrimination [they] would experience there,'" *Burns*, 675 F. Supp.3d at 550 n.10 (quoting *Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 787 (3d Cir. 2020) (not precedential)). "[A]bsent a sufficient likelihood that he will again be wronged in a similar way," however, a plaintiff cannot establish any special "entitle[ment] to an injunction . . . and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices" are unlawful. *Lyons*, 461 U.S. at 111.

SeaWorld argues that no Plaintiff intends to return to Sesame Place, so none can demonstrate that they are likely to suffer a sufficiently imminent injury as necessary to establish standing for injunctive relief. Indeed, it is undisputed that the Burns, Fleming, Miles, Morales, Romero, Valette, and Willie families have no intention of returning to the park.[4] That leaves the

---

[4] Thus, although they served as the hook for Plaintiffs' standing to seek injunctive relief at previous stages in this litigation, the Willie family no longer are the Plaintiffs on which standing to seek injunctive relief is premised.

Valdez family, the only family on whom Plaintiffs rely to establish standing for injunctive relief.

Katie Valdez originally testified that she and her family had no plans to return to Sesame Place,

but she filed a subsequent affidavit indicating that they intended to visit the park for the 2024

Easter holiday.  In general, "a single, non-conclusory affidavit or witness's testimony, when

based on personal knowledge and directed at a material issue, is sufficient to defeat summary

judgment." *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 230 (3d Cir. 2014) (citing *Kirleis

v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d Cir. 2009)).  At the same time,

however, "a party may not create a material issue of fact to defeat summary judgment by filing

an affidavit disputing his or her own sworn testimony without demonstrating a plausible

explanation for the conflict."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir.

2007) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)).

This "sham affidavit doctrine" is premised on the idea that the later-filed document

"indicates only that the affiant cannot maintain a consistent story or is willing to offer a

statement solely for the purpose of defeating summary judgment."  *Id.* at 253.  Thus, "[a] sham

affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier

deposition testimony, and therefore no reasonable jury could rely on it to find for the

nonmovant."  *Id.*

Accordingly, while Valdez's non-conclusory affidavit ordinarily would be sufficient at

the summary judgment stage to establish her family's intent to return to Sesame Place, *Lupyan*,

761 F.3d at 230 (citation omitted), absent "a plausible explanation for the conflict," it must be

disregarded in this respect, *Jiminez*, 503 F.3d at 251.  That explanation can come from

"'independent evidence in the record to bolster'" the affidavit, or from "a 'satisfactory

explanation' for the conflict between the prior deposition and the affidavit."  *Id.* at 254 (first

15

quoting *Baer*, 392 F.3d at 625; and then quoting *Hackman v. Valley Fair*, 932 F.3d 239, 241 (3d Cir. 1991)).

Here, the record can explain Valdez's statements in her affidavit, so it is competent evidence of her intent to return to Sesame Place.  In her deposition, Valdez testified that she and her kids "really love the park.  We enjoy the rides.  Everything is . . . for the kids, catered to them . . . ."  Even though she "was still very much upset" and "outraged," she nonetheless conceded that "[t]he park is amazing," and her children "love the characters."  Valdez thus has consistently maintained that, despite the "emotional trauma" of what transpired at the parade, which has led her to avoid those events on subsequent visits, she has positive feelings towards Sesame Place in general.  In light of this consistent attitude, it should not be surprising, that, even though she had no specific plans to do so when deposed, when presented with guest passes to the park multiple times in 2023 as her affidavit describes, Valdez jumped at the opportunity to bring her family again.  Nor should it surprise that she plans to purchase tickets to enter the park on another occasion.  The high regard Valdez has for Sesame Place's entertainment value for her family thus harmonizes her testimony and her subsequent affidavit.  *Jiminez*, 503 F.3d at 251.

Because her affidavit therefore is not a sham, it can be credited and thus defeats SeaWorld's Motion for Summary Judgment on this ground.  *Lupyan*, 761 F.3d at 230.  Therefore, based on Valdez's affidavit establishing her intent to return to Sesame Place, Plaintiffs continue to have standing to seek injunctive relief.

### B.  Section 1981 and Negligence *Per Se*[5]

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States

---

[5] Plaintiffs' negligence *per se* claims rise and fall with their claims under Section 1981.  Under Pennsylvania law, "[t]he concept of 'negligence *per se*' establishes the elements of duty and breach of duty where an individual violates an applicable statute, ordinance, or regulation designed to prevent a public harm."  *Maham v. Am-Gard, Inc.*, 841 A.2d 1052, 1058 (Pa. Super. 2003) (citing *J.E.J. v. Tri-Cnty. Big Brothers/Big Sisters*, 692 A.2d 582, 585 (Pa. Super. 1997)).  Thus, violation of a statute is a necessary, but not sufficient condition to sustain a cause of

shall have the same right . . . to make and enforce contracts . . . ."  42 U.S.C. § 1981(a).  The statute defines "mak[ing] and enforc[ing] contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).  "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' . . . under which the plaintiff has rights."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Additionally, the Supreme Court has clarified that "a plaintiff must . . . ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  At the summary judgment stage, however, the non-moving party can create a triable issue "by showing merely that [his or] her race was the '*likely reason* for the'" discrimination.  *Onely v. Redner's Markets, Inc.*, 2023 WL 6626120, at *5 (E.D. Pa. Oct. 11, 2023) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017)).

### *i. The Impaired Contractual Right*

The first issue in evaluating Plaintiffs' Section 1981 claims, then, is what, if any, contractual right SeaWorld abridged.  SeaWorld argues that summary judgment must be granted with respect to all of Plaintiffs' Section 1981 claims because the "right not to be discriminated against on the basis of race at Sesame Place" is not a right guaranteed by the contract between the park and Plaintiffs embodied in the tickets that they purchased and instead is protected by Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*  But, as was discussed at

---

action for negligence *per se*.  *See Sodders v. Fry*, 32 A.3d 882, 887 (Pa. Commw. 2011) ("[N]ot every violation of a statute constitutes negligence *per se* . . . ."); *McCloud v. McLaughlin*, 837 A.2d 541, 545 (Pa. Super. 2003) ("There can be no finding of negligence *per se* without there first being a statute that regulates conduct and an actual violation of that statute.").  As Plaintiffs maintain only one claim for violation of a statute designed to prevent a public harm—Section 1981, *see Hassett v. Dafoe*, 74 A.3d 202, 216 (Pa. Super. 2013)—where summary judgment is proper on that claim, it will be granted on the corresponding negligence *per se* claim as well.

length at the motion-to-dismiss stage, it is well established that the right Plaintiffs seek to vindicate is grounded in contract and thus is covered by Section 1981.  SeaWorld employees were accused of "repeatedly ignoring minority children while engaging with similarly situated White children."  *Burns*, 675 F. Supp.3d at 543.  By allegedly denying a privilege of being at Sesame Place to them that was "freely given to White patrons . . . SeaWorld performs its contracts with its White and minority patrons on different terms," which, if proven, would be a violation of Section 1981.  *Id.* at 541, 543; *cf. Valle v. Stengel*, 176 F.2d 697, 699, 703-04 (3d Cir. 1949).  This conclusion is law of the case and will not be revisited here.  *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232-33 (3d Cir. 2002) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).  True enough, Section 1981 does not vindicate claims by those who "were merely disappointed with the quality of the interactive events" in which they participated.  *Burns*, 675 F. Supp.3d at 542; *see Mayer v. Belichick*, 605 F.3d 223, 236 (3d Cir. 2010).  But Section 1981 does not allow entities to maintain a "policy deliberately adopted . . . to offer its services under different terms dependent on race" either.  *Hall v. Pa. State Police*, 570 F.2d 86, 92 (3d Cir. 1978).

Thus, where a contractual benefit—here, "interactions with the performers"—is "refused to minority patrons, but freely given to White patrons," *Burns*, 675 F. Supp.3d at 541, or "offer[ed]" to those patrons "under different terms," *Hall*, 570 F.2d at 92, a contractual right has been impaired, and Section 1981 is implicated.  Put differently, the contractual right Plaintiffs sue to vindicate here is not to a specific interaction with a costumed character.  Instead, Section 1981 protects the right of Sesame Place guests to the same interactions as would be offered to similarly situated guests of a different race.

### ii. *Proving SeaWorld's Impairment of the Right*

The next issue is how to prove the impairment of that right.  Here, the parties employ the

burden-shifting framework for proving intentional discrimination via indirect evidence from

*McDonnell Douglas Corp. v. Green*, 522 U.S. 792 (1983).[6]  Under that framework, each Plaintiff

bears the burden of establishing the *prima facie* case of racial discrimination, which in this

context requires they show that: (1) they are racial minorities (which is not contested here);

(2) SeaWorld intentionally discriminated against them, *Gen. Bldg. Contractors Ass'n, Inc.*

*v. Pennsylvania*, 458 U.S. 375, 391 (1982); and, (3) the "discrimination concerned one or more

of the activities enumerated in the statute (*i.e.* the making and enforcing a contract)," *Farmer*

*v. Am. Home Med. Equip. and Servs., Inc.*, 2018 WL 878367, at *4 (E.D. Pa. Feb. 14, 2018)

(italicization added) (quoting *McCrea v. Saks, Inc.*, 2000 WL 1912726, at *3 (E.D. Pa. Dec. 22,

2000)).

      Plaintiffs can prove intentional discrimination by pointing to "comparator" evidence, *i.e.*,

similarly situated White guests who were treated more favorably.  *See Golod v. Bank of Am.*

*Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (not precedential) (citing *Swierkiewicz*

*v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)); *cf. Abdul-Latif v. County of Lancaster*, 990

F. Supp.2d 517, 525-26 (E.D. Pa. 2014).  In this context, that means Plaintiffs can establish their

claim by pointing to evidence that other similarly situated guests of different races received

interactions with costumed characters while they did not.  Whether two individuals are similarly

situated is generally a question of fact for a jury unless "no reasonable jury could find that the

---

[6] As discussed *supra*, it is now well established that Plaintiffs must establish a but-for causal relationship between their races and the discrimination in contracting that they allegedly suffered.  *Comcast*, 140 S. Ct. at 1019.  The Third Circuit has accepted that *McDonnell Douglas* nonetheless can be applied to Section 1981 cases in the employment discrimination context.  *Williams v. Tech Mahindra (Ams.) Inc.*, 70 F.4th 646, 651-52 (3d Cir. 2023). District courts in this circuit, consistent with pre-*Comcast* precedent, have continued to do so in non-employment cases.  *E.g.*, *Calhoun v. TJM Trevose, LLC*, 2023 WL 5208853, at *3 (E.D. Pa. Aug. 14, 2023) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010)).  Other circuit courts have done the same.  *Doe v. Brown Univ.*, 43 F.4th 195, 208 n.9 (1st Cir. 2022).  The Court will follow these cases' and the parties' lead and do the same here.

individuals identified by the plaintiffs" fit the bill. *Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019) (not precedential) (citing *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)).

If the plaintiff establishes the *prima facie* case, the burden shifts to "the defendant to articulate a legitimate nondiscriminatory reason for" its actions. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999). If the defendant successfully does so, the burden shifts back to the plaintiff to put on evidence from which "a factfinder reasonably [can] infer that *each* of the [defendant's] proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the" discriminatory act. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff may not rebut that explanation "simply by arguing that the factfinder need not believe" it, but "adduc[ing] evidence directly contradicting the defendant's proffered legitimate explanations" is not necessary either. *Id.* Thus, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (citations omitted).

### iii. *Evaluating Plaintiffs' Claims*

#### a.   The Fleming, Miles, and Romero Families

With respect to the Fleming, Miles, and Romero families, SeaWorld presses essentially the same argument: to wit, that summary judgment is proper because these families' children were not refused interactions with costumed characters at all, let alone in contexts where similarly situated guests of other races received such interactions, so they were not deprived of any contractual right that Section 1981 protects and cannot establish their *prima facie* case.

20

### 1. The Fleming Family

A rational factfinder could conclude that the Fleming family has established their *prima facie* case of discrimination at the first step in the *McDonnell Douglas* framework.  As Nathan Fleming described it, Telly Monster appeared to be walking right towards O.F., but at the last second, the character "veered" to the left and brushed the hand of the Asian boy right next to her.  After that, Telly Monster, per Fleming, "brushed [her] off and just kept walking."  Given that Telly Monster did not approach the crowd in a straight line, a rational factfinder could infer that the employee inside saw O.F. and intentionally interacted with another guest because of their respective races.  *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002).  On top of that, the two children were quite close to each other, and the interaction between Telly Monster and the Asian boy was quite brief, so offering the same to O.F. would not have jeopardized the smooth operation of the parade, so a rational factfinder could consider the two children similarly situated.  Thus, it is in genuine dispute whether O.F.'s race was the "*likely reason*" for the refusal of the Sesame Place employee performing as Telly Monster to interact with her, thus establishing the *prima facie* case of discrimination.  *Carvalho-Grevious*, 851 F.3d at 253.

At the next step in the *McDonnell Douglas* framework, SeaWorld offers no legitimate, nondiscriminatory explanation for its employee's conduct.  Therefore, it is not entitled to summary judgment on the Flemings' Section 1981 claims.  *Jones*, 198 F.3d at 412.

### 2. The Miles Family

Much of the same can be said about the incident that gave rise to the Miles family's suit.  As discussed above, Rosita hugged a White girl who was standing right next to M.C. and then proceeded to walk past her.  SeaWorld argues that Rosita in fact waved at M.C. and her sister and, given that Lashonda Miles conceded in her deposition that a wave would count as an

interaction, this vitiates the family's Section 1981 claim.  But a rational factfinder could conclude: (1) that M.C. and her sister did not in fact receive such an interaction and instead were, as Miles testified, "shoo[ed]" away, *i.e.*, were refused an interaction; and, (2) when considered in the context of the hug that Rosita gave a nearby White girl, that race is a likely explanation for the employee's conduct.  *See Carvalho-Grevious*, 851 F.3d at 253.  A rational factfinder could conclude that M.C. and this White girl were similarly situated, so, like the Fleming family, the Miles family has established the *prima facie* case of discrimination.  *Hampshire*, 793 F. App'x at 80.

That said, unlike in the Flemings' case, SeaWorld has offered a "legitimate nondiscriminatory" explanation for its employee's conduct—the employee in the Rosita costume was performing in a mini-parade, meaning that it was imperative that he keep moving after hugging the White girl next to M.C., so he only waved to subsequent guests.  *Jones*, 198 F.3d at 412.  Therefore, the third step in the *McDonnell Douglas* burden-shifting framework is implicated here.  *Fuentes*, 32 F.3d at 764.

But Plaintiffs offer no reason to cast doubt on SeaWorld's explanation for what happened.  Therefore, any argument by Plaintiffs against summary judgment is waived with respect to Miles's and M.C.'s Section 1981 claims.  *See Dempsey v. Del. Dep't of Pub. Safety*, 359 F. App'x 347, 349 (3d Cir. 2009) (not precedential) (citing *Adair v. Charter County of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006)) ("Dempsey failed to argue before the District Court that DPS's articulated legitimate, nondiscriminatory reason for her discipline was a pretext for discrimination and has therefore waived that argument on appeal."); *cf. Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp.3d 571, 604 (E.D. Pa. 2017) ("[B]ecause Plaintiff's sole pretext argument concerns only her termination and she makes no attempt to establish pretext or 'but

for' causation with respect to any prior adverse action, she has waived any claim of retaliation concerning adverse actions occurring prior to her termination."). SeaWorld's Motion therefore will be granted with respect to the Miles family's claim under Section 1981.

### 3. The Romero Family

With respect to the Romero family, given the circumstances of their interaction with costumed characters at the parade they attended, no rational factfinder could conclude that E.C. was denied interactions that were given to similarly situated guests of different races. Thus, through neither alleged incident of racial discrimination can the Romero family establish their *prima facie* case, so summary judgment will also be granted on their Section 1981 claims.

First, as Yoselis Romero conceded in her deposition, the employee performing as Cookie Monster extended a hand towards E.C. and gave her "[a] quick tap in the air." While Cookie Monster did hug a White boy several feet away, this was consistent with Sesame Place training to guide a guest who has strayed beyond the yellow safety line back to where they are supposed to be standing. That boy thus was not similarly situated to E.C., and the hug he received cannot be considered a contractual benefit that was doled out on the basis of race.[7] *Golod*, 403 F. App'x at 702 n.2 (citation omitted). Second, Romero conceded in her deposition that Zoe gave E.C. a "thumbs up," so that character did not refuse to interact with her at all. Nor is there any evidence from which a rational jury could conclude that Zoe's less-than-fulsome interaction with E.C. was really a refusal to engage with her. Because it is undisputed that E.C.'s contractual rights were not impaired, the Romero family cannot establish the *prima facie* case of discrimination, and

---

[7] Relatedly, to the extent that the Romero family's claim is predicated on Sesame Place employees' yelling at E.C. for crossing that same line, SeaWorld has proffered a legitimate, nondiscriminatory reason for that conduct in that all guests, regardless of race, are required to stay behind the line. Because Plaintiffs offer no reason to cast doubt on that explanation, this incident cannot serve as a basis for denying SeaWorld's Motion for Summary Judgment either.

SeaWorld is entitled to summary judgment.[8]

b.  <u>The Burns, Morales, Valdez, and Willie Families</u>

Instead of arguing that the Burns, Morales, Valdez, and Willie families have failed to establish their *prima facie* case, SeaWorld focuses on the second step in the *McDonnell Douglas* framework, arguing that summary judgment is proper because the Sesame Place employees who interacted with their children could not see them, and Plaintiffs have failed to cast doubt on this "legitimate nondiscriminatory" explanation for what happened.  *Jones*, 198 F.3d at 412.  But what the costumed character performers could see is in genuine dispute, so, in most instances, this is not a valid basis for summary judgment as to these families.

*1.  The Burns Family*

With respect to the Burns family,[9] SeaWorld argues that, in that the only thing that Abby Cadabby's escort told him was that the line for a picture was now closed, they have offered a legitimate, nondiscriminatory reason for their employees' conduct.  Similarly, they argue that the employees performing as Telly Monster and Ernie could not see K.B. and therefore did not intentionally ignore her.

Summary judgment is proper regarding the Burns family's interactions with Abby Cadabby and her escort because Plaintiffs do not point to any reason to cast doubt on the legitimate, nondiscriminatory reason for her conduct that SeaWorld has proffered.  *Fuentes*, 32

---

[8] Plaintiffs' briefing also references interactions with an employee performing as a "Vampire" character, but Romero confirmed in her deposition that she is not suing over any interactions with that character.

[9] In Plaintiffs' Second Amended Complaint, it was alleged that SeaWorld discriminated against Burns and K.B. when costumed characters performing as the Sesame Street characters Elmo, Ernie, Telly Monster, and Abby Cadabby ignored K.B. at meet-and-greets because of their race.  Quinton Burns's concessions in his deposition, however, have narrowed this claim substantially.  He conceded that he had confused two Sesame Street characters and no Sesame Place employee dressed as Elmo had discriminated against K.B.  Moreover, Burns clarified that he is alleging that, at a meet-and-greet, the Sesame Place employee accompanying Abby Cadabby—not the costumed character themselves—discriminated against his child.

24

F.3d at 764.  In his deposition, Burns testified that he saw another White family remain in the line to meet Abby Cadabby after he was told that the line was closed.  He did not, however, see whether the family was able to interact with Abby Cadabby or if, instead, they were told, just as he was, that the line was closed.  Moreover, by Burns's own admission, this incident took place "just before the parade was ready to start," which is typically when meet-and-greets get cut off for costumed characters to perform in the parade.  If there was any evidence in the record that tended to show that this second family in fact interacted with Abby Cadabby, that would cast doubt on SeaWorld's proffered nondiscriminatory explanation for the escort's conduct.  Because there is no such evidence, however, and Plaintiffs do not attempt to rebut these legitimate, nondiscriminatory explanations for the incident, *Dempsey*, 359 F. App'x at 349, SeaWorld is entitled to summary judgment on this portion of Burns's Section 1981 claim.

The evidence with respect to K.B.'s interactions with Telly Monster and Ernie at the parade, however, is more mixed, so the remainder of the Burns family's claim must go to a jury. The employee who was performing as Telly Monster testified that he could not see K.B. Consistent with that statement, Schweizer testified that, based on his experience performing as the character, whoever is inside the Ernie costume sees out of its mouth, which was not pointed towards K.B. in the video of the interaction with Ernie that the Burns family recorded.  But in his deposition, Burns pointed out that K.B. was standing right next to another park guest whom Ernie and Telly Monster high-fived.  A rational factfinder could conclude, based on Burns's testimony, that these employees in fact could see K.B. if they were able to high-five the person directly next to her.  Therefore, with respect to K.B.'s interactions with Telly Monster and Ernie, Plaintiffs have cast sufficient doubt on SeaWorld's proffered legitimate, nondiscriminatory explanation for its employee's conduct such that summary judgment is improper.

### 2.  The Morales Family

SeaWorld's argument in favor of summary judgment as to the Morales family is similar and will be rejected for the same reason.  It points to testimony from the employee who was performing as Big Bird that the part of the costume out of which he could see—Big Bird's tie—was pointing away from N.M., so she never entered his field of vision.  Again, this is a legitimate, nondiscriminatory explanation for the employee's conduct that rebuts Morales's *prima facie* case at *McDonnell Douglas*'s second step.  *Jones*, 198 F.3d at 412.

But at the final step in the *McDonnell Douglas* framework, as with the Burns family, a rational factfinder could credit Plaintiffs' counter to that explanation.  *Fuentes*, 32 F.3d at 764.  Per Ingrid Morales, Big Bird was "extremely close to" N.M. but interacted with another guest right next to her.  The Sesame Place employees performing as Grover and Baby Bear acted in a similar manner.  From the close proximity between N.M. and the children with whom these costumed characters did interact with, a rational factfinder could conclude that the employees inside in fact could see N.M.  Therefore, SeaWorld is not entitled to summary judgment on the Morales family's Section 1981 claims.

### 3.  The Valdez Family

In the same vein, a rational jury could conclude that the Sesame Place employee performing as Abby Cadabby in fact could see M.L., who was lined up behind the children whom she hugged, so summary judgment is improper as to the Valdez family.  Although the employee's testimony that she did not see M.L. supplies SeaWorld with a legitimate, nondiscriminatory explanation for her conduct and thus rebuts the *prima facie* case at the second step in the *McDonnell Douglas* framework, *Jones*, 198 F.3d at 412, Katie Valdez's testimony casts sufficient doubt on it at its final step, so a jury should decide this issue.  In her deposition, Valdez placed M.L. right next to the child with whom Abby Cadabby interacted.  Moreover,

another former Entertainment Department employee testified that it was usually fairly easy to see out of the Abby Cadabby costume's mouth.  Taken together, this evidence could provide a jury with a reasonable basis to cast doubt on SeaWorld's proffered legitimate, nondiscriminatory reason for its employee's conduct, *Fuentes*, 32 F.3d at 764, so summary judgment will be denied as to the Valdez family's Section 1981 claim.

### 4.   The Willie Family

Next is the Willie family, who allege racial discrimination in an interaction with the costumed character performing as Rosita while walking through the park, during a meet-and-greet with the same character, and in access to dining options at Sesame Place.

SeaWorld appears to concede that the Willies have established their *prima facie* case of discrimination with respect to their first interaction with Rosita, offering two nondiscriminatory explanations for what happened.  *Jones*, 198 F.3d at 412.  First, it argues that summary judgment is proper because the person who was in the Rosita costume could not see L.W. when she ran up to her, because the costume blocks everything below the eyeline.  Second, it cites testimony by the employee in the Rosita costume that the White family with whom she interacted was standing at a mural where she often takes photographs with guests.  Plaintiffs are correct that, consistent with Willie's testimony, a rational jury could conclude that the Sesame Place employee in the Rosita costume in fact could see L.W., who "ran towards" Rosita from some distance and might not have been below the costume's eyeline the entire time.  They thus sufficiently have called into question the first of the park's two proffered explanations for Rosita's conduct.  *Fuentes*, however, is clear that "*each* . . . proffered non-discriminatory reason[]" must be successfully challenged at the final stage in the *McDonnell Douglas* framework if summary judgment is to be denied.  32 F.3d at 764.  In that Plaintiffs have failed to cast doubt on SeaWorld's second nondiscriminatory explanation for what happened to L.W.,

Plaintiffs have waived any argument against it. *Dempsey*, 359 F. App'x at 349.  Therefore, SeaWorld is entitled to summary judgment on this portion of the Willie family's claim.

The next incident that forms the basis for the Willies' Section 1981 claim took place at a subsequent meet-and-greet.  According to her testimony, Lauren Willie and her family lined up for the meet-and-greet immediately behind a White family, but the Sesame Place employee escorting Rosita told them that no more photographs would be taken because the costumed character had to get ready for an upcoming parade.  Willie believes that the escort recognized L.W. and her family from the previous incident.  Like the Burns family's case, SeaWorld has proffered a legitimate, nondiscriminatory explanation for this conduct: the line for the meet-and-greet was closed because Rosita needed to get ready for an upcoming parade, so the burden shifts back to Plaintiffs at the third step in the *McDonnell Douglas* framework.[10]  *Jones*, 198 F.3d at 412.  To do so, they argue that, even if it is generally the case that meet-and-greets need to be cut off so a costumed character can participate in a parade, a rational factfinder could conclude that is not what happened here because, per Willie's testimony, the incident took place an hour and a half before the next parade, *i.e.*, half an hour before the employee playing Rosita generally would have to get ready.  This would be contrary to the park's practice as established by the record here, so a rational factfinder could choose not to lend it credence.  *Fuentes*, 32 F.3d at 764.  Therefore, SeaWorld is not entitled to summary judgment on this portion of the Willies' Section 1981 claim.[11]

---

[10] SeaWorld also points out that meet-and-greets are ended after a set period of time for the costumed characters' safety.  While true, SeaWorld does not cite any portion of the record that indicates that this was the case with respect to the Willies' interaction with Rosita in particular, so this fact cannot serve as a race-neutral explanation for the employees' conduct in this instance.

[11] In her deposition, Lauren Willie also testified that her family appeared to receive food that they had ordered long after other White guests received them.  SeaWorld did not challenge this claim in its Motion for Summary Judgment.

c.   The Valette Family

SeaWorld argues that it is entitled to summary judgment on the Valette family's Section 1981 claims because even if Plaintiffs can establish the *prima facie* case of discrimination, safety, not intentional racism, led the employee performing as Grover to hug two White children next to D.V.  That employee testified that these children had strayed beyond where they were supposed to be standing.  As in the case of the Romero family, she hugged them and moved them back behind the yellow line for their safety.  This testimony is corroborated by park employees' descriptions of Sesame Place's policies regulating guest conduct at parades.  Therefore, SeaWorld has proffered a nondiscriminatory explanation for its employee's conduct that Plaintiffs must cast doubt on at the third step in the *McDonnell Douglas* framework.  *Id.*  And here, as with some other Plaintiffs, no argument at that step can be discerned.  Therefore, any such argument is waived, and SeaWorld is entitled to summary judgment on the Valette family's Section 1981 claim.  *Dempsey*, 359 F. App'x at 349.

In sum, summary judgment will be granted in part with respect to the Burns family's Section 1981 claim: only Burns's allegations relating to discrimination by the costumed character employees performing as Telly Monster and Ernie at a parade will go to trial.  Summary judgment similarly will be granted only in part on the Willie family's claims: only their allegations relating to food service and the incident at a meet-and-greet involving the employee escorting the costumed character Rosita will be presented to a jury.  Summary judgment will be granted in full on the Miles, Romero, and Valette families' Section 1981 claims.  Finally, summary judgment will be denied on the Fleming, Morales, and Valdez families' Section 1981 claims.

**C.  Negligent Supervision**

Plaintiffs' claims against SeaWorld for negligent supervision need not be analyzed on a

family-by-family basis because each fails for the same reason: no rational factfinder could conclude on this record that any Sesame Place employee was acting outside the scope of their employment when any alleged racial discrimination took place.

Critical to any negligent supervision claim is proof that the perpetrators of the intentional harm were "acting outside the scope of [their] employment." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013) (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (1968); *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107-08 (Pa. Super. 1998)).  In turn, Pennsylvania courts follow the Restatement of Agency to define the scope of one's employment, *McGuire ex rel. Neidig v. City of Pittsburgh*, 285 A.3d 887, 892 (Pa. 2022); *Justice v. Lombardo*, 208 A.3d 1057, 1067 (Pa. 2019), which bounds that scope by examining whether the at-issue conduct: (1) "is of the kind he is employed to perform;" (2) "occurs substantially within the authorized time and space limits;" and, (3) "is actuated, at least in part, by a purpose to serve the master." *McGuire*, 285 A.3d at 892 (citing Restatement (Second) of Agency § 228 (Am. L. Inst. 1958)).

Under this test, "even . . . intentional or criminal acts committed by the servant" can fall within the scope of one's employment. *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. 1979) (citations omitted).  That includes intentional acts of discrimination.  *See Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp.2d 740, 748 (E.D. Pa. 1998); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 757 (1998) (citation omitted) ("There are instances, of course, where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer.").  "[W]hether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury" unless "neither the facts nor the inferences to be drawn from them are in dispute." *Justice*, 208 A.3d at 1068.

Here, Plaintiffs make only conclusory arguments to defend their position that the alleged racial discrimination in this case took place outside of the costumed characters' scope of employment.  These "[d]enials in the form of legal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."  *SEC v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980) (citations omitted).  On the first element of the Restatement's test, Plaintiffs simply assert that "a dispute of material fact exists as to whether the discriminatory conduct . . . was of a kind and nature Defendants did not expect them to perform" without identifying what that dispute is.  And their argument on the third element, again bereft of citations to the record or caselaw, appears to proceed from the premise that racial discrimination can never be motivated even in part by a motivation to serve one's employer.  That position is inconsistent with Pennsylvania law.  *Kemether*, 15 F. Supp.2d at 748.

Because it is not in genuine dispute that Sesame Place employees were in fact acting within the scope of their employment when the instances of alleged discrimination took place, SeaWorld is entitled to summary judgment on all Plaintiffs' negligent supervision claims.

## IV.    CONCLUSION

For the foregoing reasons, SeaWorld's Motion for Summary Judgment will be granted in part and denied in part.  An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

**WENDY BEETLESTONE, J.**